1  Michael G. Marderosian, No. 077296 (mick@mcc-legal.com)
   Heather S. Cohen, No. 263093 (heather@mcc-legal.com)
2  MARDEROSIAN & COHEN
   1260 Fulton Mall
3  Fresno, CA 93721
   Telephone:  (559) 441-7991
4  Facsimile: (559) 441-8170

5  Virginia Gennaro, No. 138877
   City Attorney
6  CITY OF BAKERSFIELD
   1501 Truxtun Avenue
7  Bakersfield, CA  93301
   Telephone:  (661) 326-3721
8  Facsimile:  (661) 852-2020

9  Attorneys for:  Defendants CITY OF BAKERSFIELD, BAKERSFIELD POLICE OFFICER
                    RICHARD BITTLESTON (sued herein as R.  BITTLESTON), BAKERSFIELD
10                  POLICE OFFICER JUSTIN ENNS (sued herein as J.  ENNS), BAKERSFIELD
                    POLICE OFFICER CHAD OTT (sued herein as C.  OTT) and BAKERSFIELD
11                  POLICE OFFICER ADAM GARCIA (sued herein as A.  GARCIA)

12                           UNITED STATES DISTRICT COURT

13                        EASTERN DISTRICT / FRESNO DIVISION

14

15  MICHAEL WILSON,                        )   Case No.
                                           )
16              Plaintiff,                  )   **NOTICE OF REMOVAL OF CASE TO**
                                           )   **FEDERAL COURT BY DEFENDANTS**
17        v.                               )
                                           )
18  CITY OF BAKERSFIELD, BAKERSFIELD       )
    POLICE OFFICER R.  BITTLESTON          )
19  (#965); BAKERSFIELD POLICE OFFICER     )
    J.  ENNS (#1008); BAKERSFIELD POLICE   )
20  OFFICER C.  OTT (#1195); BAKERSFIELD   )
    POLICE OFFICER A.  GARCIA (#1183);     )
21  and DOES 1 to 15, inclusive,           )
                                           )
22              Defendants.                )
                                           )
23

24        Defendants CITY OF BAKERSFIELD, BAKERSFIELD POLICE OFFICER RICHARD

25  BITTLESTON, BAKERSFIELD POLICE OFFICER JUSTIN ENNS, BAKERSFIELD POLICE

26  OFFICER CHAD OTT and BAKERSFIELD POLICE OFFICER ADAM GARCIA (hereinafter

27  "Defendants") respectfully allege as follows:

28  ///

1.     On March 11, 2016, Plaintiff filed his Summons, Complaint and Civil Case Cover Sheet with the Kern County Superior Court.

2.     On March 14, 2016, Kern County Superior Court issued an Order to Show Cause re 3.110 hearing.

3.     On March 14, 2016, Kern County Superior Court issued the Summons.

4.     A copy of all of the pleadings in the Defendants' file are attached hereto as Exhibits 1 through 4 as follows:

| NO. | DATE | DOCUMENT | FILED BY |
|-----|------|----------|----------|
| 1 | 03/11/16 | Complaint | Plaintiff |
| 2 | 03/11/16 | Civil Case Cover Sheet | Plaintiff |
| 3 | 03/14/16 | Issued Summons | Plaintiff |
| 4 | 03/14/16 | Order to Show Cause Re 3.110 Hearing | Plaintiff |

5.     The only matters set for hearing in the Kern County Superior Court is the Order to Show Cause hearing on June 24, 2016, and a Case Management Conference on September 7, 2016.

6.     This Court has original jurisdiction over the claim against Defendants under 28 U.S.C § 1331 because district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

7.     The removal of this claim against Defendants to this Court is proper under 28 U.S.C § 1441(b) because any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties, or laws of the United States shall be removable without regard to the citizenship or residence of the parties and under 28 U.S.C § 1441(c) because the claims asserted against the Defendants are separate and independent.

8.     A copy of the Notice to Adverse Parties of Removal of Case to Federal Court which attaches this Notice of Removal of Case to Federal Court that will be filed with the Kern County Superior Court is attached hereto as Exhibit 5.

///

///

///

1         WHEREFORE, Defendants pray that this action be removed to this Court.

2 Dated: May 24, 2016               MARDEROSIAN & COHEN

3                                */s/ Michael G. Marderosian*

4              By:_____

5                    Michael G. Marderosian
                   Attorney for Defendants above-named.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF KERN

MAR 11 2016

TERRY McNALLY, CLERK
BY _____ DEPUTY

1  Frederick C. Kumpel,   #122073
   P. O. Box 2659
2  Bakersfield, CA 93303
   [physical: 6116 Castleton Street
3  Bakersfield, CA 93313  **NOTICE OF ASSIGNMENT AND**
   Telephone: (661) 599-9078   **CASE MANAGEMENT CONFERENCE** :
4  E-mail:  fredkumpel@sbcglobal.net  Assigned to SIDNEY P CHAPIN for all purposes.

5  Attorney for Plaintiff         SEP - 7 2016
                          Hearing Date: _____
6                          Time: _____

7                          Department: ____
                          See CRC Rule 3.720 Et. Seq.
8         SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN

9               METROPOLITAN  DIVISION

10
   MICHAEL WILSON,                  )  **Case No:**
11                                   )
            **Plaintiff,**           )   ECV-16 / ____ SPC
12                                   )
   **vs.**                           )
13                                   )
   **CITY OF BAKERSFIELD; BAKERSFIELD**   )      **COMPLAINT**
14 **POLICE OFFICER R. BITTLESTON (#965);** )
   **BAKERSFIELD POLICE OFFICER J. ENNS**  )
15 **(#1008); BAKERSFIELD POLICE OFFICER** )
   **C. OTT (#1195); BAKERSFIELD POLICE**  )
16 **OFFICER A. GARCIA (#1183);**         )
   **and DOES 1 through 15, inclusive,**  )
17                                        )
            **Defendants,**             )   **[Unlimited Jurisdiction].**
18 _____)

19 Plaintiff MICHAEL WILSON [ "Wilson"] alleges:

20                **GENERAL ALLEGATIONS**

21 **A.    Parties, Jurisdiction and Venue.**

22      1.    Plaintiff Wilson is, and at all times relevant to this action was, a resident of the

23 County of Kern, State of California.

24      2.    Defendant, CITY OF BAKERSFIELD ["City"] is an incorporated city located in

25 Kern County, California.  City operates the Bakersfield Police Department.

26      3.    Defendants BAKERSFIELD POLICE OFFICER R. BITTLESTON (#965);

27 BAKERSFIELD POLICE OFFICER J. ENNS (#1008); BAKERSFIELD POLICE

28 OFFICER C. OTT (#1195); BAKERSFIELD POLICE OFFICER A. GARCIA (#1183)

are, at all times relevant herein, police officers who work for and are a part of the Bakersfield Police Department.

4.     The injuries and damages suffered by plaintiff Wilson occurred in Kern County, California.

5.     The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants sued as DOES 1 through 15, inclusive, are unknown to the plaintiff, who therefore sues such defendants by such fictitious names.  Each of the defendants  designated as a Doe (or DOES)  is legally responsible in some manner for the events and happenings referred to in this  complaint, and legally and proximately caused injury and damages to the plaintiff as alleged.

6.     At  all times relevant to this action, the defendants, and each of them, were  the  agents  and employees of each of the remaining defendants, and were at all times acting within the purpose and scope of said agency and employment, and each defendant has ratified and approved the acts of its agent.  Each defendant ratified the conduct of the other defendants alleged herein.

B.     **Plaintiff Wilson and Factual Allegations.**

7.     Michael Wilson is a resident of Bakersfield, California. Date of Birth: August 1, 1950 (65 – years old).  Race: White. Height: 5 ft. 11 inches (as set forth in police report).

8.     Michael Wilson is a diabetic.  At  the  scene, on  April 6, 2015, blood sugar was 30 and a "few minutes later" was 38.  Normal blood levels in diabetics can fluctuate from 70 to 140.

9.     This incident of police  malfeasance  and  misconduct took place on April 6, 2015  at approximately 8:00 a.m..  Plaintiff was operating or had been operating Wilson's 1990 White Bronco (CA Lic. 3SUV932) at or near 6200 Block of Gosford Road in Bakersfield, California.

10.     On  the  morning  of April 6, 2015  Michael Wilson noted that, upon arising for the day, his blood sugar was elevated.  Wilson brought the blood sugar down to a normal level using a short acting insulin.  Mr. Wilson traveled to the jury

services office in order to get an extension of time for his jury duty obligation. The wait in line was long. Wilson walked back approximately five (5) blocks to Wilson's Bronco. Mr. Wilson started to drive home. Noting that his glucose level was dropping, Wilson opened a can of Glucerna. (Glucerna is a diabetic drink that helps manage blood sugar spikes.)

11.    At about this time, just after 8:00 a.m., still during morning daylight time, Mr. Wilson suffered a diabetic crisis. Wilson recalls seeing police lights behind him. Wilson pulled to the right side. Mr. Wilson has a recollection of his vehicle being stuck in the dirt; of opening his door; of looking at his tire which had no traction. At some point, Wilson finds himself on his knees facing his driver side door. Wilson tried to scratch his nose and could not. Mr. Wilson then heard a voice tell him, "you are in handcuffs." Mr. Wilson asked why (was Wilson in handcuffs). Wilson was told "a person called 911 and reported me [Wilson] driving and drinking a beer." Wilson was on his knees, handcuffed, beaten, and still confused at his circumstances.

12.    Claimant Michael Wilson was suffering diabetic medical episode and was in crisis while driving his vehicle. Police were called to the scene and at least four (4) officers failed to properly assess the diabetic crisis and pulled Wilson from his car – by pulling Wilson out of his driver's side window – and proceeding to beat Wilson. Wilson was beaten severely and taken to San Joaquin Hospital where Wilson was treated for Wilson's injuries. The Bakersfield Police (Officer A. Garcia #1183; Bittleston #965; Enns #1008; Ott #1195) aggravated matters by preparing a police report which contains false and suspicious entries. Wilson claims damages for violation of Wilson's rights and for the beating suffered at the hands of the Bakersfield Police. The officers around him were laughing and joking about someone [Wilson] being drunk so early in the morning – the officers were commenting on the drunk driver [Wilson] and the time of day. The police were able to enter the vehicle on the passenger side and secure the key and secure the vehicle despite falsely claiming that they, the police, were in fear of their own safety.

13.     Wilson was asked to breathe through a tube. Mr. Wilson complied.  A noticeable silence followed.  One of the officers then came over and stated, "It's a Glucerna, not a beer."  Another officer asked, "Should we call an ambulance?"  Mr. Wilson then said, "Call an ambulance."

14.     An ambulance was called and an EMT arrived. While in the ambulance, Mr. Wilson was told his blood sugar was 38.  Mr. Wilson was transported to San Joaquin Hospital Emergency Room.  Many people at the hospital were shocked and commented on Wilson's injuries and condition.

15.     Wilson  believes that certain parts of the police report are not credible. For example, any  comment  about an officer fearing for his safety is suspect.   The fact that Wilson was apparently pulled through his driver side window by police suggests the officers are poorly trained to assess and handle this type of situation.

16.     Mr. Wilson is a white  male  who was driving a Bronco early in the morning at the time of the incident – a much more  likely assessment of the situation is  that  a medical crisis was in progress and not that Wilson was a drunk who deserved a beating at the hands of police.  The police beat, handcuffed, and humiliated Wilson.

17.     Wilson was treated and has made a recovery from physical injuries. However the anger, trauma  and  emotional  upset from the incident remain problematic at best.  The fear of any future encounter with police remains a real concern for Wilson.

18.     Wilson's civil rights were violated. The officers were negligent in handling the situation.  The officers lied on the police report which is attached as part of the exhibit  attached to this complaint.

19.     As a result of the negligence and conduct of defendants, Wilson has suffered damages in the form of physical injury, emotional upset, pain and suffering, medical and other expense, all in an amount according to proof and in an amount greater than $25,000.

20.    Within six (6) months of the incident on April 6, 2015, Wilson filed a Governmental Claim with City of Bakersfield. That Governmental Claim was rejected within days after the Governmental Claim had been served upon City of Bakersfield. This complaint is filed within six (6) months of the rejection of the Governmental Claim.    The Governmental Claim was filed on September 15, 2015.    The Governmental Claim was rejected on or before September 28, 2015. Wilson contends that defendants at no time reviewed the claim, do not take claims of this type seriously, and reject all or almost all of these claims without regard to the legitimacy and seriousness of these claims.

21.    On or about November 10, 2015, Wilson caused a settlement demand to be sent to City of Bakersfield. More specifically, Wilson's settlement demand was sent to the City Attorney and to the City's Risk Manager. The demand was rejected upon receipt.

22.    Included in the Settlement Demand were medial records and bills, a summary of the incident, a copy of the relevant police report, and information about similar cases and a program operated through the American Diabetes Association. The Diabetes Association program is geared to train officers in recognizing and handling citizens in diabetic crisis and avoiding liability for damages. Information about liability of municipalities for cases of this type were also included in the settlement demand. The demand was geared to create a "win-win" for City by a compromise of the claim and by initiation of efforts to effectuate the American Diabetes Association program – or at least explore use of the program. The demand was rejected by defendants.

23.    A copy of the settlement demand, with pages numbered in the lower left hand corner, is attached as Exhibit 1.

24.    Defendants are the actual, legal, and proximate cause of harm and damage to Wilson.

25.    Wilson claims all economic, non-economic, special, and general damages and loss of earnings and all pre-judgment interest as may be awarded in this action.

**E.     Miscellaneous.**

26.     Unless otherwise explicitly set forth, each and every allegation set out in these General Allegations is incorporated by reference under each Cause of Action. Plaintiff reserves the right to amend this complaint for any reason whatsoever.

**FIRST CAUSE OF ACTION**

**BATTERY**

27.     In doing the things alleged, defendants acted with the intent to make a contact with Wilson's person.

28.     At no time did Wilson consent to any of the acts of defendants alleged in this complaint.

**SECOND CAUSE OF ACTION**

**BATTERY COMMITTED BY UNLAWFUL ARREST**

29.     Wilson is informed and believes and thereon alleges that at the time of the above-described events, and at all other pertinent times, defendants had no warrant for the arrest of Wilson or other fact or information that constituted probable cause that plaintiff had ever committed or was about to commit a crime, so as to provide grounds for a lawful arrest; nor did defendants have any facts or information that constituted a reasonable suspicion that defendant was involved in any unlawful activity so as to provide grounds for any detention or restrain whatsoever on Wilson's freedom of movement and safety, and that Wilson's detention and arrest was, therefore, unlawful.

30.     In doing the acts alleged, defendants acted with the intent to make a contact with Wilson's person.

31.     At times relevant herein Wilson found the contact made with Wilson's person to be harmful and offensive to Wilson's person and dignity.

32.     At no time did plaintiff consent to any of the acts of defendant alleged above.

## THIRD CAUSE OF ACTION

### Violation of California Due Process Clause

33.    By doing the acts alleged in this complaint, defendants deprived Wilson of liberty without due process of law in violation of Article I, Section 7(a) of the California Constitution.

34.    Plaintiff has a liberty interest in not being unlawfully detained, stopped, arrested or beaten and being treated with requisite professionalism and safety by defendants.

## FOURTH CAUSE OF ACTION

### Violation of 42 U.S.C.A. Section 1983

35.    In doing the things alleged in this complaint, defendants acted under color of state law in depriving Wilson of his liberty in violation of due process of law. Among other things, defendants violated Wilson's rights under the due process clause of the Fourteenth Amendment to the United States Constitution.

## FIFTH CAUSE OF ACTION

### False Detention and False Arrest

36.    In doing the things alleged in this complaint, defendants intentionally deprived Wilson of Wilson's freedom of movement by use of restraints, beating, threats of force and unreasonable duress.

37.    The restraint ad detention cause Wilson to be on his knees, beaten and in handcuffs at or near the door of Wilson's vehicle.

38.    Wilson at no time knowingly consented to any restraint or detention or arrest.

39.    As alleged in this complaint, Wilson was harmed as a result of the defendants' wrongful and false arrest and false detention perpetrated upon plaintiff.

40.    Wilson suffered harm as a result of this false arrest or false detention.

////

## PRAYER FOR RELIEF

Wherefore, the plaintiff prays judgment against the defendants as follows:

1.  For general and compensatory damage including, but not limited to, injuries resulting from humiliation, mental anguish and emotional distress according to proof.

2.  For all economic, non-economic, general, and special damages awardable under law.

3.  For attorneys fees incurred in bringing this action.

4.  For damages, penalties, attorney's fees and costs of suit as permitted under law.

5.  For costs of suit.

6.  For prejudgment interest on any damages, as provided by law.

7.  For such other and further relief as this Court deems just and proper.

Dated: March 7, 2016

By _____
Frederick C. Kumpel, Attorney for the
Plaintiff Michael Wilson



**CAMPBELL WHITTEN**

CAMPBELL WHITTEN
1712 19th Street, Suite 101 Bakersfield, CA 93301
P (661) 334-3000 – F (661) 852-0760
www.campbellwhitten.com

November 10, 2015

Virginia Genaro
City Attorney
1600 Truxtun Avenue, 4th Floor
Bakersfield, CA 93301

Jena L. Covey
Risk Manager
City Hall
1600 Truxtun Ave
Bakersfield, CA 93301

RE: Settlement Demand of Michael Wilson ($58,000.00)

The Claimant, Michael Wilson

     Michael Wilson is a resident of Bakersfield, California.
     Date of Birth: ▓▓▓▓▓▓ (65 – years old)
     Race:  White ▓▓▓▓    Height: 5 ft. 11 inches (as set forth in police report)
     Michael Wilson is a diabetic. At the scene blood sugar was 30 and a "few minutes later" was 38.

The Incident

     Date:  April 6, 2015   Time: "at 0802 hours" – After 8:00 a.m.

     Vehicle listed as 1990 White Bronco (CA Lic. 3SUV932)

     At or near 6200 Block of Gosford Road in Bakersfield, California.

     Summary of Incident:   On the morning of April 6, 2015 Michael Wilson noted that, upon arising for the day, his blood sugar was elevated. Mr. Wilson brought the blood sugar down to a normal level using a short acting insulin.

     Mr. Wilson traveled to the jury services office in order to get an extension of time for his jury duty obligation. The wait in line was long. Mr. Wilson walked back approximately five (5) blocks to Mr. Wilson's Bronco. Mr. Wilson started to drive home. Noting that his glucose level was dropping, Mr. Wilson opened a can of Glucerna. (Glucerna is a diabetic drink that helps manage blood sugar spikes.)

At about this time, Mr. Wilson suffered a diabetic crisis. Mr. Wilson recalls seeing police lights behind him. Mr. Wilson pulled to the right side. Mr. Wilson has a recollection of his vehicle being stuck in the dirt; of opening his door; of looking at his tire which had no traction. At some point, Mr. Wilson finds himself on his knees facing his driver side door. Mr. Wilson tried to scratch his nose and could not. Mr. Wilson then heard a voice tell him,

*Exhibit 1*

"you are in handcuffs." Mr. Wilson asked why (was Mr. Wilson in handcuffs). Mr. Wilson was told "a person called 911 and reported me [Wilson] driving and drinking a beer." Mr. Wilson was on his knees, handcuffed, beaten, and still confused at his circumstances.

Claimant Michael Wilson was suffering diabetic medical episode and was in crisis while driving his vehicle. Police were called to the scene and at least four (4) officers failed to properly assess the diabetic crisis and pulled Wilson from his car – by pulling Wilson out of his driver's side window – and proceeding to beat Wilson. Wilson was beaten severely and taken to San Joaquin Hospital where Wilson was treated for Wilson's injuries. The Bakersfield Police (Officer A. Garcia #1183; Bittleston #965; Enns #1008; Ott #1195) aggravated matters by preparing a police report which contains false and suspicious entries. Wilson claims damages for violation of Wilson's rights and for the beating suffered at the hands of the Bakersfield Police. The officers around him were laughing and joking about someone [Wilson] being drunk so early in the morning – the officers were comming on the drunk driver [Wilson] and the time of day.

Mr. Wilson was asked to breathe through a tube. Mr. Wilson complied. A noticeable silence followed. One of the officers then came over and stated, "It's a Glucerna, not a beer." Another officer asked, "Should we call an ambulance?" Mr. Wilson then said, "Call an ambulance."

An ambulance was called and an EMT arrived. While in the ambulance, Mr. Wilson was told his blood sugar was 38. Mr. Wilson was transported to San Joaquin Hospital Emergency Room. Many people at the hospital were shocked and commented on Mr. Wilson's injuries and condition.

Mr. Wilson believes that certain parts of the police report are not credible. For example, any comment about an officer fearing for his safety is suspect. The fact that Wilson was apparently pulled through his driver side window by police suggests the officers a re poorly trained to assess this type of situation.

Mr. Wilson is a white male driving a Bronco early in the morning – a much more likely assessment of the situation is that a medical crisis was in progress and not that Wilson was a drunk who deserved a beating at the hands of police.

Mr. Wilson was treated and has made a recovery frm physical injuries. However the anger, trauma and emotional upset from the incident remain problematic at best. The fear of any future encounter with police remains a real concern for Mr. Wilson.

Damages

Medical Specials (Summary Attached):

| | | |
|---|---|---|
| Hall Ambulance: | $ | 2,349.13 |
| San Joaquin Community Hospital: | | 9,962.00 |
| Total: | $ | 12,311.00 |

Other Damages:

| | | |
|---|---|---|
| JC Hunt, Inc. (Towing) | $ | 221.00 |

Increase on Insurance                                    80.00 (more than $80)

Total Itemized Damages are approximately **$ 12,700.00** for purposes of this settlement demand.

## American Diabetes Association Training for Law Enforcement

Attached are materials that refer to and discuss the problem of improper training of police when confronting a diabetic citizen. Jury verdicts from similar incidents are in excess of $150,000.00.

The American Diabetes Association has programs and materials to train officers to handle diabetic persons. Some material referring to these programs is also included with this demand.

The officers are liable for beating a diabetic man who was suffering a crisis early in the morning on April 6, 2015.

## Liability

The Bakersfield Police Department and the officers involved failed to properly assess and handle the situation. Officer training is called into question. If any officer involved is a "drug expert," then liability is all the more clear. The City of Bakersfield, Bakersfield Police Department, and the officers are the actual, legal, and proximate cause of the beating and injuries suffered by Michael Wilson. The subsequent report prepared by the officers involved only aggravates and makes worse the poor performance by police on this occasion.

The officers handled the situation negligently. The officers violated Mr. Wilson's rights. The officers are improperly trained. Liability is clear.

## Settlement Demand

Michael Wilson is entitled to $162,000 or more for the abuse and beating suffered at the hands of the Bakersfield Police. This demand includes information about verdicts equal to and in excess of this amount for similar incidents. Mr. Wilson would very much like to learn that Bakersfield Police will receive better training to assess and handle diabetic citizens.

Mr. Wilson is willing to compromise and settle this matter for fifty-eight thousand dollars ($58,000.00). Please advise if City of Bakersfield agrees to settlement by paying Mr. Wilson $58,000. Thank you.

Sincerely,

CAMPBELL WITTEN, PC

Frederick C. Kumpel

## MEDICAL BILLING/ OTHER BILLING

|  | Total Bill | Insurance Discount | Insurance Payment | Patient Payment | Balance Due |
|---|---|---|---|---|---|
| SJCH | $ 9,962.00 | $ 7323.17 | $ 2,538.83 | $ 100.00 | $ 0.00 |
| Hall Ambulance | $ 2,349.13 | | $ 2,299.13 | $ 50.00 | $ 0.00 |
| JCHUNT INC. DBA PAYLESS TOWING | $ 221.00 | | | $ 221.00 | $ 0.00 |
| GRAND TOTALS | $12,532.13 | $ 7,323.17 | $ 4,837.96 | $ 371.00 | $0.00 |

(WILSON, Michael )



# ASSIST OFFICER

## A Summary Of Hints To Aid Police Officers

## DIABETES MELLITUS...WHAT YOU SHOULD KNOW (Page 1 of 2)

There are 25 million people in the United States who have diabetes. Of that number, it is estimated that 7 million people are not aware that they have the disease. Diabetes has no cure.

In diabetes, insulin, a hormone produced by the pancreas, is either totally or partially lacking. Insulin is needed by the body to convert sugar, starches and other food into energy needed to sustain life. Without insulin, life is not possible for long due to high sugars and toxins that increase in the blood. On the other hand, too much insulin lowers the blood sugar so much that the brain and other organs cannot function.

There are two major types of Diabetes:

**Type 1 Diabetes** - Accounts for 10% of all diabetes cases (formerly called Juvenile but can occur at any age). This condition requires daily insulin because the body does not produce insulin. It is administered via needle injections or an insulin pump. The absence of insulin can lead to severe illness and death.

**Type 2 Diabetes** - The body does not produce sufficient quantities of insulin. This condition requires diet, exercise, pills and sometimes insulin injections and pumps to control the blood sugar.

## DIABETIC EMERGENCIES:

**INSULIN REACTION**: (*Hypoglycemia - very low blood sugar*) This condition can be caused by too much insulin or certain diabetes pills, alone, or in conjunction with, too little or delayed food intake, exercise, alcohol, drugs, over the counter medication, or any combinations of these factors.

The following signs and symptoms of a *very low blood sugar emergency* that may occur at the onset of insulin reactions:

* Possible sudden onset * Staggering or poor coordination (may be mistaken for intoxication or drug use)
* Slurred Speech * Confusion * Poor concentration * Bizarre behavior * Changes in personality or mood swings (irritable, displaying anger, bad temper or combative!) * Pale color * Sudden hunger
* Excessive sweating * Trembling * Eventual unconsciousness and seizures

**DIABETIC COMA**: (*Hyperglycemia - very high blood sugar*) This condition may be caused by insufficient insulin, illness, dehydration, a heart attack, stroke or other medical problems.

The following signs and symptoms of a *very high blood sugar* emergency that may require first aid:

* Gradual onset * Drowsiness * Confusion * Extreme thirst * Very frequent urination * Flushed skin
* Vomiting * Fruity breath odor (may be mistaken for alcohol on breath) * Heavy breathing
* Eventual unconsciousness

## Philadelphia Police Department Education & Training Bureau

No.   13-01                Date :   4-5-13

# ASSIST OFFICER

### A Summary Of Hints To Aid Police Officers

# DIABETES MELLITUS...WHAT YOU SHOULD KNOW (Page 2 of 2)

## LOOK FOR EVIDENCE OF DIABETES: MEDIC ALERTS AND DIABETES SUPPLIES

Always check for _medical alert tags_ (worn around the neck or wrist) and wallet cards if the person is exhibiting the signs or symptoms of a diabetic emergency. A medical alert tag can provide you with important medical information about the person's condition. If no medical alert tag is present, try asking the individual about a possible medical condition. When in doubt, treat as a medical emergency!

## EMERGENCY CARE FOR LOW BLOOD SUGAR:

It can be hard to tell if a victim has a high or low blood-sugar, so treat the low blood sugar first and give water if they can drink! Have the person eat sugar (15 grams, about ½ glass of OJ or 3 sugar tablets) or drink other fruit juice NOT DIET SODA or DIET JUICE!

*DO NOT FORCE AN UNCONSCIOUS PERSON TO SWALLOW!*
Give sugar if all three conditions are present:
* The victim is known to have diabetes.
* The victim's mental status is altered.
* The victim is awake enough to swallow.

## INSULIN DELIVERY SYSTEMS AND DIABETES SUPPLIES

Diabetes Medic Alerts:          Insulin pumps:          Insulin bottles:







Blood Glucose Meter:          Insulin injections "pens":          Lancet devices:





## Philadelphia Police Department Education & Training Bureau

No. 13-01                    Date: 4-5-13

Police get training to distinguish hypoglycemia from intoxication

By Lindsey Wahowiak
January 2014



Wesley Hitt/Getty Images

It's a way of

Picture it: You're a police officer, and you've just pulled over a man for driving erratically. You ask the driver for his license. The driver is slurring his words, irritable, sweating, and pale. When you ask him to step out of the car, he *t.*

# bridging the gap between the community and the police.

Margrett Davis, BSN, MPH, CDFS, CHES

staggers.

Is he intoxicated? Or is he a person with diabetes who's having an episode of hypoglycemia, or low blood glucose? Do you cuff the driver, call an ambulance, give him some glucose gel—or all three?

While these situations are rare, they can grab headlines. Many of the signs of hypoglycemia (download a printable medical alert card) are similar to signs of someone who is drunk or on illegal drugs. People with diabetes and their friends and family may know how to recognize low blood sugar, but do the police?

In more and more communities across the country, the answer is yes. The American Diabetes Association's legal advocacy volunteers—doctors, nurses, lawyers, parents, and others—have been working with law enforcement personnel to educate their communities. First responders (police, firefighters, and emergency medical technicians) are training on how to spot and care for people with diabetes.

## Philadelphia

Attorney Alan Yatvin is chair of the Legal Advocacy Subcommittee of the ADA. In his time volunteering with the Association and representing people with diabetes, he's seen some difficult cases in which people with diabetes weren't able to get the care they needed while in police custody. For example, in Philadelphia, Steven Rosen was held in custody for 23 hours without access to appropriate food, fluids, and medications and was hospitalized for diabetic ketoacidosis. That's not the case anymore in Philadelphia, where Yatvin, with the Association's help, filed a class-action lawsuit against the city on behalf of people with diabetes. The resulting settlement required that all Philadelphia Police Department (PPD) officers be trained to identify and handle medical emergencies, including dealing with people who are having an episode of hypoglycemia.

Part of that training is a PPD diabetes-themed "Assist Officer," a reference guide that describes type 1 and type 2 diabetes and diabetes emergencies for police and other first responders. The two-page guide, updated with input from ADA volunteers, gives tips for treating an incident of low blood glucose and offers images and descriptions of diabetes supplies that people may be wearing or carrying, such as blood glucose meters and medical alert jewelry. The guide is available here. "Any department could adapt it into their training to address the needs of people with diabetes with whom they might come in contact," Yatvin says.

The Philadelphia Police Department has also enhanced its diabetes awareness training through a video and poster jointly produced by the department and the ADA. The video, featuring Lt. James Gould of the department's advanced training unit, describes and shows how to treat diabetes emergencies, both in the general public and in people in police custody. The video is available at diabetes.org/policevideos.

Since the training has been implemented, Gould says he has seen real changes within the department. Officers have a better understanding of diabetes and how to spot people who are dealing with hypoglycemia. He says now there are guidelines in place for officers to ask about a person's medical history, and someone who mentions having diabetes can be treated for

hypoglycemia on the scene. F... ple with diabetes who are taken in... custody are transported to police headquarters instead of local booking offices, because there is a nurse on staff who can provide medical treatment if needed. "You can always improve," Gould says of the training he and his fellow officers now receive. "I think it's working well."

## Indiana

Shannon Eagen is a supporter of police officers: Her husband, Jim, is a police officer in Portage, Ind. But when her father, Frank "Dan" McAllister, experienced an episode of hypoglycemia behind the wheel and was involved in a three-car crash, she suddenly found herself squaring off with local law enforcement. Eagen says that after the 2006 crash, officers assumed her dad was intoxicated and resisting police. He was pulled from his car, brought to the ground, and handcuffed before a bystander suggested that McAllister, who had lived with type 1 diabetes since he was 18 years old, might be having a medical emergency. Eagen adds that her father wasn't treated for hypoglycemia until he got to the hospital. McAllister subsequently had surgery to repair a hip fracture and spent three weeks in the hospital and a rehabilitation center.

Eagen's family won a civil lawsuit against the police officer, but she says the suit wasn't about money. "It was because the officer was unfamiliar with the signs and symptoms of hypoglycemia," she says. "It's about ... bringing education about diabetes to law enforcement to the forefront, so no other diabetic [person] has to go through what my dad did.

"And I don't want another officer to be put into that situation either," she adds. "I want them to respond correctly, because I don't want anything negative to happen with them."

To raise police awareness about diabetes, Eagen has delivered the "Assist Officer" guide and the ADA's educational videos and posters to about 10 local law enforcement offices and police academies. She has also requested that as part of police officers' mandatory annual continuing training, they get two hours of "something medical-related, whether it be diabetes, or heart disease, or psychiatric disorders."

Most departments received the information "very warmly," Eagen says. She's not sure how many of them have passed the information along to officers. At one department Diabetes Forecast was able to reach, the programs and continuing education haven't been implemented, according to an officer who declined to comment on the record. He did say, however, that officers are more aware of diabetes and work closely to alert emergency medical services when someone in police custody has diabetes. Their medical training ensures proper care, he adds.

## Mississippi

Nurse and diabetes educator Margrett Davis, BSN, MPH, CDFS, CHES, of Jackson, Miss., has been a dedicated diabetes advocate for years. Diabetes runs in her family, and she sees it throughout her neighborhood. What she was hearing from friends and neighbors, however, was that while the condition was common in the community, police didn't know how to spot people who were having episodes of hypoglycemia—or how to treat them.

That didn't sit well with Davis, so she teamed up with her local ADA office and Jackson State University to reach out to local law enforcement agencies and educate officers about diabetes: what it is, what to look for, and how to respond. Since 2012, Davis has helped host one big seminar and three meetings with area police (from Jackson, Madison, and Rankin counties), and she says the results have been positive.

"It's a way of bridging the gap between the community and the police," she says. "They took the information, and they were really pleased to have it, because they said they weren't aware of a lot of the signs and symptoms." Officers who work in rural communities were especially grateful, she adds, because they are often first on the scene of an emergency. Sometimes, an ambulance can be 30 minutes away or more. Now, she says, they know how to spot and treat low blood glucose.

Santa Fe, N.M.

Sometimes, law enforcement officials are also advocates. In September, Sgt. Ron Crow, training supervisor of the Santa Fe County Sheriff's Office, contacted the ADA's Legal Advocacy team to relate the success of his department's use of the ADA/PPD video. "Thank you for the video," he wrote, noting that 90 percent of department employees had seen the video, and soon all officers would be trained with it. "We have now incorporated this video into our new-hire orientation as well. I think this is information we … need."

## What Can You Do?

You can take these steps to help first responders:

1. You can offer education. Go online to diabetes.org/corrections to download or order a diabetes "Assist Officer" guide, training video, and poster (pay only shipping for the DVD and poster). Contact your local law enforcement officers, firefighters, and other first responders to see if they can use the material. Then e-mail legaladvocate@diabetes.org to let us know whom you contacted.
2. You can also identify yourself as a person with diabetes—this will help protect you in case of emergency. Police officers consulted for this story suggested that carrying an identification card (download a printable medical alert card) can be easier to spot than a medic alert bracelet, necklace, or tattoo. You can keep it with your driver's license or registration; if you are pulled over while driving, it'll be one of the first things you hand an officer or that police will look for if you are unable to respond. Your license doesn't contain this information, and sharing your diabetes status is voluntary, but it could help you stay healthy and safe in an emergency.

American Diabetes Association, 1701 N. Beauregard St., Alexandria, VA 22311

Copyright © 2015 American Diabetes Association

# Police Training on Diabetes: Dwindling, If Anything

Topics touching diabetes never go away, but many of them seem to get simplified at times. We often ask ourselves: "Whatever happened to ..." In this case involving police to better deal with people with diabetes, PwDs, who might be acting irrationally due to a blood sugar low? Today, fellow D-blogger and journalist who writes here joins us to report on the state of affairs, so we have it too frustrating!

Special to the 'Mine by Michael Hoskins



We've all seen the headlines about police conduct toward those with diabetes, in those regrettable driving-while-low situations.

For example, one story recently came out ... where police mistook a man's "diabetic shock" for drunken driving back in October 2011 and beat him pretty severely. Video captured it all, and now in February the city and state have agreed to pay $292,500 in damages to the man and his wife as a result.

It brings every time I hear about these situations, not only because of the generalized fear that this could happen to any of us PwDs, but more specifically because I personally have been behind the wheel and had a low suddenly I've not faced any police or first responders who mistook my medical emergency for criminal behavior. But I know it happens, and that scares the heck out of me.

With all the stories about these situations, we wondered what's changed in recent years in how police receive training to recognize and deal with diabetes. What can our community expect these days compared to how things "used to be"?

The answer from some of those who monitor this, not nearly enough.

"It's a hodgepodge of progress and it's all over the place," said the American Diabetes Association's legal advocacy director Katie Hathaway. "It's hard to assess if there's been a dip here, but what I can say is that this problem certainly, isn't fixed."



...the ADA released a 20-minute training video to help address this issue (available to the public in its entirety through the ADA for just $3, or ... in three parts). That video stemmed from a Philadelphia lawsuit settlement and served as a jumping-off point for the advocacy organization to target this topic nationally. Many police departments did request the video and used it in training, Hathaway says, but those requests eventually dwindled, and by now, only occasionally spoke. Most of the current queries the ADA receives on this issue come from people facing these incidents or from other advocacy organizations and entities, but rarely from the police themselves.

Essentially, all the 2007 video covers are the basics about what officers should know in recognizing the signs and symptoms of hypo and hyperglycemia. It includes two "real-life" scenarios. One featuring a woman sitting in the passenger side of an SUV after the driver decides to pull over in front of a school, jump out and run to get some juice for her D-friend (leaving her by herself to encounter police in a confused fashion, of course,) and a second example in which a man is arrested and taken to jail, where he is questioned about his diabetes and then later has a high because of his lack of insulin and needs to be taken to the hospital.

What the video does not feature, though, are the most common situations police officers might face dealing with PWDs. for example making on-the-fly decisions about what's happening when someone is swerving all over the road, or if they come up against a violent, arm-swinging individual (who happens to be hypoglycemic). Hathaway says these critical "driving with diabetes" and "combative" points might be fodder for an updated video ("Ya think?"). That review is ongoing and some decisions will likely be announced by ADA soon, she said.

So here we are, five years later, and the number of these incidents is once again a "growing concern" for the ADA, particularly with rising number of Type 2's and LADA population, i.e. more individuals using insulin treatment.

Being behind the wheel certainly isn't the only situation where police should be aware of diabetes (remember the 2007 story about ... ... ... ... ... having a low in a movie theater? ...) But the ADA says driving is one of the top situations where police involvement comes into play with PWDs. So the organization continues to prioritize it.

In this January's issue of the journal Diabetes Care, the ADA published its first-ever position statement focused on driving with diabetes. The six-page document advises against "blanket bans or restrictions," and instead recommends that patients who have issues that might pose a driving risk be assessed by an endocrinologist or other diabetes doc.

The ADA is also in the process of reviewing its training tools and determining what else might be done to better train law enforcement officers who might encounter PWDs experiencing glucose lows.

Some are hoping to change some aspect of this as the ADA's Hathaway said incline.



It's so department i-based, and we're up against competing interests of public safety and drivers rights. These aren't easy situations for police to face, we get that. But we need more institutionalized training than we have now."

The ADA also struggles to have enough resources available to push for better police information and training across the nation. "When you think of the pure number of law enforcement officials, police and sheriff departments around the country, it is a challenge," Hathaway says. "We have a legal advocacy staff of six people who cover all kinds of discrimination issues. Three of those staff — myself and two lawyers who work for me — respond to the some 250 calls we receive to our 1-800-DIABETES hotline each month."

We also queried Dr. Daniel Lorber, Director of Endocrinology at the New York hospital of Queens in New York City, who chaired the writing group that developed the ADA position statement on driving with diabetes. He said that his experience consulting on diabetes police training and testifying in court shows that police are still lacking what they need in D-training.

"It's not widespread enough," he said. "This is a problem around the country with police not knowing about hypos or what to do. Yes, maybe things have improved just because there's more public attention. But not by much, and there's still a lot of work to do."

Both Hathaway and Lorber acknowledge that many police departments have embraced change and are willing to work with national organizations to revise policies, but the change is just not at the level it should be and no one really tracks the changes that are happening, so improvement is difficult to measure.

Sadly, two leading law enforcement training organizations — the National Law Enforcement Association and National Law Enforcement Training Center — didn't respond to our requests for their thoughts on this topic. Maybe that reflects the kinds of roadblocks the ADA faces from law enforcement authorities.

Facing that resistance, Hathaway says there's only so much the ADA can do when they're generally tapped to react to calls or court cases, rather than having the opportunity to proactively advocate in general before a situation arises.

In the Nevada traffic stop case referenced earlier, news outlets report that Henderson police "have changed the departmental use of force policies as a result of this incident." But Hathaway emphasizes that sometimes it takes proactive outcry from people living in a particular community to wake up the local law enforcement on this issue. That's where our D-community comes into play.

Police departments need some nudging from their own communities about this training and the materials available, Hathaway said. That might mean contacting local police chiefs or sheriffs and asking questions about these internal policies. Or even bringing them materials to possibly review or use.

"There's some hope, and that will get there eventually, that may be something we're thinking about if they haven't already," Hathaway said. "So what it comes down to ... it's like everything else. Diabetes is that we need to advocate for ourselves."

# Related posts



**Advocacy**

Justus Harris has taken an unusual path with his life. [...] diabetes. He's become a Visual Artist & Technologist who creates amazing 3D sculptures of blood glucose data, as well as other Health Care Sculptures and visualizations. He went as far [...]

Read more...



**Advocacy**

Written by Kerri Morrone on Oct. 20, 2014

This month is a big milestone in my world with diabetes, as it's the 10-year anniversary of when I first found the Diabetes Online Community (DOC), and my discovery of the mantra "I am not alone." At the time, I was in my mid-20s, newly married [...]

Read more...



**Advocacy**

Written by Mike Hoskins on [...]

The days of diabetes podcasting seem to have been reborn, with a surge in these audio shows hitting our Diabetes Online Community (DOC) recently. Patient-led podcasts aren't anything new, of course, nor is talking diabetes on the air a novel concept [...]

Read more...



**Advocacy**

Written by Amy Tenderich on Sep. 17, 2014

It's an unfortunate enough circumstance to land someone [...] who have diabetes and shouldn't be in prison, because they ended up there due to lack of awareness and insulin and care. And future of what's happening with too often. The American [...]

Read more...



Advocacy

Written by Alex posted on Oct 29, 2014

November's nearly upon us — that time of year when "awareness" are on diabetes. With it being National Diabetes Awareness Month and World Diabetes Day on Nov. 14. That day was chosen in honor of Dr. Frederick Banting, the co-discoverer of insulin.

Read more

Add a comment

0 Comments                                                          Sort by  Oldest

Add a comment

Facebook Comments Plugin

## Archived Comments

Anne Findley | 2013-03-08

Thanks for the update. It is appalling to read about the treatment that Doug Burns and others have received because of misunderstandings and ignorance of diabetes health issues by law enforcement. I agree that more education would be helpful and does need to be ongoing. However, I also want to suggest that as people with diabetes, we have a responsibility to get off the road if we are having a BG that impairs our ability to drive safely. If you are already at the point of "swerving all over the road," you are endangering yourself and others. People with severe hypoglycemic unawareness may need to take extra precaution while driving. CGMs can be especially useful in this situation as well as more frequent testing and perhaps letting the BG ride up just a tad.

Amy T | 2012-03-08

Thanks, Anne - but I think "swerving all over the road" is the point at which the PWD has lost their sense of reason. If they were thinking straight, OF COURSE they'd pull over before it went that far, right?

Rich | 2012-03-0...

I am a PWD with type 1 DM for 60 years. I have been driving for the last 40 of them. Although I agree, police need education about hypoglycemia, we need to understand that most people who have erratic driving and are confused (and sometimes combatant usually have alcohol intoxication, not diabetes. People with diabetes have to take responsibility to avoid lows while driving at all costs. Unfortunately, sometimes that means loosening up a little on control while driving. Accidents due to hypoglycemia often occur in people who have had diabetes for a while and stop believing it could happen - IT COULD HAPPEN! Unfortunately, a study in Canada has shown that motor vehicle accidents in people with diabetes increase as HgbA1C decreases.

http://www.ncbi.nlm.nih.gov/pubmed/13997821. Even if a person with diabetes is willing to assume the risks of low blood sugar for himself/herself to optimize control, he/she should NOT put others, passengers in their cars, people in other cars on the road, pedestrians, at risk. Unfortunately, at times this means either choosing between NOT driving, or detecting signs of low blood glucose levels. All Persons with Diabetes should do what God wants them to if necessary; they can't say without stopping if they think they are stopping by the

http://www.healthline.com/diabetesmine/police-training-on-diabetes-dwindling-if-anything



...yes it is better to stop and rest if you ... ... on a highway that isn't always possible to do without delay. While driving, it is better to treat if you don't need it than to not treat if you do need it and go low. If you get killed in a car accident due to a low blood sugar, you don't have to worry about living long enough to develop later complications of diabetes. ... Until we have better means of control, people with diabetes will continue to walk a tightrope between low blood glucose and high blood glucose. We have to hope we "don't fall off" and/or injure ourselves or others if we do fall.

Dr. John ...

Dr. Sam or... Your talking about henderson police abuse and it goes way beyond Diabetes. Wake up. Henderson police are out of control, abusive and overzealous. They can not be trusted. Trainging means nothing to these Terrorist. Henderson is a bad place to visit for me.

... ... I wasn't going to restate the obvious. Articles on this topic have been written before. This one, published in March on Diabetes Mine, comes to ...

Healthline's mission is to make the people of the world healthier through the power of information. We do this by creating quality health information that is authoritative, approachable, and actionable.

Join more than 50 million monthly visitors like you and let Healthline be your guide to better health.

**Site Map**

**About Healthline**

**Get In Touch**

Sign Up for Health Tips

Get the latest health & wellness advice delivered straight to your inbox ...

Find us on: f y 8+ p

Copyright © 2005 - 2015 Healthline Networks, Inc. All rights reserved for Healthline. Healthline is for informational purposes and should not be considered medical advice, diagnosis or treatment recommendations. ...

# Police Beat Man in Diabetic Shock - and Nevada City Pays for It

**February 8, 2012**

By MARIA NIKIAS via GOOD MORNING AMERICA



Police Beat Man in Diabetic Shock

AUTO START ON | OFF

A Nevada city will pay a diabetic man $158,500 after police beat him while he was in diabetic shock, thinking he was a drunken driver.

The Henderson, Nev., city council approved the settlement on Tuesday for the physical and emotional distress endured in late 2010 by the man who asked not to be identified.

"It's alarming and it's egregious," the man's attorney, Todd Moody, told ABC 13 Action News. "It will make you a little sick to your stomach watching it."

The incident was caught by the dash cam of a Nevada Highway Patrol trooper present during the incident, which began as a chase in the early morning hours of Oct. 29, 2010. Police suspected the man was driving drunk.

It was not clear why the man led police on a chase.

The video showed that once the car was pulled over, police officers swarmed the driver and began kicking him.

"Stop resisting motherf***r. Stop resisting motherf***r," an officer yelled as the man lay on the ground.

However, the man was not drunk - he was suffering a diabetic episode. Insulin shock can mimic the symptoms of intoxication.

"They should have been aware of that," Moody told ABC 13. "They should have been trained on how to handle that and I think they made some assumptions that were wrong."

Later in the video, the officers appeared to realize the man wasn't drunk and called for medical help.

"We found some insulin in his pocket," said an officer. "Tell them to expedite. He's semi-conscious."

The $158,000 settlement was in addition to a $30,000 settlement for the man's wife and $35,000 from the state of Nevada for civil rights violations.

http://abcnews.go.com/blogs/headlines/2012/02/police-beat-man-in-diabetic-shock-and-nevada-city-pays-for-it/







An officer seen in the video kicking the diabetic man is Sgt. Brett Seekatz, who has been with the Henderson Police Department since August 2002, ABC 13 reported.

Officials wouldn't specify how or if Seekatz was disciplined over the incident, saying the information is a personnel matter and will not be released. He remains a member of the Henderson Police Department.

However, the department issued a statement noting changes since the incident.

The Henderson Police Chief Jutta Chambers ordered a closer look at the training Henderson officers receive, the statement read. "The training or use of force techniques was subsequently modified."







PROMOTED STORIES      MORE FROM ABC NEWS





rld
Politics      Menu
Entertainment
Health
Tech

Health
Tech         lock
Lifestyle         lock
Money         More Video »
Investigative
Sports
Good News
Topics
Job Search
Weather
Photos



More ABCNews

Cities Cities
New York City New York City
Los Angeles Los Angeles
Chicago Chicago
Philadelphia Philadelphia
San Francisco - Oakland - San Jose San Francisco - Oakland - San Jose
Houston Houston
Durham - Raleigh - Fayetteville Durham - Raleigh - Fayetteville
Fresno Fresno
Partner Sites Partner Sites
abc.com abc.com
fusion.net fusion.net
espn.com espn.com
fivethirtyeight.com fivethirtyeight.com
grantland.com grantland.com
disney.com disney.com
Privacy PolicyPrivacy Policy
Your CA Privacy RightsYour CA Privacy Rights
Children's Online Privacy PolicyChildren's Online Privacy Policy
Interest-Based AdsInterest-Based Ads
Terms of UseTerms of Use
Contact UsContact Us





Yahoo!-ABC News Network | © 2015 ABC News Internet Ventures. All rights reserved
Shows
Good Morning America Good Morning America
World News Tonight World News Tonight
Nightline Nightline
20/20 20/20
This Week This Week

Live 3



RADAR: Severe Storms and Heavy Rain Moving EastRADAR: Severe Storms and Heavy Rain Moving East



EXPLORE.ORG: Penguin HabitatEXPLORE.ORG: Penguin Habitat



Now On ABC NewsNow On ABC News
Video

Anyll I get a a for real? The sisting is he is "resisting" ay get sued.

I have friends who are police, they are trained to yell loudly to create witnesses to events, even if the witnesses don't see what is actually happening, they hear and will testify on behalf of police who create the impressions on the hearers based on the words they use and how they say them.

It is like the brother poking his sister in the car and yelling "Stop it!" every time he pokes her. He creates the illusion that his little sister is the problem, so mom doesn't even have turn around. She just yells at the little sister.



**Marukun**

He is just lucky they didn't just kill him and call it resisting arrest in order to cover up what they did.



**Ashton**

Of course the officer won't get in trouble. Cops never do, they think they can ignore the law, because it turns out they can.

I've personally come to the decision that there are no good cops, only bad cops and enablers. All the "good cops" stand around and watch bad cops do horrific things.



**Lance**

this is why I hate humanity. people like this cop just makes me hate everything about everything.



**Tim**

I love how violence is always the first resort. Just whale on a guy the minute the rules are "broken." This is America for you.



**Derrick**

I would personally sue all officers involved. Not the department but the officer himself. As for the statement by the police department. You are a PUBLIC office. You are obligated to tell us what you have done in this matter. In my mind you are all criminals. We are SLAVES. Open your eyes. This is Human Farming.

**jan.jo**

Maybe they were drug abusers. were the animals tested?

**Crook**

Fire someone.





_person

This didn't happen because of a lack of training or awareness about the diabetic condition

... this is a lack of sound judgement and a willful interest in beating the F out of someone

Yahoo!-ABC News Network

Privacy Policy    Your CA Privacy Rights    Children's Online Privacy Policy    Interest-Based Ads    Terms of Use    Contact Us

© 2015 ABC News Internet Ventures. All rights reserved.

20.

**BAKERSFIELD POLICE DE. .RTMENT**
**GENERAL OFFENSE HARDCOPY**
THIS REPORT IS FOR THE EXCLUSIVE USE OF:

GO# 2015-78659 PATROL ARREST

4801-0 OBSTRUCT-RESISTING OFFICER

## General Offense Information

Operational status: **PATROL ARREST**
Reported on: **Apr-06-2015 (Mon.) 750**
Occurred on: **Apr-06-2015 (Mon.) 750**
Approved on: **Apr-06-2015 (Mon.)** by: **894 - JOHNSON, CHRIS**
Report submitted by: **1183 - GARCIA, ADAM**
Org unit: **OPERATIONS**
Address: **6200 BLOCK GOSFORD RD**
    Municipality: **BAKERSFIELD** County: **KERN COUNTY**
    District: **W** Beat: **S** Grid: **127**
Felony/Misdemeanor: **MISDEMEANOR**
Bias: **NONE (NO BIAS)**
Special study: **NON APPLICABLE**
Family violence: **NO**

## Offenses (Completed/Attempted)

Offense: # 1 **4801-0 OBSTRUCT-RESISTING OFFICER - COMPLETED**
Location: **HIGHWAY/ROAD/ALLEY (INCLUDES STREET)**
Offender suspected of using: **NOT APPLICABLE**
Weapon type: **PERSONAL WEAPONS**
Offense: # 2 **5499-15 TRAFFIC-RECKLESS DRIVING - COMPLETED**
Location: **HIGHWAY/ROAD/ALLEY (INCLUDES STREET)**
Offender suspected of using: **NOT APPLICABLE**
Weapon type: **MOTOR VEHICLE**



**BAKERSFIELD POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
THIS REPORT IS FOR THE EXCLUSIVE USE OF:

GO# 2015-78659 PATROL ARREST

4801-0 OBSTRUCT-RESISTING OFFICER

## Related Event(s)

**CP**      **2015-78659**

## Related Person(s)

### 1. WITNESS # 1 - ORELLANA, URIAN

#### (Case Specific Information)

Sex: **MALE**
Race: **WHITE**
Date of birth: ████████
Address: **3208 IDAHO ST**
       Municipality: **BAKERSFIELD , CALIFORNIA  93305-**
**Phone Numbers**
       HOME: **(661) 426-5270**

#### Particulars

Occupation: **SECURITY GUARD**
Ethnicity: **HISPANIC/MEXICAN/LATINO**

#### Master Name Index Reference

Name: **ORELLANA, URIAN**
Sex: **MALE**
Race: **WHITE**
Date of birth: ████████
Ethnicity: **HISPANIC/MEXICAN/LATINO**
Address: **3208 IDAHO ST**
       Municipality: **BAKERSFIELD , CALIFORNIA  93305-**
**Phone numbers**
HOME: **(661) 426-5270**

#### Linkage factors

Resident status : **RESIDENT**
Age range : **22-29 YEARS**

### 2. DRIVER # 1 - WILSON, MICHAEL GENE

#### (Case Specific Information)

Sex: **MALE**
Race: **WHITE**
Date of birth: ████████
Address: **413 PEBBLE BEACH DR**
       Municipality: **BAKERSFIELD , CALIFORNIA  93309-**

#### Particulars

Ethnicity: **WHITE**



# BAKERSFIELD POLICE DEPARTMENT

## GENERAL OFFENSE HARDCOPY
### THIS REPORT IS FOR THE EXCLUSIVE USE OF:

GO# 2015-78659 PATROL ARREST

4801-0 OBSTRUCT-RESISTING OFFICER

Height: **5'11** Weight: **200 lbs.**
Eye color: **BROWN**
Hair color: **BROWN**

## Master Name Index Reference

Name: **WILSON, MICHAEL  GENE**
Sex: **MALE**
Race: **WHITE**
Date of birth: ▮▮▮▮▮▮▮
Ethnicity: **WHITE**
Address: **413 PEBBLE BEACH DR**
      Municipality: **BAKERSFIELD , CALIFORNIA  93309-**

## Linkage factors

Resident status : **RESIDENT**
Age range : **50-64 YEARS**

# Related Vehicle(s)

## 1. INVOLVED # 1 - 3SUV932, CA VIN# 1FMEU15N8LLA88489

### (Case Specific Information)

License number: **3SUV932**
State of issue: **CALIFORNIA**
VIN #: **1FMEU15N8LLA88489**
License type: **COMMERCIAL**
Vehicle type: **TRUCK/VAN**
Make and model: **FORD  BRONCO**
Style: **2 DOOR**
Year: **1990**
Color: **WHITE**

## Master Vehicle Index Reference

License number: **3SUV932**
State of issue: **CALIFORNIA**
License type: **COMMERCIAL**
**Owner Information**
Owner type: **PERSON**
Owner role: **INVOLVED**

*23.*



**BAKERSFIELD POLICE DEPARTMENT**
GENERAL OFFENSE HARDCOPY
THIS REPORT IS FOR THE EXCLUSIVE USE OF:

GO# 2015-78659 PATROL ARREST                    4801-0 OBSTRUCT-RESISTING OFFICER

# Related Text Page(s)

Document: **Initial Offense Report**
Author: **1183 - GARCIA, ADAM**
Related date/time: **Apr-06-2015 (Mon.) 854**

On Monday, 4-6-15 at 0802 hours; Officer R.Bittleston #965, Officer J.Enns #1008, Officer C.Ott #1195, and I (Officer A Garcia #1183), responded to the 6200 block of Gosford Road for a possible DUI driver which had crashed in a dirt field. The text of the call read;

VEH IS A WHI FORD BRONCO UNK PLATE DRIVING UP ON THE SIDEWALK -- LS SB GOSFORD. SUBJ NOW STOPPED AT THIS TIME,APPEARS TO POSS BE GETTING STUCK,SPINNING HIS TIRES. VEH OCCUP'D BY A WM/M40'S-50'S,BRN SWEATSHIRT,RP LEAVING THE AREA,SUBJS APPEARS STUCK AT THIS TIME

I was the first unit on scene and noticed a;

1990 WHI FORD BRONCO
CA LIC:3SUV932

stuck in the dirt, on the West side of Gosford Road. The driver (MICHAEL WILSON) was still in the vehicle and I attempted to ascertain if he was okay.

Upon contacting WILSON, he appeared coherent and began speaking to me. I noticed the vehicle was still running and due to officer and public safety I instructed him to turn off the vehicle. WILSON then replied, "No, I just want to go home." I asked WILSON a second time, "Sir, I'm Officer Garcia with the Bakersfield Police Department and you need to turn off you vehicle now." WILSON replied, "No I'm not turning my car off, I'm going home." I noticed WILSON then shifted the vehicle into drive and attempted to flee the scene. At this point I was in fear for my life, because he could easily run me over with his vehicle. I told WILSON, "Stop, your vehicle now." At the same time, I grabbed WILSON'S left arm and pulled it out of the driver side window and applied an arm-bar, to gain pain compliance. WILSON removed his foot from the gas pedal, however refused to put the vehicle in park.

Shortly after, back-up officers arrived and assisted me in removing WILSON from the vehicle. Officer Bittleston was the first on scene and responded with me at the driver side window. It should be noted that during this time WILSON'S left arm was still lose and he and the vehicle had not been searched for weapons yet. While still having control of WILSON'S right arm,

24.



**BAKERSFIELD POLICE DEPARTMENT**
GENERAL OFFENSE HARDCOPY
THIS REPORT IS FOR THE EXCLUSIVE USE OF:

| GO# 2015-78659 PATROL ARREST | 4801-0 OBSTRUCT-RESISTING OFFICER |
|---|---|

Officer Bittleston grabbed the back of WILSON'S sweater and we attempted to remove WILSON out of the driver's window, as we were unable to open the locked driver door. It became apparent that WILSON'S lap belt was still attached and we were unable to pull him from the vehicle. While Officer Bittleston and I remained with WILSON at the driver's window, Officer Ott broke open the passenger side window and gained entry into the cab from the passenger side. Officer Ott was able to unlock the lap belt, which freed WILSON. Once WILSON was free of the lap belt, he continued to actively resist Officers. Officer Enns arrived on scene and assisted Officer Bittleston and I with WILSON at the driver window.

Officer Enns was closest to WILSON'S head/face area, while attempting to pull WILSON from the vehicle, Officer Enns used a bladed hand to redirect WILSON'S head the other way in order to avoid injury as he was violently thrashing his whole body around. Officers finally removed WILSON from the vehicle and guided him to the dirt ground next to the vehicle. Once on the ground WILSON continued to resist Officer Bittleston and I, by attempting to push himself up off the ground and kicking his legs back and fourth as we attempted to regain control of his left arm. At the same time Officer Enns noticed that WILSON had his free right hand under his body; in his waistband area. Officer's told WILSON several times to put his right hand behind his back, however he refused. Fearing for Officer safety, Officer Enns used his baton by wedging it between WILSON'S ribcage and forearm. Officer Enns then began to pry WILSON'S arm out from under his body. Officer Ott assisted Officer Enns and both Officers were able to gain control of WILSON'S right arm. I then handcuffed WILSON without further incident.

WILSON sustained an approximate one inch abrasion on his right cheek from when he resisted officers on the ground. WILSON also sustained scratched to his left temple/forehead area. Officer Bittleston took digital photographs of WILSON'S injuries and later downloaded them into DIMS as evidence. For further on his involvement refer to his supplemental report accomplished under this same case number.

Officer Enns noticed WILSON appeared to be possibly experiencing a diabetic episode and requested an ambulance to respond to evaluate WILSON. For further on Officer Enns findings, refer to his supplemental report accomplished under this same case number.

WILSON was transported to the hospital by HALLS ambulance, due to being a diabetic with low blood sugar.

25.



**BAKERSFIELD POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
THIS REPORT IS FOR THE EXCLUSIVE USE OF:

GO# 2015-78659 PATROL ARREST        4801-0 OBSTRUCT-RESISTING OFFICER

Based on the totality of circumstances, no criminal charges are being filed at this time.

N/853



BAKERSFIELD POLICE DEPARTMENT
GENERAL OFFENSE HARDCOPY
THIS REPORT IS FOR THE EXCLUSIVE USE OF:

GO# 2015-78659 PATROL ARREST

4801-0 OBSTRUCT-RESISTING OFFICER

## Related Image - DMV Suspension Order Form

Attachment Description:
Reference Number:

NOTICE OF PRIORITY RE-EXAMINATION OF DRIVER (Driver Incapacity)
The driver listed below committed a violation of Section(s) 21000 through 23336 of the California Vehicle Code (CVC) and should be re-examined pursuant to Section 21061 CVC. At the time of the violation, the driver exhibited evidence of incapacity which reasonably led me to believe that the person is not capable of operating a motor vehicle without presenting a clear or potential danger, to that of injury to himself/herself of others. As required by law, on the date below, I issued a copy of this Notice of Priority Re-examination/Notice of Suspension for Non-Compliance to the driver listed below.

The driver does not have to be cited for one of the above CVC sections. Please indicate evidence of the incapacity in the Summary area below. If the driver was involved in a traffic accident, attach a copy of that report. You must give a copy of this form to the driver.

If this form is being issued as a Notice of Priority re-examination/Notice of Suspension for Non-Compliance, immediately list the document (if available) to the Driver Safety Office nearest the driver's home (see reverse), then mail the original Notice to the same office.

### NOTICE OF SUSPENSION FOR NON-COMPLIANCE

INSTRUCTIONS TO DRIVER
If the above box is checked, you must contact the Department of Motor Vehicles (DMV) for a re-examination under Sections 12818 and 12819 CVC. If you do not call or appear within five (5) working days, your privilege to drive in this state will be suspended until you satisfactorily complete a re-examination. SEE IMPORTANT PRIORITY RE-EXAMINATION INFORMATION ON THE REVERSE SIDE OF THIS FORM.

REQUEST FOR REGULAR RE-EXAMINATION OF DRIVER (Officer's instructions on reverse.)
The driver listed below should be re-examined by DMV, but does not require a Priority Re-examination.

| 04-06-2015 | 0750 | | | CA |
| MICHAEL | GENE | WILSON | | |
| 413 PEBBLE BEACH DR | | | | |
| BAKERSFIELD | | CA | 93309 | 661-578-2689 |
| 6300 BLK GOSFORD RD BAKERSFIELD CA | | | | |

| 15-78659 | | | BF( | KERLI |

OBSERVED DRIVING BEHAVIOR—Check appropriate boxes for driving problems you observed. (Use space below if needed for additional comments.)

- [ ] Responding adequately to Emergency Signal/Lighting
- [ ] Drifting or weaving in and out of lanes
- [ ] Caused, or nearly caused, collision
- [ ] Not reacting to other cars, pedestrians, etc.
- [ ] Driving too far right side of road
- [ ] Driving on sidewalk
- [ ] Driving in wrong lane
- [ ] Driving too slow, obscuring traffic
- [ ] Failed to stop at red light/stop sign
- [ ] Unsafe/inappropriate lane change
- [ ] Major/turn/entry injured

- [ ] Failed to yield right of way
- [ ] Lost control of vehicle
- [ ] Struck stationary object
- [ ] Failed to go on green light
- [ ] Driving without lights at night/dim curtains
- [ ] Made turn from wrong lane
- [ ] Fell asleep while driving
- [ ] Violent or aggressive driving
- [ ] Not adequately controlling vehicle
- [ ] Other Observations

DRIVER CONDITION (Observations that Stop/Collision)—Check all appropriate boxes below. Please use the space below to provide specific details, if known, and the driver's medical (physical or mental) condition such as cause of illness or illness, any medications taken, etc.

- [ ] Confused, disoriented, incoherent, or unaware of actions
- [ ] Impaired/Observed Medical Condition
- [ ] Has or no recollection of incident
- [ ] Medicated
- [ ] Vision Correction/Vision Impairment
- [ ] Mental/Emotional Condition
- [ ] Driver (confused him/her did not see cars, pedestrians, etc.)
- [ ] Difficulty Walking
- [ ] Impairment of Coordination Problems

- [ ] Alcohol/Drug Use (Describe below)
- [ ] Confused by traffic
- [ ] Lost or confused while driving near home
- [ ] Enter Area/Backing/Parking
- [ ] Driver appears to need help with impaired and/or drinking injuries/abilty
- [ ] Other Observations

SUMMARY: You may use this space below to further describe actions of the driver which led you to believe a re-examination is needed. Describe any impairment, serious physical injury or illness, mental impairment or disorientation. Describe any traffic law violations whether or not a citation was issued.

WILSON LEFT THE ROADWAY AND BECAME STUCK IN A FIELD.
UPON OFFICER CONTACT, HE FOUGHT AND ATTEMPTED TO FLEE
FORCING OFFICER TO PHYSICALLY EXTRACT HIM FROM HIS VEH.

| BAKERSFIELD POLICE DEPT | (661) 327-7111 |
| 1601 TRUXTUN AVE | BAKERSFIELD 93301 |
| DENNIS | ROB |

I certify (or declare) under penalty of perjury under the laws of the State of California that the information above provided is true and correct.

| X | | |
| | Xmas-DMV | Canary-Law Enforcement | Pink-Driver (Priority Re-Exam Only) |

BAKERSFIELD POLICE DEPARTMENT
## GENERAL OFFENSE HARDCOPY
### THIS REPORT IS FOR THE EXCLUSIVE USE OF:

GO# 2015-78659 PATROL ARREST

4801-0 OBSTRUCT-RESISTING OFFICER

## Related Text Page(s)

Document: **Supplemental Report**
Author: 1008 - ENNS, JUSTIN
Related date/time: **Apr-06-2015 (Mon.) 1000**

On 4/6/15, at 0806 hours, I responded to citizen reports of a possibly intoxicated driver operating his vehicle erratically, driving on sidewalks, across lanes and ultimately into a field where the reporting party stated the vehicle appeared to have become stuck. For information on the witness statements regarding driving observations, refer to Officer Garcia's #1183 report under this case number.

Upon my arrival, officers were still struggling to take the driver, Mike WILSON, into custody. For information regarding the physical force utilized by officers to take WILSON into to custody, refer to Officer Garcia's supplemental report under this case number. After successfully subduing WILSON in handcuffs, Officer Ott #1195 read WILSON his Miranda rights.

I asked WILSON if he'd been drinking any alcoholic beverages this morning or late last night and he replied no. At the beginning of my questioning, WILSON seemed disoriented and confused as to the recent events leading up to the point which we were now speaking. Wilson told me he did not recall driving or fighting with the police. As WILSON spoke I could hear a thick slur to his speech but noticed there was no apparent odor of alcohol or obvious signs or odors of drugs/narcotics.

I asked WILSON if he had any medical conditions he took medication for and he said he was diabetic and takes insulin. WILSON began to become more cognizant and told me he tested his blood sugar early this morning and it was over 500, which is critically high. WILSON said he took a larger dose of insulin than ordinary since his sugar was so high. WILSON said some time later he felt as if his blood sugar was starting to plummet so he drank a Coke. Soon after this, he began to drive home then lost all recollection.

Hall Ambulance arrived on scene and assessed WILSON and confirmed his blood sugar was at 30 then a few minutes later at 38. Hall Ambulance personnel transported WILSON to San Joaquin Hospital for further treatment.

It is my opinion as a certified Drug Recognition Expert WILSON suffered an extreme lack of sugar causing his impairment and incoherence.

No further

BAKERSFIELD POLICE DEPARTMENT
**GENERAL OFFENSE HARDCOPY**
THIS REPORT IS FOR THE EXCLUSIVE USE OF:

GO# 2015-78659 PATROL ARREST

4801-0 OBSTRUCT-RESISTING OFFICER

# Related Text Page(s)

Document: **Supplemental Report**
Author: **965 - BITTLESTON, RICHARD**
Subject: **ORELLANA'S STATEMENT**
Related date/time: **Apr-07-2015 (Tue.) 1132**

On 4/6/15 at 0802 hours, I was dispatched to Gosford Rd and Panama Ln
regarding a DUI driver being followed. Prior to my arrival, the DUI driver
had reportedly become stuck in a dirt field. Officer Garcia #1183 arrived
as other officers were still en route. Officer Garcia broadcast via police
radio that the driver was attempting to flee and requested officers to
expedite to his location. I responded code 3 to the location and observed
the driver was still in the driver's seat of his vehicle and Officer Garcia
was physically engaged with the suspect from outside of the driver's door.
I also observed a citizen, wearing what I recognized to be a local security
guard company uniform, standing approximately 150' south of the vehicle on
the dirt shoulder.

For information regarding the use of force and disposition of the listed
vehicle, refer to other reports bearing this case number.

I contacted the citizen witness, who was identified by his California
Driver's license as ORELLANA, and obtained his statement.

He stated he had observed the listed vehicle driving on sidewalks
southbound Gosford Rd to the front of WalMart. He stated he was going to
call police, but saw a vehicle following and assumed other citizens had
already reported the situation. ORELLANA stated he went to his employer to
return equipment and drove southbound on Gosford Rd when he observed the
listed vehicle had become disabled. At this time, Officer Garcia arrived.
ORELLANA stated he observed the suspect was refusing to exit the vehicle
and was attempting to accelerate causing the stuck vehicle to spin the rear
tires, throwing dirt into the air behind the vehicle.

ORELLANA observed me and Officer Ott arrive and approach the vehicle. He
stated he was unable to see what was happening in detail; however stated he
could see that the suspect was obviously resisting officers. ORELLANA
stated he observed officers remove the suspect from the vehicle via the
open driver's window and place him face down on the ground. I asked
ORELLANA if he had observed any particular use of force and stated he did
not and only described it as a struggle.

I asked ORELLANA, specifically, if he had seen anyone use any tools other
than control holds including tasers, batons, pepper spray, or firearms and

29.



**BAKERSFIELD POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
**THIS REPORT IS FOR THE EXCLUSIVE USE OF:**

GO# 2015-78659 PATROL ARREST      4801-0 OBSTRUCT-RESISTING OFFICER

he stated he saw no deployment of any tools. I asked him if he observed
any officer punch or kick the suspect and he stated he did not. I asked
ORELLANA if there was anything that I did not ask him that he thought I
should know or should be documented and he stated, "No."

For further, refer to other reports bearing this case number.

NFI



**BAKERSFIELD POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**
THIS REPORT IS FOR THE EXCLUSIVE USE OF:

GO# 2015-78659 PATROL ARREST                    4801-0 OBSTRUCT-RESISTING OFFICER

*** END OF HARDCOPY ***

3/.



September 11, 2015 13:16
Receipt #: 5293434152                    Page: 1
MasterCard #: XXXXXXXXXXXX5854
2015/09/11 13:13

| Qty | Description | Amount |
|-----|-------------|--------|
| 13 | ES B&W S/S White 8.5 x11 | 1.56 |

| | | |
|---|---|---|
| | SubTotal | 1.56 |
| | Taxes | 0.12 |
| | Total | 1.68 |

The Cardholder agrees to pay the Issuer of the charge
card in accordance with the agreement between the
Issuer and the Cardholder.

FedEx Office Print & Ship Centers

4001 STOCKDALE HWY
BAKERSFIELD,CA 93309
(661) 837-1451
www.FedExOffice.com

Tell us how we're doing and receive
20% off your next $35 print order
fedex.com/welisten or 1-800-398-0242
Offer Code:_____ Offer expires 12/31/2015

Please Recycle This Receipt

*$158,500.00 Settlement  - And American Diabetes Association Offers Training for Police.*

On January 13th of this year, 70-year-old San Antonio resident Thomas Mathieu was driving along a frontage road when he felt the onset of a diabetic attack. Fearing that he might have an accident and harm others, he pulled over onto the shoulder of the road. After successfully stopping his vehicle, he lost consciousness.

Police noticed his vehicle on the side of the road and stopped to investigate. News 4 San Antonio is reporting that, upon discovering Mathieu unconscious in his car, officers confused him for a drunk driver and ordered him out of the vehicle. Given that Mathieu was unconscious and unable to hear the orders, he did not comply. An officer reached into the vehicle to force him out and, when he did not cooperate, punched Mathieu several times.

The officers wrestled him to the ground and threatened to taze him. Five minutes into the encounter, another policeman on the scene thought to ask whether or not Mathieu might be diabetic and suffering from a low blood sugar episode.

After the assault, Mathieu was hospitalized for injuries to the arms, face, and head and suffered three broken ribs. The officer who was seen on video punching him reported that he feared the unconscious Mathieu was reaching to switch the car in gear and wanted to prevent him from driving back onto the roadway and potentially injuring others.

San Antonio Police Department Chief Bill McManus commented that the case had been sent to internal affairs, but that the officers involved had been cleared of wrongdoing. He also pointed out that the department does train police to identify a diabetic episode.

Police departments across the nation have struggled to properly educate officers on how to deal with people suffering from diabetic shock. In 2012, the Henderson, Nevada city council paid $158,500 in damages to another man who was beaten by police in a similar situation. The New Jersey Star Ledger also reported on another case in which officers assaulted a man suffering from diabetic shock back in 2010. Coincidentally, the victim of the assault in the New Jersey case, Daniel Fried, had, prior to the incident, created a video for the American Diabetes Association which instructs police officers on how to identify when an individual is suffering from a diabetic episode. Ever since a 2003 case in which the city government of Philadelphia was ordered to pay damages to diabetic suspects who were denied care while in police custody, the American Diabetes Association has been working with police departments around the country to provide training and information on how to deal with individuals suffering from the disease.

News 4 San Antonio's video coverage of the beating of Thomas Mathieu, including dash cam footage, can be seen in the player below.

23



# Rough treatment of diabetic driver raises questions about N.J. State Police training

**Christopher Baxter | NJ Advance Media for NJ.com** By Christopher Baxter | NJ Advance Media for NJ.com

**Email the author | Follow on Twitter**

on October 14, 2012 at 8:00 AM, updated October 14, 2012 at 10:38 AM

One November night two years ago, State Police found Daniel Fried slumped behind the wheel of his van along Route 72 in Burlington County. He stared forward, eyelids drooping. He was incoherent, slurred his words and seemed to be falling asleep.

He may have looked drunk or like he was on drugs, but doctors say these are classic symptoms of diabetic shock. Paramedics found Fried's blood sugar was so low he could have suffered a coma, seized or died, according to State Police records.

But two troopers took his erratic behavior for belligerence. They wrestled him down, hit him



Andre Malok/The Star-Ledger

Daniel Fried, 46, of Springfield, Pa., ended up in a struggle with New Jersey State Police after he pulled himself over in his van in November 2010 on Route 72 in Burlington County because he had gone into diabetic shock.

with a baton and arrested him, their reports said. The struggle was captured by a microphone on one of the troopers, and the recording was obtained by The Star-Ledger.

On the tape, Fried can be heard screaming and telling troopers they are hurting his arm, while they yell at him to stop resisting. Fried said in court records he suffered cuts, bruises and a broken wrist, and despite repeated requests, troopers refused to fetch the fruit punch he kept in his van.

"I was stuck somewhere between angry, frustrated and embarrassed," Fried told The Star-Ledger in an interview.

As the number of Americans with diabetes soars toward 26 million, there is growing concern around the country among diabetes advocates and medical experts that too many police officers don't know how to recognize people in diabetic shock or how to help.

One person who does know all about that is Fried: after all, he wrote the book on it for the Philadelphia Police Department.

0/31/2015
Police treatment of diabetic driver raises questions about police training
Case 1:16-cv-00720-JLT  Document 1  Filed 05/24/16  Page 48 of 95

When the American Diabetes Association settled a class-action lawsuit against the city in 2003, alleging diabetics were denied care while in police custody, it asked Fried, an award-winning director and producer, to make the training video for officers.

**Police car camera footage of Daniel Fried arrest**

On Nov. 20, 2010, Daniel Fried, 46, of Springfield, Pa., was driving home from his shore house on Long Beach Island when he suffered low blood sugar and pulled over. State Police Trooper Paul Brown responded to a report of an erratic driver, found Fried's van on the side of Route 72 in Woodland Township and suspected he may be suffering from diabetes. But when a second trooper, Scott Tetzlaff, arrived, Brown did not mention his suspicion of a medical problem or the odd symptoms Fried was displaying. The video interview of Daniel Fried is **here**.

"Compared to most diabetics, I'm an expert," Fried said. "It doesn't matter how much you know and who you are. If you're diabetic, it is possible to have this kind of situation happen to you."

In a federal lawsuit pending in U.S. District Court in Camden, Fried, 46, claims the troopers — Paul Brown and Scott Tetzlaff — did the opposite of what the video shows they should have done. He said they were not trained to recognize diabetic shock, used excessive force and violated his civil rights.

The state Attorney General's Office and State Police declined comment on the case, the troopers' actions or their training because the matters were central to the ongoing litigation. In the lawsuit, the state denies wrongdoing.

Two sources familiar with a State Police internal investigation said the allegation of excessive force was determined to be unfounded. The sources were not allowed to discuss internal disciplinary matters and requested anonymity. The two troopers could not be reached for comment.

Wayne Fisher, a professor with the Police Institute at Rutgers-Newark, said while police must be prepared to recognize people's needs and attend to them, "it's just not possible officers can be prepared for every possible fact situation they might encounter."

In the recordings obtained by The Star-Ledger, Brown's uniform microphone was not working, making it impossible to know exactly what was said between him and Fried. None of the interactions between troopers and Fried were captured on video because his van blocked the camera's view.

Fried's attorney, Aaron Freiwald, said the case revealed a "deep problem" with the State Police: a lack of training and sensitivity toward people in need. About 38 minutes passed from when the first trooper arrived on scene until Fried received medical care.

"All he could do was pull over to the side of the road where he did and when he did," said Freiwald. "He needed medical attention; he did not need a beating."

## SUSPICION OF DIABETES

35.

In State Police reports and court depositions, Brown, who was first on scene, said he suspected Fried had diabetes but did not call paramedics because he could not rule out drugs or alcohol. He said he saw no evidence of drugs or alcohol and did not smell anything.

"I asked Mr. Fried if he was diabetic to which he replied, 'Yes! You didn't know that?!' Brown, who had two years on the force at the time, said in his report. "I then asked Mr. Fried if he takes insulin to which he replied, 'No. Yes. No. I don't have diabetes. I told you that.' "

Brown said he initially did not think Fried was much of a threat. He said he asked Fried to get out of the van, but did not frisk him and left him alone when Tetzlaff arrived.

Before the struggle, Brown did not tell Tetzlaff about his conversations with Fried, the strange behavior and his suspicion of diabetes. He told his colleague "this guy's giving me the runaround" and suggested Fried was being purposefully evasive, records show.

"In my experience with, you know, people that are having a medical issue, I haven't — I never experienced that where somebody was just

**Video interview with Pennsylvania man who went into diabetic shock and was accosted by New Jersey State Police in Woodland, N.J.**

On Nov. 20, 2010, Daniel Fried, 46, of Springfield, Pa., was driving home from his shore house on Long Beach Island when he suffered low blood sugar and pulled over. State Police Trooper Paul Brown responded to a report of an erratic driver, found Fried's van on the side of Route 72 in Woodland Township and suspected he may be suffering from diabetes. But when a second trooper, Scott Tetzlaff, arrived, Brown did not mention his suspicion of a medical problem or the odd symptoms Fried was displaying. Fried was hit with a baton and his wrist was broken. Fried and his attorney have filed a federal lawsuit. (Video by Andre Malok / The Star-Ledger) The video from the police car dashboard camera is here.

disregarding me completely, so I felt at that time, you know, that there was some intent there," Brown said in his deposition.

Tetzlaff said in his report Fried would not take his hands out of his pockets, and when he did, he put them back. Tetzlaff said he feared Fried might have a weapon, though none was found. He said Fried was belligerent and tried to walk away, so he grabbed him.

"He clenched his arms downward and pulled me close to his body with force," Tetzlaff wrote. "I took the accused to the ground and gained control of his left arm. ... The accused was face down, kicking and trying to roll over on his back."

In the recording, Tetzlaff later scolded Fried for not being upfront about his condition.

"Hey you know what bud, if this is all about ... the sugar you may have needed or something like that, this could have all been avoided by you just saying 'I'm diabetic, I need sugar,' " said Tetzlaff, who also had two years on the force at the time.

36

Fried was charged with disorderly conduct and resisting arrest in Woodland Township Municipal Court. The charges

were dismissed.

## A GROWING EPIDEMIC

Fried, of Springfield, Pa., in Delaware County, is among an estimated 25.8 million people in the country — including more than 589,000 in New Jersey, or 9.2 percent of the population — who have diabetes, according to the U.S. Centers for Disease Control and Prevention.

A diabetic since he was 8 years old, Fried said he has been active with the Juvenile Diabetes Research Foundation, helping educate the public and diabetics about the disease and how to best manage it. He owns an independent production company and has worked on everything from medical training videos to Discovery Channel shows, major network broadcasts and concert events.

He said he has worn a medical bracelet since his childhood, keeps a jug of fruit punch and insulin in his car, and has never before had a problem with the police. But even those who manage the disease best can suffer from low blood sugar, said Daniel Lorber, associate director of research at New York Hospital Queens and volunteer for the American Diabetes Association.

The symptoms Fried displayed were some of the most common, said Lorber, who has been treating people with diabetes for 35 years. "Hypoglycemia turns on your fight-or-flight reaction, so people get very anxious," he said.

The symptoms were also the same portrayed by the actress in the training video made by Fried around 2005. In the video, Lt. Jim Gould of the Philadelphia Police Department explains how officers should handle someone who appears to be in diabetic shock.

"When a person's blood sugar continues to fall, disorientation and confusion can increase," Gould said. "If the person is having trouble thinking clearly when answering questions, a little bit more time should be taken to figure out what is wrong before taking any action."

Lorber said scolding Fried for not communicating his problem was "ridiculous."

## PULLED OVER, WAITING FOR HELP TO ARRIVE

*On Nov. 20, 2010, while suffering from diabetic shock caused by dangerously low blood sugar, Daniel Fried pulled over along Route 72 in Burlington County. A State Police trooper responded and suspected Fried had diabetes, but 38 minutes passed before he received medical care. Here's how the stop unfolded:*

• **6:54 p.m.:** Responding to a call of an erratic driver, Trooper Paul Brown arrives on scene and questions Fried about his condition. He asks if he has diabetes. Fried says yes, then says no, appears sleepy, incoherent and has slurred speech. The trooper does not feel threatened.

• **7:06 p.m.:** Trooper Scott Tetzlaff arrives. Brown tells him Fried is giving him "the runaround" and being evasive, but says nothing about his observations, questions or suspicion of diabetes. Tetzlaff approaches Fried and asks him to take his hands from his pockets.

• **7:07 p.m.:** Fried removes his hands but puts them back. Seconds later, Tetzlaff grabs Fried's arm to secure his hands and Fried resists. Tetzlaff takes him down and a struggle ensues. Brown hits Fried in the leg with his baton. Fried suffers cuts, bruises and fractured wrist.

• **7:14 p.m.:** In the back of a patrol car, Fried asks for sugar. Tetzlaff decides to call paramedics and tells Fried if he had said he had diabetes and needed help, "this could have all been avoided." Fried asks to explain his condition, but Tetzlaff ignores him.

"His brain was starving, that's the real answer," Lorber said. "And to expect him to be able to handle something more complicated than saying, 'I need sugar' is cruel and unusual punishment."

## LACK OF TRAINING

In their depositions, Brown, Tetzlaff and a third trooper on scene, Brian Oliver, said they received no specific training on how to identify and help people in diabetic shock. They also said they did not see Fried's medical alert bracelet.

"I never received any training to say you need to check people for a medical alert bracelet whenever you have them in a situation like that, side of the road," Brown said.

Three sources with knowledge of State Police procedures said differentiating diabetes from intoxication was mentioned during first aid training, but they could not remember any specific instructions on identifying diabetic shock, its symptoms and how to help someone suffering from it. The sources were not allowed to discuss State Police policy and requested anonymity.

• **7:20 p.m.:** continuously asks trooper Tetzlaff what happened and is told he will be charged. Fried pleads with him to talk. The trooper responds, "What happened was you caused mine and two other troopers uniforms to get dirty, that's what happened tonight, all right?"

• **7:30 p.m.:** Fried pleads for juice he keeps in his van, but troopers refuse to get it and Fried is told to keep his mouth shut. Fried asks for them to listen to him. "Same way I asked you to listen to me before, right?" Tetzlaff said. "I was in shock!" Fried replies.

• **7:32 p.m.:** Paramedics arrive. Tetzlaff then searches Fried's van for juice. Fried's blood sugar tests at 26, a critically low level that requires immediate attention and can cause seizures, coma or death. Fried is stabilized and taken to Southern Ocean County Hospital.

*Sources: Federal court documents; sworn court depositions; State Police patrol car audio and video recordings; State Police investigation reports.*

Alan Yatvin, chair of legal advocacy for the American Diabetes Association and the attorney who filed the class-action lawsuit against Philadelphia, said a lot of police departments across the country are stepping up training to help those with diabetes.

"It's disappointing the New Jersey State Police is not doing anything," he said.

Yatvin said the New York Police Department recently asked for help. The city has faced several lawsuits, including one in 2010 that led to a $17.5 million jury award for a man who suffered brain damage after being refused insulin while in custody.

A number of other lawsuits have been filed against police in Nevada, Oregon and Maryland. Some have cost taxpayers thousands of dollars and prompted reviews of use-of-force policies and led to improved training to recognize medical distress.

Kathanne Gordon, staff attorney for the American Diabetes Association, said she receives several calls every month from diabetics who had bad encounters with police.

"There can be issues from the smallest Southern town to a town you would think would have much better training," Gordon said. "It certainly is a concern across the country."

38.

But Fabrice Czarnecki, chairman of the police physicians section of the International Association of Chiefs of Police, said officers should not be diagnosing diabetes, but should recognize medical emergencies and act appropriately, such as calling paramedics.

Czarnecki said the association was working on a model "extremely agitated persons" policy that would cover some of the issues related to people in diabetic shock.

**BEFORE THE STRUGGLE**

On Nov. 20, 2010, Fried said, he was driving home from his Shore house on Long Beach Island. He planned to meet his brothers at a nearby diner, but just before the exit, he said in court documents, he became disoriented and eventually pulled over.

Fried said he does not remember what happened from when he pulled over to when he was in the patrol car. According to the audio recording, after Tetzlaff arrived, he and Brown approached Fried.



Andre Malok/The Star-Ledger

Daniel Fried, 46, of Springfield, Pa., is wearing the same medical alert bracelet he said he wore when he pulled himself over in his van on Nov. 20, 2010 on Route 72 in Burlington County because he had gone into diabetic shock.

"What's gong on, bud?" Tetzlaff said, to no response.

"What's happening, man?" he said.

"What?" Fried said.

"I said what's happening?"

Fried makes a sort of grunt.

"Get your hands out of your pockets for me," Tetzlaff said.

"Why?" Fried replied.

"Because I said so, that's why," Tetzlaff said.

"Because you're making me nervous."

"No, you're making me nervous," Fried said. Tetzlaff said in court documents Fried briefly took his hands from his pockets but put them back.

"I'm making you nervous? All right. Well now you're not going anywhere," Tetzlaff said. "Get your hands out of your pockets."

"Do not push me," Fried said, just before the sounds of a struggle begin.

## I NEED SUGAR

Once in the patrol car, the recording reveals, Fried became more coherent and asked for sugar. He tried to explain his medical condition to troopers, who sometimes ignored him or told him to shut his mouth. He asked them to listen.

"Same way I asked you to listen to me before, right?" Tetzlaff replied. "I was in shock!" Fried shouted back at him.

Tetzlaff told Fried he would be charged and an ambulance was coming. Fried continued to ask what happened. "What happened was you caused mine and two other troopers' uniforms to get dirty, that's what happened tonight, all right?" Tetzlaff said.

The third trooper on scene, Oliver, said Fried asked for the juice he kept in his van. The fruit punch contains a lot of sugar and can quickly raise blood sugar levels.

"I don't know what you're talking about. I don't know what juice. Just sit down, be quiet, first aid's coming," Oliver said he told Fried, according to his deposition.

Oliver said he never asked Brown or Tetzlaff about the juice because he assumed they were looking for it and had things under control.

Tetzlaff said in a deposition he searched the van but only found fruit, and was told that would not suffice. But according to the recording, that happened after paramedics arrived. The trooper also wondered why Fried was suddenly able to talk more clearly.

Lorber, the New York doctor, said one way the body increases blood sugar is through adrenaline, and the struggle could have caused it to surge. When paramedics arrived, records show, they determined Fried's blood sugar to be 26, a level that required immediate attention. He was taken to Southern Ocean County Hospital.

## CHRONIC PAIN

Fried said in an interview his fractured wrist required multiple surgeries and he has constant pain. "I'm lucky it was only a broken wrist," he said. "It could have been brain damage."

Fried hopes the State Police realize they need better training.

"These are quick and easy things to learn," he said. "Please learn it. So people like me can live long lives."

## RECOGNIZING DIABETIC SHOCK

A training video created by Daniel Fried for the American Diabetes Association and Philadelphia Police shows how

someone in diabetic shock can act .    how officers should respond. Seven ye   .ter producing it, Fried, a diabetic since childhood, exhibited the same symptoms minutes before New Jersey State Police troopers wrestled him to the ground and arrested him.



• **Know the causes:** Low blood sugar, also referred to as diabetic shock or hypoglycemia, happens at some point to nearly everyone with diabetes, even those who manage the disease best. Without immediate treatment, the condition can cause seizures, coma or death.

• **Recognize the symptoms:** People in diabetic shock can appear drunk, under the influence of drugs or uncooperative, but need immediate medical attention. Symptoms include sweating, shakiness, anxiety, confusion, difficulty speaking, uncooperative behavior, paleness, irritability, dizziness, trouble swallowing, seizure and loss of consciousness.

• **Rule out drugs and alcohol:** Absent the smell of alcohol or evidence of drug use, police officers dealing with someone exhibiting the signs of diabetic shock should continue to question if the person needs help and should ask for a medical identification bracelet. Extra time should be taken to determine if someone needs medical attention before escalating a situation.

• **Know how to provide help:** If someone with diabetes requests a source of sugar to treat diabetic shock, immediately provide them with a sugared soft drink, juice, or another fast-acting source of sugar, followed by bread or crackers, and call paramedics.

• **Have proper training:** An estimated 25.8 million people in the United States — including more than 589,000 in New Jersey, or 9.2 percent of the population — have diabetes. An increasing number of police agencies across the country are implementing training, but a lack of awareness continues to cause problems when police encounter people in diabetic shock or hold diabetics in custody.

**For more information:** Visit the American Diabetes Association website at **www.diabetes.org** or call 1-800-DIABETES.

*Source: U.S. Centers for Disease Control and Prevention; American Diabetes Association; federal court documents*

© 2015 NJ.com. All rights reserved.





Help improve the lives of those with diabetes



**American Diabetes Association.**

ESTABLISHED 1940

American Diabetes Association
1701 North Beauregard Street
Alexandria, VA 22311
1-800-DIABETES (800-342-2383)

# Law Enforcement Training

Law enforcement officers recognize the scope of the diabetes epidemic in the communities they serve, and the danger of responding incorrectly to people with diabetes. However, when given the tools, training, and resources to identify diabetes emergencies and to provide appropriate diabetes care to individuals in their custody, officers can be confident in their ability to serve and protect people with diabetes. To that end, the American Diabetes Association has developed several resources to help law enforcement agencies train their officers on diabetes.

If you are a law enforcement officer and would like more specific information about diabetes awareness training, including how you can set one up with your department, please contact LegalAdvocate@diabetes.org.

## Training Resources

**Helping First Responders Save Lives**
http://www.diabetesforecast.org/2014-jan-feb/nurse-responder.html  Learn about how law enforcement agencies and Association volunteers are working together across the country to train officers to distinguish hypoglycemia from intoxication and how you can get involved.

**Philadelphia Police Department Lesson Officer**
http://main.diabetes.org/dorg/PDFs/advocacy/Discrimination-and-staff-lesson-2 (PDF)
The Association helped the Philadelphia Police Department update a quick reference guide about diabetes for law enforcement officers. It is a valuable tool for law enforcement officers throughout the country.

**Diabetes: A Particular Can Be Life Threatening**
http://main.diabetes.org/dorg/PDFs/advocacy/Discrimination-poster-law-enforcement-diabetes (PDF)
This poster was originally created with the help of the Philadelphia Police Department, where it hangs in each precinct. It can be downloaded and printed, or a large poster can be ordered free of charge except for shipping, at

Treating Diabetes Emergencies

This 20-minute video, produced by the Philadelphia Police Department and the American Diabetes Association helps officers identify potential diabetes emergencies and respond quickly and effectively. It may be watched in its entirety on YouTube or ordered, free of charge except for shipping, at www.shopdiabetes.org.html www.shopdiabetes.org



Treating Diabetes Emergencies DVD

Treating Diabetes Emergencies DVD

*Last Reviewed: August 26, 2014*
*Last Edited: September 4, 2014*

    

Copyright 1995-2015, American Diabetes Association. All rights reserved. Use of this website constitutes acceptance of our Terms of Use and Privacy Policy.



blackbaud

HOME     ABOUT BLUESHEEPDOG     POLICE TRAINING ARTICLES     GEAR REVIEWS

BLUE CREW MEMBERSHIP     BLOG

# BLUE SHEEPDOG

POLICE GEAR REVIEWS, TRAINING AND OFFICER SAFETY — BS

YOU ARE HERE: HOME / RECOGNIZING AND RESPONDING TO A DIABETIC EMERGENCY

# Recognizing and Responding to a Diabetic Emergency

Diabetic hypoglycemia can cause blurred speech, confusion, irrational behavior and a dazed appearance. Untreated, it can lead to unconsciousness, brain damage or death.

In October 2010, Adam Greene was forcefully pulled from his car by peace officers from the Henderson, Nevada, Police Department and the Nevada Highway Patrol (NHP), then battered and kicked for allegedly resisting the officers. A NHP dash cam video captured Mr. Greene's forceful removal from his vehicle and the applied use. Mr. Greene was thought to be driving under the influence. Shortly after Mr. Greene was placed onto the roadway, officers suspected he was not driving under the influence, but was instead suffering from a diabetic emergency (which caused him to appear intoxicated) and reportedly to be losing consciousness. Many officers and administrators have read or heard about the widely reported $292,000 settlement of Mr. Greene's civil lawsuit in early 2012.

The goals of this article are to explain diabetes, identify behavioral cues, suggest action steps, and to also communicate how to obtain a complimentary video or DVD and a free poster which can be used as a training aid to help educate about this serious, life threatening medical emergency.

### Diabetes Insipidus and Mellitus



There are two broad categories of diabetes: *diabetes insipidus* and *diabetes mellitus*. Diabetes insipidus, although rare, causes frequent urination and can dehydrate a person very quickly. Because an individual is urinating frequently, (s)he may experience sleep interruptions, become quickly dehydrated, irritable, listless, vomit, have a fever, or have diarrhea. During an excited delirium instructor training class at a Southern California sheriff's academy, a female deputy shared how a relative who was diagnosed with diabetes insipidus would go into an altered mental state, develop incredible strength, and destroy things around her. The deputy said that it would often take six or more people to capture, control, and/or restrain her during these medical episodes. Although diabetes insipidus shares many common behavioral cues with diabetes mellitus, it can be caused by damage to the pituitary gland, head injuries, neurosurgery, or genetic disorders. There are also four types of diabetes insipidus: central diabetes insipidus, nephrogenic diabetes insipidus, dipsogenic diabetes insipidus, and gestational diabetes insipidus.

*Central diabetes insipidus* can be caused by damage to the pituitary gland, head injuries, neurosurgery, or genetic disorders. The pituitary gland stores a hormone made in the hypothalamus of the brain called AntiDiuretic Hormone (ADH), or vasopressin. ADH is released into the person's bloodstream via the pituitary gland when needed and basically instructs the kidneys. Diabetes insipidus can develop when there is a disruption in this system. Generally, a synthetic hormone, desmopressin, is given to the patient via injection, nasal spray, or pill which will prevent the individual from urinating frequently.

*Nephrogenic diabetes insipidus* focuses on the kidneys' inability to respond to ADH. Although this impairment may not have an identifiable cause, identified causes include, but are not limited to: drugs (e.g., lithium), sickle-cell disease, polycystic kidney disease, kidney failure, and inherited genetic disorders. Desmopressin which may be prescribed for central diabetes insipidus will not work on this form of diabetes insipidus.

When a person's thirst mechanism is damaged or has a defect, this often results in an abnormal increase in thirst and fluid intake which will often increase urine output. This "fluid overload" can lead to water intoxication which can cause brain damage in the person because of a lowering of sodium in the blood. This form of diabetes is known as *dipsogenic diabetes insipidus*.

The fourth type of diabetes insipidus is called *gestational diabetes insipidus* and only occurs during pregnancy. The placenta makes an enzyme which destroys ADH in the mother.

Diabetes Mellitus



Most of us are familiar with diabetes mellitus, commonly referred as Type I and Type II. Both types of diabetes mellitus are associated with high levels of glucose (sugar) in the blood. *Type I* diabetes mellitus is often called "insulin dependent" and is often diagnosed in children, but can also be diagnosed in people over the age of 20. In short, the person's body fails to make insulin, or makes too little insulin which requires that they take daily injections of insulin.

*Type II* diabetes mellitus is more common and usually occurs in adults. However, it is hard to pick up a newspaper, magazine, or watch a television broadcast where writers and newscasters are not discussing the epidemic of Type II diabetes in people living in the United States. Over 20 million Americans are affected by diabetes; approximately 40 million more Americans have early Type II diabetes. In Type II diabetes, the pancreas fails to make enough insulin to maintain normal glucose levels. Associated risk factors include, but are not limited to: obesity (Body Mass Index [BMI] greater than 25); lack of exercise; heart disease; high blood cholesterol levels; age 45 or older; and having a sibling or parent with diabetes.

## Manic-Depressives and Diabetes

Manic-depressive people are also more likely to have diabetes because of the newer psychotropic medications they are taking. A 1999 study conducted at Duke University estimated that individuals who have been diagnosed with bipolar disorder may be three times more likely to have diabetes than the general population. Investigators found that ten percent of the hospitalized patients in the study were found to have diabetes.

## Symptoms and Warning Signs of Type I and Type II Diabetes

Symptoms of Type I diabetes include, but are not limited to: fatigue; increased thirst; frequent urination; nausea; vomiting; increased appetite; weight loss (even with the increase in appetite).

Symptoms of Type II diabetes include, but are not limited to: increased urination; increased thirst; increased appetite; fatigue; blurred vision.

## Hypoglycemia and Hyperglycemia Warning Signs

There are several warning signs law enforcement officers must be able to recognize so they can take appropriate actions steps. Remember, a person who is experiencing a diabetic event may appear to be intoxicated or under the influence of drugs. The person will often be noncooperative. Here are several warnings signs which will require action for individuals who are in a state of hypoglycemia (low blood sugar) and hyperglycemia (high blood sugar)

*Hypoglycemia* – sweating; weakness; anxiety; confusion; difficulty speaking; uncooperative behavior; paleness; irritability; dizziness; inability to swallow; seizure; and/or loss of consciousness.

*Hyperglycemia* – flushed skin, labored breathing; confusion; cramps; weakness; sweet breath; nausea; and/or loss of consciousness.

Remember that, in addition to these "warning signs," the individual may also be showing additional symptoms of Type I and Type II diabetes which were previously discussed.

**Situational Action Steps**

· Remember: This is first and foremost a MEDICAL EMERGENCY;

· Ask the person or someone who knows him or her if (s)he is a diabetic;

· Ask the person or someone who knows him or her if (s)he needs medication or sugar;

· Check for a medical identification (e.g., bracelet, necklace, or card), but remember that many people may not wear or have such identification;

· Request Emergency Medical Services (EMS) to either stage nearby if the person is not under control, or to immediately treat the patient if (s)he is under control;

· Try to contain the person;

· Try to have the person sit and relax;

· Speak calmly to the person;

· If necessary, carefully *capture* the person based upon agency training, directives, and force options;

· Next, *control* the patient (e.g., possibly using an escort hold);

· Only if necessary, temporarily *restrain* the patient (extended use of metallic restraints may cause infection in people with diabetes which in rare cases has resulted in amputation of the affected area);

· **Immediately** provide a hypoglycemic patient (low blood sugar) with sugar (candy bar, sugared soft drink; juice; food) if (s)he requests it or if it becomes known that (s)he needs sugar intervention;

· **Immediately** have EMS or a qualified medical professional provide the *hyperglycemic* patient (high blood sugar) with medication to lower his or her blood sugar levels.

· **Transport** by ambulance (preferable) or patrol car (only if no ambulance is available) to a hospital; and

· **Only** take a detained (e.g., involuntary hold) or an arrested person to a jail or a prison where (s)he will have immediate access to health care professionals who can help to manage the person's diabetes. Remember: Experiencing a diabetic event is a *medical emergency* and **not a crime**.

**Training Materials**

The situational action steps may be used when the person you are confronting shows the behavioral cues and/or symptoms of someone experiencing a diabetic event. Knowing these situational action steps often is a result of inservice training programs which are provided by your agency or by outside training firms. Training programs must contain a section about the Americans with Disabilities Act (ADA) because, many times, a severe or "brittle" diabetic will qualify as being disabled under the ADA. Also, make sure this information is contained in lesson plans (e.g., defensive tactics, restraint, transport, etc.). The American Diabetes Association offers a complimentary video or DVD.

*Treating Diabetes Emergencies: What Police Officers Need to Know* and also a free poster, "Diabetes is serious. It can be life threatening." To order, please call (800)232-6733 or E- mail ADAOrders@phd.com. A copy of this video has also been posted to YouTube.

Part 1.



Recognizing and Responding to a Diabetic Emer...



Part 2:



Part 3:



## Summary

Even with continuous training programs which focus on diabetic events, law enforcement officers may unintentionally "misread" a person. However, it is important to view individuals who are in an altered state of mind as being in a medical emergency. DO NOT assume the person to whom you are speaking is "drunk," "high on drugs," or in a state of excited delirium. The individual may be experiencing a diabetic event which is a medical emergency. If possible, ask the person or someone who knows the person if (s)he is a diabetic. Think back to your police academy recruit training when the instructor cautioned everyone about assuming the person you are about to stop for suspected impaired driving might be having a diabetic event. After all, no one wants to live through an Adam Greene traffic stop and lawsuit.

*About the Authors: John G. Peters, Jr., Ph.D., CLS, is President and Chief Learning Officer of the internationally recognized training firm, Institute for the Prevention of In-Custody Deaths, Inc. A former law enforcement administrator and officer, Dr. Peters is often called upon to provide consulting, training, public speaking, and expert witness services. An Americans for Effective Law Enforcement (AELE) Certified Litigation Specialist in police, correctional, and campus law enforcement liability, he is also Adjunct Faculty, University of Phoenix. For training dates, information, and course locations about diabetes and similar events (e.g. excited delirium), please visit www.ipicd.com.*

5

A. David Berman, M.S., CLS . Vice President of the Henderson, Nevada-based Institute for the Prevention of In-Custody Deaths, Inc. and did the literature review for this article. A former law enforcement officer and police academy defensive tactics instructor, David holds a Master of Science degree in criminal justice, and is also a Certified Litigation Specialist in police and campus law enforcement liability.

This article is a contribution from Police & Security News. P&SN is bi-monthly law enforcement magazine that is packed with training articles and gear reviews for the patrol officer. P&SN is a valued supporter of BlueSheepdog and the Blue Crew. You can obtain a free subscription to the Police & Security News magazine by joining the Blue Crew.

Latest Posts



**Police and Security News**

This article is a contribution from Police & Security News. P&SN is bi-monthly law enforcement magazine that is packed with training articles and gear reviews for the patrol officer. P&SN is a valued supporter of BlueSheepdog and the Blue Crew. You can obtain a free subscription to the Police & Security News magazine by joining the Blue Crew.

SEARCH BLUESHEEPDOG

Search this website

TODAY'S MOST READ



FOLLOW US AROUND THE WEB



BlueSheepdog.com is dedicated to providing superior police training, officer safety tips and more. Make sure you check out our podcast, training videos and newsletter

POPULAR POSTS

•Pedestrian Cop Shooting, ded
•No Guns for Police at Disney World
•LAPD's new Backup Guns
•Investigating Domestic Violence Strangulation
•Policing in Jd001h
•Sw Things That Can Save Your Life

Copyright © 2015 BlueSheepdog.com

$\mathcal{SY}.$

# examiner

# Police Training Needed To Better Manage Diabetes Emergencies



It was October 20, 2009 when John Harmon, a diabetic 52-year old Ohio man, was driving home from work and his blood sugar plummeted to a dangerously low level. When his Ford Expedition began to weave, a Hamilton County Sheriff's deputy pulled him over.

According to the Cincinnati Enquirer, "Deputies broke the window of Harmon's SUV, shocked him seven times with a Taser, cut him out of his seatbelt and wrestled him to the ground, severely dislocating his elbow and causing trauma to his shoulder and thumb." A sheriff's office investigation confirmed that excessive force was used and four officers were punished. Litigation is pending.

(Nov. 2011) -- In Stow, Ohio, Chelsea Garrett, a 23-year old diabetic woman, had a similar problem while driving. When she stepped out of her vehicle the 5-foot-2, 90-pound woman was greeted by a Stow police officer with a punch to the chest that knocked her on the ground. There is a police video of the incident that will likely be used in litigation there too.

(Aug. 2010) -- In Lauderhill, F   Enrique Gonzalez, a 36-year old diabetic, was driving on the wrong side of SR-441. Despite the flawed driving no charges were filed by police, but in confronting Mr. Gonzalez he somehow ended up with a broken nose, fractured eye socket, fractured hand and multiple abrasions.

When it comes to dealing properly and safely with motorists experiencing diabetic or other medical emergencies, big city police department have similar problems too. The Philadelphia Police Department had an infamous incident (*Rosen v. City of Philadelphia*) involving a diabetic man who had been arrested and left alone in a cell when he badly needed food and medical treatment to correct his blood sugar level. A settlement was reached in that case involving the American Diabetes Association's assistance in setting new policies and procedures specifically for treating detainees with diabetes. The City of Philadelphia and ADA also produced a training video as part of the settlement.

Clearly, some police agencies are better equipped than others to recognize when motorists are experiencing diabetes episodes or other medical conditions.

In Tampa, FL. Sgt. Raymond Fernandez heads up a dedicated DUI Unit (15 officers) for the Tampa Police Dept. which he says works well because each member is highly trained on DUI and recognizing related diabetes or other medical emergencies. Fernandez has directed the unit for 14 years and he's worked with some DUI Unit members for 18 years.

With Fernandez, the Tampa P.D. has someone who has seen diabetes and its effects in his own family. "My grandmother is diabetic and her blood sugar went down to 30 one day, so I know what to look for... it's a scary thing!"

In his work environment Fernandez says "I've seeen many people who have diabetes, who when we first come across them, there's a suspicion of DUI. But there are things we look for that are obvious clues (syringes, diabetes meds, glucose tablets, diabetes bracelets or medals). When people are in diabetic shock they'll mimic a DUI. They become incoherent; you may even smell a faint odor which you might think is alcohol on their breath. We talk to them and ask: 'Do you have any injuries or illnesses?'

"When we think diabetes or another medical issue may be the problem we call in the Fire Rescue Unit. Their response time is typically 3 to 4 minutes. If something has to be administered (like a glucose solution) they do that. They'll come out and test the blood sugar right on the side of the road. And we'll put those blood results right into our reports."

Fernandez acknowledged that many agencies don't have dedicated DUI Units, and therefore don't have the opportunity to train and focus on recognition of diabetes shock, seizures or

other medical conditions. Bu    's an approach that works well fo    ampa.

"We arrest about 2,400 to 2,500 people for DUI each year. We go to another 3,000 call-outs each year where we don't arrest anybody. Maybe 1 to 2 percent, 20 or 30 are actual medical emergencies." said Fernandez.

"We're seeing a lot more DUIs involving prescription medications, not just alcohol," Fernandez added. "In the old days DUI was just alcohol impairment. Now, with prescription medications you have to start considering many different things... Obviously, we're not trained doctors but I think we do a pretty good job."



**Gregg Laskoski**

© 2006-2015 AXS Digital Group LLC d/b/a Examiner.com


# Adventist Health

SAN JOAQUIN COMMUNITY HOSPITAL
2615 CHESTER AVENUE
BAKERSFIELD CA 93301-2905

## SUMMARY OF SERVICES

| Description | | Amount |
|---|---|---|
| Cardiology | | 326.55 |
| Emergency Room | | 1,930.95 |
| Laboratory | | 1,167.60 |
| Pharmacy | | 11.55 |
| Professional or Physician Fees | | 260.00 |
| Radiology | | 6,265.35 |
| **Total Patient Services** | | **$9,962.00** |
| Insurance Discount | 04/17/15 | -177.18 |
| Insurance Discount | 04/18/15 | -7,633.03 |
| Insurance Discount | 05/15/15 | -33.88 |
| Insurance Payment | 05/15/15 | -116.78 |
| Insurance Discount | 05/29/15 | 0.00 |
| Insurance Payment | 05/29/15 | -2,422.05 |
| Insurance Discount | 09/04/15 | 520.92 |
| **Total Payments & Adjustments** | | **$-9,862.00** |
| **Current Account Balance** | | **$100.00** |

▶ **IMPORTANT MESSAGE**

Your insurance has processed your claim. This balance is your responsibility. Please make your payment today or contact us to discuss financial arrangements.

▶ **ENCOUNTER SUMMARY**

| | |
|---|---|
| Patient | MICHAEL GENE WILSON |
| Date(s) of Service | 04/06/15 |
| Statement Number | 1570103 |
| Encounter Number | 37700325194 |
| Physician | OSHITA, MD, TAKASHI |

▶ **INSURANCE INFORMATION**

Primary  KAISER PERMANENTE SOUTHERN
CALIFORNIA
Subscriber  MICHAEL GENE WILSON
ID Number  XXXXXXX37424

Secondary
Subscriber

▶ **QUESTIONS? (661) 869-6800**

For questions about your statement, call Customer Service at (661) 869-6800.

**Financial Assistance:**
Adventist Health provides discounts to eligible low-income patients. If you can't pay part of your bill, please contact our Customer Service Department. We will review your financial situation to determine if you are eligible for financial assistance.

SEPARATE PHYSICIAN BILLING: You may receive separate bills from physicians who provided care or who consulted on your case

THANK YOU FOR ALLOWING SAN JOAQUIN COMMUNITY HOSPITAL TO PROVIDE FOR YOUR RECENT HEALTHCARE NEEDS.

# Adventist Health
SAN JOAQUIN COMMUNITY HOSPITAL
PO BOX 846178
LOS ANGELES CA 90084-6178

☐ Please check box if address is incorrect or insurance information has changed, and indicate change(s) on reverse side.

**Pay Online:** HTTPS://MYADVENTISTHEALTH.PAYMYHEALTHBILL.COM
**Access Code:** 7877752770



MICHAEL GENE WILSON
413 PEBBLE BEACH DR
BAKERSFIELD CA 93309-2813



IF PAYING BY CREDIT CARD, FILL OUT BELOW

DISC_VER    VISA

MICHAEL GENE WILSON                    09/26/201

| ACCOUNT NUMBER | AMOUNT DUE |
|---|---|
| 1570103 | $100.00 |



SAN JOAQUIN COMMUNITY HOSPITAL
PO BOX 846178
LOS ANGELES CA 90084-6178


**Adventist Health**

SAN JOAQUIN COMMUNITY HOSPITAL
2615 CHESTER AVENUE
BAKERSFIELD, CA 93301-2006

RE      Encounter Number:      37700325194
        Statement Number:      1570103

## Important Information Regarding Financial Assistance

Adventist Health is committed to providing quality health care that is affordable for our community. We have financial assistance policies that may help to cover the cost of your health care needs.

You are receiving this notice because we have billed all of the insurance plans related to your encounter and there is a remaining balance that is your responsibility to pay. Please review the enclosed statement and let us know if you have additional coverage such as Medicare, Medi-Cal, coverage offered through the California Health Benefit Exchange, California Children's Services, or any other insurance plan.

Below is a sample statement, showing where to look for your insurance plans. If you have additional coverage not listed on your statement, please contact us at the customer service number listed at the top of the enclosed statement.

This is a sample statement.
Check your statement to
confirm the insurance plans
on file for your account.



► INSURANCE INFORMATION

Primary
Subscriber
ID Number

Medicare
John Q. Patient
XXXXX-9999

Secondary
Subscriber
ID Number

Anthem BlueCross
John Q. Patient
XXXXX-9999

If you do not have additional coverage and you meet certain low to moderate income requirements you may qualify for a discount and/or extended payment plan terms on the remaining balance. Please contact our customer service department and we will review your financial situation to determine if you are eligible for financial assistance.

Adventist Health believes everyone should be treated with respect. We adhere to state and federal laws that require debt collectors to treat you fairly and prohibit debt collectors from making false statements or threats of violence, using obscene or profane language, and making improper communications with third parties, including your employer. Except under unusual circumstances, debt collectors may not contact you before 8:00 a.m. or after 9:00 p.m. In general, a debt collector may not give information about your debt to another person, other than your attorney or spouse. A debt collector may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities you may contact the Federal Trade Commission by telephone at 1-877-FTC-HELP (382-4357) or online at www.ftc.gov

Nonprofit credit counseling services may be available in your area.

We are here to serve your health care needs. If there is anything that you need please don't hesitate to contact us



# JCHUNT INC. DBA PAYLESS TOWING CA# 356303

1400 WASHINGTON STREET BAKERSFIELD CA 93305-5545
Phone (661) 325-7700 / Fax (661) 324-7078

Released To                MARY WILSON

**Impound Invoice**

Printed 4/7/2015

411 PEBBLE BEACH BAKERSFIELD

| | |
|---|---|
| Invoice # | P5,298 |
| Reference # | 00015281 |
| Stock # | 535645 |
| Account | Bill (Impounds) |
| Date/Time Requested | 4/6/2015 8:45 AM |
| Date/Time Completed | 4/6/2015 10:14 AM |
| Date/Time Impounded: | 4/6/2015 8:46 AM |
| Driver | ALVINO MARTINEZ |
| Truck | 2014 HINO FLATBED |
| Truck | 2014 HINO FLATBED |
| Date/Time Released: | 4/7/2015 9:51 AM |
| Days Held in Impound | 2 days |

| | |
|---|---|
| Reason for Impound | Police |
| VIN Number | 1FNEU15N8LA68489 |
| Model | 1990 Ford Bronco (White) |
| License Plate | 3SUY912 (CA) |
| Drivable | No |
| Keys | Yes |
| Towed from | GOSFORD/PANAMA LN |
| Stored at | 1400 WASHINGTON ST, MAIN YARD |
| | 1400 WASHINGTON ST , BAKERSFIELD CA 93305 |

## Storage charges

| | Quantity | Price | Line Total |
|---|---|---|---|
| (Storage - Storage Fees) Impounds Storage Daily Impound Rate | 2 | $28.00 | $56.00 |

## Towing charges

| | Quantity | Price | Line Total |
|---|---|---|---|
| (Towing) BAKERSFIELD POLICE TOW RATE | 1 | $165.00 | $165.00 |

| | | |
|---|---|---|
| | Towing Subtotal | $165.00 |
| Storage   Storage Fees Subtotal | | $56.00 |
| | Subtotal | $221.00 |
| | Taxes | $0.00 |
| | Grand Total | $221.00 |
| | Amount Due: | $0.00 / Paid |

Cash payment of $221.00 applied

BY SIGNING THIS INVOICE I AGREE THAT ALL CONDITIONS IN THE VEHICLE AND I AGREE TO THE VEHICLES CURRENT CONDITION

Signature _____          Date: _____          CA# 356303

Upon request, you are entitled to receive a copy of the Towing Fees and Access Notice



**FINAL**



## Patient Care Report

### Hall Ambulance Service Inc
1001 21ST ST
BAKERSFIELD, CA 93301-4792
(661) 334-5419 Ext.

Run Number: 28033

Date of Service: 04/06/2015

Patient Name: MICHEAL WILSON

### CREW INFO

Vehicle: 396
Crew #1: JAEGER, WILLIAM
Crew #2: CASTRO, ERIC
Crew #3: ALLARD, DAVID
Crew'd By: JAEGER, WILLIAM
Assisted By: Bakersfield City Fire

Arrival: First In
Status

### RESPONSE INFO

Med/Trauma: Medical and Trauma
Call Type: ALS
Response Priority: 3-Priority, EOA Response
Nature Of Call: 22803
Start Mileage: 0.0

Resp Delay: <None>
<None>
<None>
Trans Delay: <None>
<None>
<None>
Call Taken by: 3-1-EOC

Resp with: Bakersfield City Fire
Location: GOSPORT RD & PANAMA LN
BAKERSFIELD, CA 93301

Pt. Found: In Roadway/Roadside

### DISPOSITION

Outcome: Transport By Ground
Dest. Reason: Patient/Family Request
Transport Priority: 3-Priority EOA Response
At Scene Mileage: 20.0
At Dest. Mileage: 21.6
Condition at Dest: Improved
Level of care: ALS
Barriers to Care: None
None
None
Pt. Transported: Semi-Fowlers, Gurney

Destination: SAN JOAQUIN COMM HOSP
Dept. ER
2615 EYE ST
BAKERSFIELD, CA 93301-2906
Recv Doctor:
Transporting Agency: Hall Ambulance
Transporting Unit: Ground

### TIMES

| | |
|---|---|
| Recv'd | 06:20 04/06/15 |
| Dispatch | 06:20 04/06/15 |
| En route | 06:21 04/06/15 |
| At scene | 06:26 04/06/15 |
| At patient | 06:27 04/06/15 |
| Transport | 06:59 04/06/15 |
| At dest | 09:15 04/06/15 |
| In service | 09:30 04/06/15 |
| At base | 09:47 04/06/15 |

Destination
Delay: Staff Delay
Reason

### PATIENT INFORMATION

Name: MICHEAL WILSON
Med Record #: 51-703-21

Phone: (661) 478-2589

DL Info:

SSN:
Sex: Male
Place of Birth:

Pt. Belongings:
ID:

DOB:
Home Addr: 413 PEBBLE BEACH DR
BAKERSFIELD CA 93309
Message Phone:
Left With: Patient

Weight:
Mailing Addr: 413 PEBBLE BEACH DR
BAKERSFIELD, CA 93309

### NEXT OF KIN

Name: MARY WILSON

Phone: (661) 478-2589

SSN
Sex

DOB:
Home Addr: 413 PEBBLE BEACH DR Bakersfield CA
93305

### INSURANCE

Work Related: No

Provider Info:
Company: HA SER

Policy #: 5F3-82-5381

Group #:

Guarantor: Self

### HISTORY

Allergies
NKDA

Chief Complaint:
Altered Level of Consciousness

Medications
None

Page 1 of 7

# FINAL

## Patient Care Report



### Hall Ambulance Service Inc

1001 21ST ST
BAKERSFIELD, CA 93301-4792
(661) 334-5419 Ext.

**Run Number:** 28033

**Date of Service:** 04/06/2015

**Patient Name:** MICHEAL WILSON

### Past Medical History

Cardiac Disease - MI

Diabetes - Insulin Dependant

Renal - Renal Insufficiency

## ASSESSMENTS

**04/06/2015 08:27:00**   By: JAEGER, WILLIAM

| Body Area | Assessment | Body Area | Assessment |
|---|---|---|---|
| Airway | Assessed with No Abnormalities | Breathing | Assessed with No Abnormalities |
| Circulation | Assessed with No Abnormalities | Central Nervous System | Neuro Intact |
| Head | Assessed with No Abnormalities | Face | Assessed with No Abnormalities |
| Nose | Assessed with No Abnormalities | Neck | Assessed with No Abnormalities |
| Chest | Assessed with No Abnormalities | Pelvis | Assessed with No Abnormalities |
| Genitalia | Not Assessed | Right Hand | Assessed with No Abnormalities |
| Left Hand | Assessed with No Abnormalities | Right Foot | Assessed with No Abnormalities |
| Left Foot | Assessed with No Abnormalities | Alcohol/Drug Use | None |
| Arm Left Lower | Assessed with No Abnormalities | Arm Left Upper | Assessed with No Abnormalities |
| Arm Right Lower | Assessed with No Abnormalities | Arm Right Upper | Assessed with No Abnormalities |
| Back- Lumbar/Sacral | Assessed with No Abnormalities | Back-Cervical | Assessed with No Abnormalities |
| Back-Upper | Assessed with No Abnormalities | Bed Confined At Release of Patient | NO Pt. able to ambulate |
| Bed Confined At Time of Assessment | NO-Pt. able to ambulate | Blood Loss | None Noted |
| Cardio Vascular | Capillary Refill - Normal | Distress Level of Patient | None noted |
| Ears | Abrasion | External/Skin | Normal |
| Eye- Left | Assessed with No Abnormalities | Eye- Right | Assessed with No Abnormalities |
| Leg Left Lower | Assessed with No Abnormalities | Leg Left Upper | Assessed with No Abnormalities |
| Leg Right Lower | Assessed with No Abnormalities | Leg Right Upper | Assessed with No Abnormalities |
| Lividity | Lividity Not Applicable | LLQ | Assessed with No Abnormalities |
| LUQ | Assessed with No Abnormalities | Medically Necessary | Yes |
| Mental Status | Normal | Patient Moved By Stretcher | Yes |
| Rigor Mortis | Rigor Mortis Not Applicable | RLQ | Assessed with No Abnormalities |
| RUQ | Assessed with No Abnormalities | Throat/Mouth | Assessed with No Abnormalities |
| Trauma Activation | No Activation | | |

## IMPRESSIONS

Primary Impression:   DIABETIC PROBLEM

## TRAUMA

no trauma entered

# Hall Ambulance Service Inc

*1001 21ST ST. BAKERSFIELD, CA 93301-4792*

(661) 334-5419

Federal Tax ID #        95-2788714

PATIENT NAME:   WILSON, MICHAEL G.

RUN NUMBER: 15 - 25,033
DATE OF CALL: 4/6/2015
TIME OF CALL: 15:20
CALLER:

MICHAEL G. WILSON
413 PEBBLE BEACH DR
BAKERSFIELD, CA 93309

FROM:  GOSFORD RD & PANAMA LN
TO:  SAN JOAQUIN COMM HOSP

PRIMARY PAYOR: KAISER EMI COMMERCIAL EMER

SECONDARY PAYOR: PRIVATE PAY

| DESCRIPTION | RECEIPT | QUANTITY | UNIT PRICE | PAYMENT DATE | AMOUNT |
|---|---|---|---|---|---|
| ALS1E EMERG/PROC | | 1 | $1,772.00 | | $1,772.00 |
| MILEAGE | | 12 | $31.33 | | $375.96 |
| EKG 1 to 3 LEADS | | 1 | $75.00 | | $75.00 |
| DEX DEXTROSE WATER | | 1 | $4.93 | | $4.93 |
| PULSE OXIMETER | | 1 | $57.00 | | $57.00 |
| IVP-NORMAL SALINE | | 1 | $6.57 | | $6.57 |
| VENIPUNCTURE | | 1 | $32.00 | | $32.00 |
| CATHETER/IV/TUBING | | 1 | $25.67 | | $25.67 |
| PAYMENT-KAISER | 4500264310 | 1 | | 5/21/2015 | ($2,299.13) |
| PAYMENT-CHECK | 1061 | 1 | | 6/4/2015 | ($50.00) |

**BILLED**                               $0.00

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
DETACH ALONG ABOVE LINE AND RETURN STUB WITH YOUR PAYMENT. THANK YOU

PATIENT NAME:   WILSON, MICHAEL G.        TRIP NUMBER: 15 - 25,033   AMOUNT
                                          CURRENT DATE: 05/15/15   ENCLOSED:

REMIT TO:   Hall Ambulance Service Inc
            1001 21ST ST
            BAKERSFIELD, CA 93301-4792

63



**Patient Care Report**

### Hall Ambulance Service Inc

1001 21ST ST
BAKERSFIELD, CA 93301-4732
(661) 334-5419 Ext.

Run Number: 28033

Date of Service: 04/06/2015

Patient Name: MICHEAL WILSON

## VITAL SIGNS

| Time | BP | Pulse | Respiratory | SPO2 | EtCO2 | Glucose | GCS |
|------|-----|-------|-------------|------|-------|---------|-----|
| 08:44 | 159/81 NIBP Machine | 84 Strong Regular | 16 Normal Regular | 94% | | 373 | E4 + V5 + M6 = 15 |

Skin Temp=Normal  Skin Color=Normal  Skin Moisture=Normal  Lung Sounds Left=Normal  Lung Sounds Right=Normal  Cap.
Refill=Normal
Pupil size: Left=3-mm, Right=3-mm   Pupil Reacts: Left=Reactive  Right=Reactive   Pupil Dilation: Left=Normal, Right=Normal
Level of Consciousness: Alert: Pain Scale=0: Arm Movement: Left=Spontaneous, Right=Spontaneous: Leg Movement: Left=Spontaneous
Right=Spontaneous
ECG=Normal Sinus Rhythm

Completed By: ZOLL E-Series

| | | | | | | | |
|------|-----|-------|-------------|------|-------|---------|-----|
| 08:29 | 140/0 Palpated | 94 Strong, Regular | 16 Normal Regular | | | 38 | E4 + V5 + M6 = 15 |

Skin Temp=Normal  Skin Color=Normal  Skin Moisture=Normal  Lung Sounds Left=Normal  Lung Sounds Right=Normal  Cap.
Refill=Normal
Pupil size: Left=3-mm, Right=3-mm   Pupil Reacts: Left=Reactive  Right=Reactive   Pupil Dilation: Left=Normal, Right=Normal
Level of Consciousness: Alert: Pain Scale=0: Arm Movement: Left=Spontaneous, Right=Spontaneous, Leg Movement: Left=Spontaneous.
Right=Spontaneous

Completed By: JAEGER, WILLIAM

| | | | | | | | |
|------|-----|-------|-------------|------|-------|---------|-----|
| 09:01 | 149/86 NIBP Machine | 84 Strong Regular | 16 Normal Regular | 97% | | 373 | E4 + V5 + M6 = 15 |

Skin Temp=Normal  Skin Color=Normal  Skin Moisture=Normal  Lung Sounds Left=Normal  Lung Sounds Right=Normal  Cap.
Refill=Normal
Pupil size: Left=3-mm, Right=3-mm   Pupil Reacts: Left=Reactive  Right=Reactive   Pupil Dilation: Left=Normal  Right=Normal
Level of Consciousness: Alert: Pain Scale=0. Arm Movement: Left=Spontaneous  Right=Spontaneous: Leg Movement: Left=Spontaneous.
Right=Spontaneous
ECG=Normal Sinus Rhythm

Completed By: ZOLL E-Series

| | | | | | | | |
|------|-----|-------|-------------|------|-------|---------|-----|
| 09:16 | 150/83 NIBP Machine | 87, Strong Regular | 16 Normal. Regular | 98% | | 373 | E4 + V5 + M6 = 15 |

Skin Temp=Normal  Skin Color=Normal  Skin Moisture=Normal  Lung Sounds Left=Normal  Lung Sounds Right=Normal  Cap.
Refill=Normal
Pupil size: Left=3-mm, Right=3-mm  Pupil Reacts. Left=Reactive. Right=Reactive   Pupil Dilation: Left=Normal, Right=Normal
Level of Consciousness: Alert, Pain Scale=0. Arm Movement: Left=Spontaneous, Right=Spontaneous: Leg Movement: Left=Spontaneous.
Right=Spontaneous
ECG=Normal Sinus Rhythm

Completed By: ZOLL E-Series

## TRAUMA SCORES

no trauma scores entered
Comments:

## TREATMENT SUMMARY

| Time | PTA | Treatment | Who performed | Comments |
|------|-----|-----------|---------------|----------|
| 08:27 | | Universal Precautions Taken | JAEGER, WILLIAM | |

Complication
None

Complication Narrative

Type Used=Gloves

Case 1:16-cv-00720-JLT Document 1 Filed 05/24/16 Page 78 of 95

# Patient Care Report



**Hall Ambulance Service Inc**

1001 21ST ST
BAKERSFIELD, CA 93301-4792
(661) 334-5419 Ext.

Run Number: 28033

Date of Service: 04/06/2015

Patient Name: MICHEAL WILSON

## TREATMENT SUMMARY CONTINUED

| Time | PTA | Treatment | | | |
|------|-----|-----------|--|--|--|
| 08:27 | | Universal Precautions Taker | Who performed | Comments | |
| | | Complication | CASTRO, ERIC | | |
| | | None | Complication Narrative | | |
| | | Type Used=Gloves | | | |

| Time | PTA | Treatment | | | |
|------|-----|-----------|--|--|--|
| 08:27 | | Universal Precautions Taker | Who performed | Comments | |
| | | Complication | ALLARD, DAVID | | |
| | | None | Complication Narrative | | |
| | | Type Used=Gloves | | | |

| Time | PTA | Treatment | | | |
|------|-----|-----------|--|--|--|
| 08:27 | | ALS/Paramedic Assessment | Who performed | Comments | |
| | | Complication | JAEGER, WILLIAM | | |
| | | None | Complication Narrative | | |

| Time | PTA | Treatment | | | |
|------|-----|-----------|--|--|--|
| 08:27 | | Stroke Scale | Who performed | Comments | |
| | | Complication | JAEGER, WILLIAM | | |
| | | None | Complication Narrative | | |

Stroke Scale=Cincinnati Stroke Scale Negative

Stroke alert=No

Duration of symptoms=0.0

Duration units=Minutes

Last known normal=0.0

Last known units=Minutes

| Time | PTA | Treatment | | | |
|------|-----|-----------|--|--|--|
| 08:27 | | Spinal Clearence | Who performed | Comments | |
| | | Complication | JAEGER, WILLIAM | | |
| | | None | Complication Narrative | | |

Mechanism of Injury=Uncertain

Spinal Pain=No

Motor/Sensory Exam Abnormal=Yes

Calm=Yes

Cooperative=Yes

Congnitivey Intact (GCS15)=Yes

Cervical Flexion Pain=No

Cervical Lateral Rotation Pain=No

Language Barrier=No

Spinal Immobilization Required=No

Result=Successful

Response=Unchanged

Procedure/Medication Auth=Level 1

Distracting Injury=No

| Time | PTA | Treatment | | | |
|------|-----|-----------|--|--|--|
| 08:35 | | Cardiac / ECG Monitor | Who performed | Comments | |
| | | Complication | JAEGER, WILLIAM | | |
| | | None | Complication Narrative | | |

Ectopy=None

Result=NSR

Procedure/Medication Auth=Level 1

| Time | PTA | Treatment | | | |
|------|-----|-----------|--|--|--|
| 08:35 | | Pulse Oximetry | Who performed | Comments | |
| | | Complication | JAEGER, WILLIAM | | |
| | | None | Complication Narrative | | |

Response=Unchanged

Result=Successful

Number of Procedure Attempts=1

Procedure/Medication Auth=Level 1



**Patient Care Report**

Hall Ambulance Service Inc

1001 21ST ST
BAKERSFIELD, CA 93301-4792
(661) 334-5419 Ext.

Run Number: 28033

Date of Service: 04/06/2015

Patient Name: MICHEAL WILSON

## TREATMENT SUMMARY CONTINUED

| Time | PTA | Treatment | Who performed | Comments |
|------|-----|-----------|---------------|----------|
| 08:36 | | **IV Access** Complication None | JAEGER, WILLIAM Complication Narrative | |
| | | Rate=TKO | Site=Hand-Left | Solution=Saline Flush |
| | | Tubing=Macro Drip | Volume Administered=Flush for Saline Lock | Size of Procedure Equipment=18 G |
| | | Length=1.25 | Results=Successful | Number of Procedure Attempts=1 |
| | | Response=Unchanged | Procedure/Medication Auth=Level 1 | |

| Time | PTA | Treatment | Who performed | Comments |
|------|-----|-----------|---------------|----------|
| 08:40 | | **Dextrose 50%** Complication None | JAEGER, WILLIAM Complication Narrative | |
| | | Indication=Hypoglycemia | Result=Successful | Medication Dosage=25 |
| | | Medication Route=Intravenous | Medication Dose Units=Gram(s) | Procedure Medication Auth=Level 1 |
| | | Response=Improved | | |

| Time | PTA | Treatment | Who performed | Comments |
|------|-----|-----------|---------------|----------|
| 09:05 | | **Base Contact** Complication None | JAEGER, WILLIAM Complication Narrative | |
| | | Notified=Contact Successful | Orders=No Orders Requested or Received | Hospital=SJH |
| | | Communication Type=Radio | Not Required=Required | Number of Procedure Attempts=1 |
| | | Orders Given By=Not Applicable | | |

| Time | PTA | Treatment | Who performed | Comments |
|------|-----|-----------|---------------|----------|
| 09:29 | | **PT Care To Facility Staff** Complication None | JAEGER, WILLIAM Complication Narrative | |
| | | Position=Bed Down With Rails Up | | |

| Time | PTA | Treatment | Who performed | Comments |
|------|-----|-----------|---------------|----------|
| 09:29 | | **ED Physician: SJH** Complication None | JAEGER, WILLIAM Complication Narrative | |
| | | SJH=Dr. Baheri | | |

## NARRATIVE

PT 64 Y/O MALE WAS FOUND SEATED ON THE SIDE OF THE ROAD IN POLICE CUSTODY AFTER DRIVING HIS VEHICLE DURING A DIABETIC INCIDENT. PT IS PRESENTING AS A/OX3 MINUS THE EVENT WITH NORMAL SKIN SIGNS. PUPILS PERL AND SPEAKING IN FULL SENTENCES. PT STATES HE DOES NOT RECALL DRIVING HIS VEHICLE ONTO THE SIDE OF THE ROAD OR HOW HE ENDED UP AT THIS LOCATION. BUT REPORTS HE FELT LIKE HIS SUGAR WAS LOW. PT DENIES ANY HEAD, NECK OR BACK PAIN BUT HAS A SMALL ABRASION ON HIS RIGHT CHECK WITH BLEEDING CONTROLLED PRIOR TO EMS ARRIVAL. PT DENIES ANY CHEST PAIN, SHORTNESS OF BREATH OR W/D/N/V. PT WITH A BLOOD SUGAR OF 38 MG/DL ON SCENE. PT WAS CARRIED TO GURNEY AND LOADED INTO AMBULANCE. IV ACCESS ESTABLISHED AND 25 GRAMS OF GLUCOSE ADMINISTERED WITH AN UPDATED BLOOD GLUCOSE OF 338 MG/DL. PT TRANSPORTED TO SJCH CODE TWO WITH NO CHANGE IN PT CONDITION NOTED. AT DESTINATION PT DELIVERED TO ER AND REPORT GIVEN TO NURSE AT BEDSIDE.

## HIPAA

no signatures entered

# Patient Care Report



## Hall Ambulance Service Inc

1001 21ST ST
BAKERSFIELD, CA 93301-4792
(661) 334-5419 Ext.

Run Number: 28033

Date of Service: 04/06/2015

Patient Name: MICHEAL WILSON

## SIGNATURES

| Time | Type |
|------|------|
| 04/06/2015 09:28 | D - Facility Signature |

**Who signed**

Nurse - GEORGES, JEFF

**Why patient did not sign**

<Not applicable>

I hereby certify that [MICHEAL WILSON] was brought to this facility by Hall Ambulance Service, Inc. on this date

X _____

| Time | Type |
|------|------|
| 04/06/2015 09:29 | A - Section One - Patient Signature |

Self - WILSON, MICHEAL

<Not applicable>

X _____

[MICHEAL WILSON], hereby acknowledge that I have received from Hall Ambulance Service, Inc. a copy of its Notice of Privacy Practices. I hereby acknowledge that I was transported by Hall Ambulance Service, Inc. on the above dates of service. I request that payment of authorized Medicare and/or other insurance benefits be made on my behalf to Hall Ambulance Service, Inc. for any services furnished to me by Hall Ambulance Service, Inc. in the past, now or in the future. I authorize any holder of medical information about me release to the Health Care Financing Administration and its agents or other authorized interested parties any information needed to determine these benefits or the benefits payable to related services in the past, now or in the future. I understand my signature requests that payment be made and authorize release of medical information necessary to pay the claim. If other health insurance is indicated in item 9 of the HCFA 1500 form or elsewhere on other approved claim forms of electronically submitted claims, my signature authorizes releasing of the information to the insurer or agency shown. Only in Medicare accepted assigned cases, the physician or supplier accepts the charge determination of the Medicare carrier. I understand that any form of payment other than payment in full at time of service constitutes the granting of credit to me by Hall Ambulance Service, Inc. Further, in accordance with this granting of credit I authorize and direct any agency, company or person holding information relating to my credit history and background to release such information to Hall Ambulance Service, Inc. I hereby agree to pay any balance due after insurance payment. I agree to pay a 1 1/2% monthly service charge on the account after 30 days following the date of service. Should Hall Ambulance Service, Inc. be required to use the services of an attorney at law in order to obtain payment from the patient for service provided to the patient, including but not limited to the filing of a lawsuit, then Hall Ambulance Service, Inc. shall be entitled to recover from the patient an amount sufficient to compensate Hall Ambulance Service, Inc. for reasonable attorney's fees, costs and expen incured.

Witness or Authorized Representative Address Information

Address of person who signed for patient

City, State, Zip Code



# Patient Care Report



## Hall Ambulance Service Inc

1001 21ST ST
BAKERSFIELD, CA 93301-4792
(661) 334-5419 Ext.

Run Number: 28033

Date of Service: 04/06/2015

Patient Name: MICHEAL WILSON

## CREW INFORMATION

Start Date/Time: 04/06/2015 06:16

| Crew # | Name | Crew # | Name | Crew # | Name |
|--------|------|--------|------|--------|------|
| 1868 | JAEGER, WILLIAM | 1644 | CASTRO, ERIC | 1938 | ALLARD, DAVID |
| License: | P33390 | License: | E040134 | License: | E032689 |

x _____     x _____     x _____

## CHANGE TRACKING

| Field ID | Caption | Date/Time | Change | Who Changed | Previous Value |
|----------|---------|-----------|--------|-------------|----------------|



**Adventist Health**

SAN JOAQUIN COMMUNITY HOSPITAL
2615 CHESTER AVENUE
BAKERSFIELD CA 93301-2006

## SUMMARY OF SERVICES

| Description | | Amount |
|---|---|---|
| Cardiology | | 326.55 |
| Emergency Room | | 1,930.95 |
| Laboratory | | 1,167.60 |
| Pharmacy | | 11.55 |
| Professional or Physician Fees | | 260.00 |
| Radiology | | 6,265.35 |
| **Total Patient Services** | | **$9,962.00** |
| Insurance Discount | 04/17/15 | -177.18 |
| Insurance Discount | 04/18/15 | -7,633.03 |
| Insurance Discount | 05/15/15 | -33.88 |
| Insurance Payment | 05/15/15 | -116.78 |
| Insurance Payment | 05/29/15 | 0.00 |
| Insurance Payment | 05/29/15 | -2,422.05 |
| Insurance Discount | 09/04/15 | 520.92 |
| **Total Payments & Adjustments** | | **$-9,862.00** |
| **Current Account Balance** | | **$100.00** |

▶ **IMPORTANT MESSAGE**

Your insurance has processed your claim. This balance is your responsibility. Please make your payment today or contact us to discuss financial arrangements.

▶ **ENCOUNTER SUMMARY**

| | |
|---|---|
| Patient | MICHAEL GENE WILSON |
| Date(s) of Service | 04/06/15 |
| Statement Number | 1570103 |
| Encounter Number | 37700325194 |
| Physician | OSHITA, MD, TAKASHI |

▶ **INSURANCE INFORMATION**

| | |
|---|---|
| Primary | KAISER PERMANENTE SOUTHERN |
| CALIFORNIA | |
| Subscriber | MICHAEL GENE WILSON |
| ID Number | XXXXXXX37424 |
| Secondary | |
| Subscriber | |

▶ **QUESTIONS? (661) 869-6800**

For questions about your statement, call Customer Service at (661) 869-6800.

**Financial Assistance:**
Adventist Health provides discounts to eligible low-income patients. If you can't pay part of your bill, please contact our Customer Service Department. We will review your financial situation to determine if you are eligible for financial assistance.

SEPARATE PHYSICIAN BILLING You may receive separate bills from physicians who provided care or who consulted on your case.

THANK YOU FOR ALLOWING SAN JOAQUIN COMMUNITY HOSPITAL TO PROVIDE FOR YOUR RECENT HEALTHCARE NEEDS.

**Adventist Health**   SAN JOAQUIN COMMUNITY HOSPITAL
PO BOX 846178
LOS ANGELES CA 90084-6178

☐ Please check box if address is incorrect or insurance information has changed, and indicate change(s) on reverse side.

**Pay Online:** HTTPS://MYADVENTISTHEALTH.PAYMYHEALTHBILL.COM/
**Access Code:** 7877752770

  ADDRESSES

MICHAEL GENE WILSON
413 PEBBLE BEACH DR
BAKERSFIELD CA 93309-2813



| | | DISC_VER | VISA | |
|---|---|---|---|---|

MICHAEL GENE WILSON                09/26/201

1570103                $100.00

SAN JOAQUIN COMMUNITY HOSPITAL
PO BOX 846178
LOS ANGELES CA 90084-6178

# JCHUNT INC. DBA PAYLESS TOWING CA# 356303

1400 WASHINGTON STREET, BAKERSFIELD CA 93305 5545

Phone (661) 325 7700 | Fax (661) 324 7078

## Impound Invoice

Printed 4/7/2015

Released To          MARY WILSON

| | | Reason for Impound | Police |
|---|---|---|---|
| Invoice # | P5298 | VIN Number | 1FMEU15RBLA08489 |
| Reference # | 00015281 | Model | 1990 Ford Bronco (White) |
| Stock # | 556645 | License Plate | 5SDV932 (CA) |
| Account | BPD (Impounds) | Drivable | No |
| Date/Time Requested | 4/6/2015 8 45 AM | Keys | Yes |
| Date/Time Completed: | 4/6/2015 10 14 AM | Towed From | GOSFORD/PANAMA LN |
| Date/Time Impounded: | 4/6/2015 8:46 AM | Stored at | 1400 WASHINGTON ST. MAIN YARD |
| Driver | ALVINO MARTINEZ | | 1400 WASHINGTON ST, BAKERSFIELD CA 93305 |
| Truck | 2014 HINO FLATBED | | |
| Truck | 2014 HINO FLATBED | | |
| Date/Time Released | 4/7/2015 9:51 AM | | |
| Days Held in Impound | 2 days | | |

### Storage Charges

| | Quantity | Price | Line Total |
|---|---|---|---|
| (Storage) Storage Fees Impounds/Storage  Daily Impound Rate | 2 | $28.00 | $56.00 |

### Towing charges

| | Quantity | Price | Line Total |
|---|---|---|---|
| (Towing) BASE HOURLY FORKLIFT TOW BAFT | 1 | $165.00 | $165.00 |

|  | |
|---|---|
| Towing Subtotal | $165.00 |
| Storage Storage Fees Subtotal | $56.00 |
| Subtotal | $221.00 |
| Taxes | $0.00 |
| Grand Total | $221.00 |
| Amount Due: | $0.00 / Paid |

Cash payment of $221.00 applied

BY SIGNING THIS INVOICE I AGREE THAT ALL CONTENTS IN THE VEHICLE ARE TAGREE TO THE VEHICLE'S CURRENT CONDITION

Signature _____     Date _____     CA# 356303

I (upon request) you are entitled to receive a copy of the Towing Fees and Access Notice



**Adventist Health**
SAN JOAQUIN COMMUNITY HOSPITAL
2615 CHESTER AVENUE
BAKERSFIELD, CA 93301-2905

RE    Encounter Number    37700325194
      Statement Number    1570103

## Important Information Regarding Financial Assistance

Adventist Health is committed to providing quality health care that is affordable for our community. We have financial assistance policies that may help to cover the cost of your health care needs.

You are receiving this notice because we have billed all of the insurance plans related to your encounter and there is a remaining balance that is your responsibility to pay. Please review the enclosed statement and let us know if you have additional coverage such as Medicare, Medi-Cal coverage offered through the California Health Benefit Exchange, California Children's Services, or any other insurance plan.

Below is a sample statement, showing where to look for your insurance plans. If you have additional coverage not listed on your statement, please contact us at the customer service number listed at the top of the enclosed statement.

This is a sample statement. Check your statement to confirm the insurance plans on file for your account. 

INSURANCE INFORMATION

Primary
Subscriber
ID Number

Secondary
Subscriber
ID Number

Medicare
John Q. Patient
XXXXX-9999

Anthem BlueCross
John Q. Patient
XXXXX-9999

If you do not have additional coverage and you meet certain low to moderate income requirements you may qualify for a discount and/or extended payment plan terms on the remaining balance. Please contact our customer service department and we will review your financial situation to determine if you are eligible for financial assistance.



Adventist Health believes everyone should be treated with respect. We adhere to state and federal laws that require debt collectors to treat you fairly and prohibit debt collectors from making false statements or threats of violence, using obscene or profane language, and making improper communications with third parties, including your employer. Except under unusual circumstances, debt collectors may not contact you before 8:00 a.m. or after 9:00 p.m. In general, a debt collector may not give information about your debt to another person, other than your attorney or spouse. A debt collector may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities you may contact the Federal Trade Commission by telephone at 1-877-FTC-HELP (382-4357) or online at www.ftc.gov.

Nonprofit credit counseling services may be available in your area.

We are here to serve your health care needs. If there is anything that you need please don't hesitate to contact us

EXHIBIT 2

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, number, and address):<br>Frederick C. Kumpel, SBN 122074<br>mail: P.O. Box~~Case 1:16-cv-00720-JLT~~ Document 1 Filed 05/24/16 Page 86 of 95<br>physical: 6116 Castleton Street, Bakersfield, CA 93313 | FOR COURT USE ONLY |
| TELEPHONE NO.: 661-599-9078   FAX NO.:<br>ATTORNEY FOR (Name): Plaintiff, Michael Wilson | FILED<br>SUPERIOR COURT METROPOLITAN DIVISION<br>COUNTY OF KERN<br><br>MAR 1 1 2016<br><br>TERRY McNALLY, CLERK<br>BY _____ DEPUTY |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN<br>STREET ADDRESS: 1415 Truxtun Avenue<br>MAILING ADDRESS: 1415 Truxtun Avenue<br>CITY AND ZIP CODE: Bakersfield, CA 93301<br>BRANCH NAME: Metropolitan Division | |
| CASE NAME:<br>Wilson v. City of Bakersfield, et al., | |

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER:<br>BCV - 16 10051.5 |
|---|---|---|
| ☑ Unlimited ☐ Limited<br>(Amount (Amount<br>demanded demanded is<br>exceeds $25,000) $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☑ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition (not specified above) (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action (specify): four Five (5) FR
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: March _____, 2016

Frederick C. Kumpel
(TYPE OR PRINT NAME) ▶ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

CM-010

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

CIVIL CASE COVER SHEET

EXHIBIT 3

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED
SUPERIOR COURT OF CALIFORNIA
16 APR 27 PM 12:59 OF KERN

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):* CITY OF BAKERSFIELD; BAKERSFIELD POLICE
OFFICER R. BITTLESTON (#965); BAKERSFIELD
POLICE OFFICER J. ENNS (#1008); BAKERSFIELD POLICE OFFICER C. OTT
(#1195); BAKERSFIELD POLICE OFFICER A. GARCIA (#1183);
and DOES 1 through 15, inclusive,

BAKERSFIELD CITY MAR 14 2016

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MICHAEL WILSON

TERRY McNALLY, CLERK
BY _____ DEPUTY

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

The name and address of the court is:
*(El nombre y dirección de la corte es):* Kern County Superior Court
Metropolitan Division
1415 Truxtun Avenue, Bakersfield, CA 93301

CASE NUMBER:
*(Número del Caso):*
BCV-16/00518 SPC

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Frederick C. Kumpel, 6116 Castleton Street, Bakersfield, CA 93313      Phone: 661-599-9078

| DATE: *(Fecha)* | MAR 14 2016 | TERRY McNALLY | Clerk, by *(Secretario)* | Y. TORRES | , Deputy *(Adjunto)* |
|---|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* City of Bakersfield

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☒ other *(specify):* Public Entity
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

EXHIBIT 4

FOR COURT USE ONLY



---



**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF KERN**
**BAKERSFIELD COURT**
**1415 TRUXTUN AVENUE**
**BAKERSFIELD CA 93301**

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF KERN

MAR 14 2016

TERRY McNALLY CLERK
BY _____ , DEPUTY

PLAINTIFF/PETITIONER:
MICHAEL WILSON
DEFENDANT/RESPONDENT:
CITY OF BAKERSFIELD
BAKERSFIELD POLICE OFFICER R. BITTLESTON (#965)
BAKERSFIELD POLICE OFFICER J. ENNS (#1008)

**NOTICE OF ORDER TO SHOW CAUSE**
**RE: CALIFORNIA RULES OF COURT, RULE 3.110**

CASE NUMBER:
BCV-16-100518 SFC

**TO PLAINTIFF AND PLAINTIFF'S COUNSEL:**

**You are ordered to appear** on **06/24/2016** at **8:30 AM** in Department/Division **Bakersfield Department 4** of the above entitled court to give any legal reason why sanctions shall not be imposed for failure to serve the complaint on all named defendants and file proof(s) of service with the court within sixty (60) days after the filing of the complaint pursuant to California Rules of Court, Rule 3.110. All appearances are mandatory, unless the required proof(s) of service are received by the court five (5) court days prior to the hearing date, and then no appearance is necessary.

Date: March 14, 2016

**TERRY MCNALLY**
CLERK OF THE SUPERIOR COURT

By: _____ Y. TORRES _____
Yesenia Torres, Deputy Clerk

Notice of Order to Show Cause Re CRC 3.110

Page 1 of 1

# EXHIBIT 5

1    Michael G. Marderosian, No. 077296 (mick@mcc-legal.com)
     Heather S. Cohen, No. 263093 (heather@mcc-legal.com)
2    MARDEROSIAN & COHEN
     1260 Fulton Mall
3    Fresno, CA 93721
     Telephone: (559) 441-7991
4    Facsimile: (559) 441-8170

5    Virginia Gennaro, No. 138877
     City Attorney
6    CITY OF BAKERSFIELD
     1501 Truxtun Avenue
7    Bakersfield, CA 93301
     Telephone: (661) 326-3721
8    Facsimile: (661) 852-2020

9    Attorneys for: Defendants CITY OF BAKERSFIELD, BAKERSFIELD POLICE OFFICER
                    RICHARD BITTLESTON (sued herein as R. BITTLESTON), BAKERSFIELD
10                  POLICE OFFICER JUSTIN ENNS (sued herein as J. ENNS), BAKERSFIELD
                    POLICE OFFICER CHAD OTT (sued herein as C. OTT) and BAKERSFIELD
11                  POLICE OFFICER ADAM GARCIA (sued herein as A. GARCIA)

12
                         SUPERIOR COURT OF THE STATE OF CALIFORNIA
13
                         COUNTY OF KERN / METROPOLITAN DIVISION
14

15   MICHAEL WILSON,                        )    Case No.  BCV-16-100518-SPC
                                            )
16                    Plaintiff,            )    **NOTICE TO ADVERSE PARTIES OF**
                                            )    **REMOVAL OF CASE TO FEDERAL**
17           v.                             )    **COURT BY DEFENDANTS**
                                            )
18   CITY OF BAKERSFIELD, BAKERSFIELD       )
     POLICE OFFICER R. BITTLESTON           )
19   (#965); BAKERSFIELD POLICE OFFICER     )
     J. ENNS (#1008); BAKERSFIELD POLICE    )
20   OFFICER C. OTT (#1195); BAKERSFIELD    )    *Complaint Filed: March 11, 2016*
     POLICE OFFICER A. GARCIA (#1183);      )    *Trial Date: Not Yet Assigned*
21   and DOES 1 to 15, inclusive,           )
                                            )
22                    Defendants.           )
                                            )
23

24           TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

25           NOTICE IS HEREBY GIVEN that Defendants CITY OF BAKERSFIELD, BAKERSFIELD

26   POLICE OFFICER RICHARD BITTLESTON, BAKERSFIELD POLICE OFFICER JUSTIN ENNS,

27   BAKERSFIELD POLICE OFFICER CHAD OTT, and BAKERSFIELD POLICE OFFICER ADAM

28   GARCIA (hereinafter "Defendants") have filed their Notice of Removal of the above-captioned

MARDEROSIAN & COHEN
1260 FULTON MALL
FRESNO, CA 93721

1    action, a copy of which is attached hereto (without exhibits), with the United States District Court for

2    the Eastern District of California, Fresno Division.

3         PLEASE TAKE FURTHER NOTICE that, pursuant to 28 U.S.C. § 1446(d) the filing of said

4    Notice in the United States District Court, together with the filing of said Notice with this Court,

5    effects the removal of this action and the above-captioned Court may proceed no further unless and

6    until the case has been remanded.

7    Dated:  May 24, 2016                              MARDEROSIAN & COHEN

8

9                                                      By: _____

10                                                         Michael G. Marderosian
                                                           Attorney for Defendants above-named.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MARDEROSIAN & COHEN
1260 FULTON MALL
FRESNO, CA 93721

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF FRESNO

I am employed in the county aforesaid; I am over the age of eighteen years and not a party to the within entitled action; my business address is 1260 Fulton Mall, Fresno, California 93721.

On May 24, 2016, I served the within **NOTICE TO ADVERSE PARTIES OF REMOVAL OF CASE TO FEDERAL COURT BY DEFENDANTS** on the interested parties in said action, as listed below:

**ATTORNEY:**                                                  **PARTY:**

Frederick C. Kumpel                                    Plaintiff MICHAEL WILSON
P.O. Box 2659
Bakersfield, CA 93303
Telephone: (661) 599-9078
Email: fredkumpel@sbcglobal.net

☒  Via U.S. Mail:   I am readily familiar with the firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. The practice is to deposit correspondence with the United States Postal Service the same day it is placed for mailing in the ordinary course of business. I placed the envelope(s), with postage prepaid, for collection and processing for mailing following said practice. (C.C.P. § 1013, *et seq.*)

☐  Via Hand Delivery:   I caused the document(s) listed above to be served via hand delivery to the address(es) listed above. (C.C.P. § 1013, *et seq.*)

☐  Via Overnight Courier:   I caused the document(s) listed above to be served by overnight courier to the address(es) listed above. (C.C.P. § 1013, *et seq.*)

☐  Via Facsimile:   I served the document(s) listed above via facsimile transmission to the number(s) listed above. (C.C.P. § 1013, *et seq.*)

☐  Via Email:   I served the document(s) listed above via electronic transmission to the email address(es) listed above.

☒  State:   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐  Federal:   I declare that I am employed in the office of a member of the bar of this court at whose direction service was made.

Executed on May 24, 2016, at Fresno, California.

_____
Kate Holly