1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   MICHAEL WILSON,                    )   Case No.: 1:16-cv-0720 - JLT
                                        )
12              Plaintiff,              )   ORDER GRANTING DEFENDANTS' MOTION
                                        )   FOR SUMMARY JUDGMENT
13        v.                            )
                                        )   (Doc. 19)
14   CITY OF BAKERSFIELD, et al.,       )
                                        )
15              Defendants.             )
                                        )
16   _____   )

17          Michael Wilson asserts that Bakersfield Police Officers Bittleston, Enns, Ott, and Garcia used

18   excessive force in the course of an unlawful detainment and seeks to hold these officers and the City of

19   Bakersfield liable for violations of state and federal law.  Defendants argue Plaintiff is unable to

20   succeed on his claims and seek summary judgment pursuant to Rule 56 of the Federal Rules of Civil

21   Procedure.  (Doc. 19)  For the following reasons, Defendants' motion for summary judgment is

22   **GRANTED**.

23   **I.      Background**

24          Plaintiff alleges that on the morning of April 6, 2015, he suffered "a diabetic medical episode"

25   while driving.  (Doc. 1 at 7, ¶12)  He contends the four officers on the scene "failed to properly assess

26   the diabetic crisis and pulled [him] from his car," through the driver's side window.  (*Id.*)  Plaintiff

27   asserts that he was "beaten severely and taken to San Joaquin Hospital where [he] was treated."  (*Id.*)

28          Plaintiff filed a Government Claim with the City of Bakersfield on September 15, 2015, which

                                           1

was rejected. (Doc. 1 at 9, ¶ 20) Plaintiff reports he sent "a settlement demand to the City of Bakersfield" on November 10, 2015, which "was rejected upon receipt." (*Id.*, ¶ 21) Plaintiff then filed a complaint on March 11, 2016, in Kern County Superior Court Case No. BCV-16-100518-SPC, in which he raised the following causes of action against the officers and the City: (1) battery; (2) "battery committed by unlawful arrest"; (3) violation of the California Due Process Clause; (4) violation of the due process clause of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983; and (5) false detention and false arrest. (*See* Doc. 1 at 10-11)

Defendants filed the motion for summary judgment now pending before the Court on October 27, 2017, arguing Plaintiff is unable to succeed on his claims. (Doc. 19) Plaintiff filed his opposition on November 16, 2017 (Doc. 22), to which Defendants filed a reply on November 21, 2017 (Doc. 29).

## II.     Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment, or summary adjudication, should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find

for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987). A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586 n.11; Fed. R. Civ. P. 56(c). Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court can only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

///

///

### III. Evidentiary Objections

#### A. Untimely Filing

As an initial matter, Defendants object to the entirety of the opposition—and the evidence in support of the opposition—as untimely. Plaintiff's opposition was to have been filed no later than November 13, 2017, pursuant to the deadlines set forth in Local Rule 230. In the interest of justice, the Court continued the hearing to allow Defendants to have additional time to file a reply brief and prepare for the hearing. Because the potential prejudice to Defendants has been cured, the objection to the opposition as untimely (Doc. 29-1 at 2) is **OVERRULED**.[1]

#### B. Undated Declaration

Defendants object to the consideration of Plaintiff's declaration in support of his opposition to the motion because it was not dated. (Doc. 29-1 at 2) In general, for a declaration to be admissible before the Court, it must be dated. *See* 28 U.S.C. § 1746 (requiring a declaration to be made "in writing of such person which is subscribed by him as true and under penalty of perjury, and dated"). Significantly, however, "[s]ubstantial compliance with the statute… is sufficient for admissibility." *Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 999 (C.D. Cal. 2000), citing *Kersting v. United States*, 865 F. Supp. 669, 676 (D. Haw. 1994); *E.E.O.C. v. World's Finest Chocolate, Inc.*, 701 F. Supp. 637, 639 (N.D. Ill. 1988). Thus, "a party need only show 'the [execution] date or approximate date (depending on the situation).'" *Id.*, quoting *World's Finest*, 701 F. Supp. at 63.

Plaintiff indicated his declaration was "true and correct" and signed under the penalty of perjury. (Doc. 21 at 13) In addition, Plaintiff indicated he executed the document in November of 2017 (*id.*), which substantially complies with the requirements of Section 1746. *See Pieszak*, 112 F. Supp. 2d at 999. Accordingly, Defendants' objection to the declaration for failure to comply with 28 U.S.C. § 1746 is **OVERRULED**.

#### C. Sham Declaration

Defendants assert that "Plaintiff has submitted a sham declaration which contradicts [his] deposition testimony." (Doc. 29-1 at 3, emphasis omitted) According to Defendants,

---

[1] The Court does not condone the failure to comply with the Local Rules. Plaintiff's counsel is reminded of his obligation to familiarize himself with the Local Rules and filing deadlines of this Court. Future failure to comply with the Local Rules may result in the imposition of sanctions.

> The majority, if not all, of what is "declared" is in direct contradiction to Plaintiff's deposition testimony wherein he testified that he cannot remember any of the events leading up to and what happened at the incident scene (Wilson Depo., pp. 19:21-20:5; 30:21-32:10; 37:15-38:2) and also his taped audio interview by the Bakersfield Police Department wherein Plaintiff stated he had no recollection regarding anything that happened at the scene other than seeing the flashing blue and red lights and other than being on his knees in handcuffs and wanting to scratch his nose. [Exhibit A to the Declaration of Scott Thatcher (Dkt. No. 19-10.)] Plaintiff made no changes to his deposition transcript.

(Doc. 29-1 at 3)

Under the "sham affidavit" rule, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mutual Ins. Co.,* 952 F.2d 262, 266 (9th Cir. 1991). The Ninth Circuit explained, "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* Because of the jury's role in resolving questions of credibility, courts have urged caution when applying the sham affidavit rule. *Id.* (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980)); *see also Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (explaining the sham affidavit rule has limited application "because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment").

To determine whether a declaration should be stricken as a sham, the Ninth Circuit requires the court to "make a factual determination that the contradiction was actually a 'sham,'" and created specifically to avoid summary judgment. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). In addition, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* at 998-99. The Court explained that "minor conflicts between [a declarant's] earlier deposition testimony and subsequent declaration... do not justify invocation of the sham affidavit rule." *Id.* at 999.

As Defendants observe, Plaintiff repeatedly testified that he had no recollection of the events that transpired while the officers were present, prior to being in handcuffs and outside of his vehicle. (*See e.g.* Doc. 19-4, Wilson Depo. 19:21-21:18, 46:15-18, 75:20-23) To the extent Plaintiff offers information in his declaration that is inconsistent with this testimony, Defendants' objection is **SUSTAINED**, and such evidence will not be considered.

### D.      Lack of Personal Knowledge

Defendants observe that Plaintiff asserts many facts in his declaration that are based upon "information and belief." (Doc. 29-1 at 3) and objects to these statements as admissible under Rule 803 of the Federal Rules of Evidence. (*Id.*, citing *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir. 1995); *Argo v. Blue Cross & Blue Shield of Kansas Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006))

Pursuant to Rule 56(c) of the Federal Rules of the Civil Procedure, "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Thus, the Ninth Circuit has determined it is an abuse of discretion for the district court, at the summary judgment stage, to consider information from an affidavit based on inadmissible hearsay rather than the affiant's personal knowledge. *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001). Likewise, statements based upon "information and belief ….[are] entitled to no weight" because the declarant lacks personal knowledge. *Bank Melli Iran*, 58 F.3d at 1412 (9th Cir. 1995); *see also Clark v. County of Tulare,* 755 F. Supp. 2d 1075, 1084 (E.D. Cal. 2010) ("affidavits made on information and belief do not satisfy the summary judgment procedural requirements"); *Heighley v. J.C. Penney Life Ins. Co.,* 257 F. Supp. 2d 1241, 1251 (C.D. Cal. 2003) ("Declarations on information and belief are insufficient to establish a factual dispute for purposes of summary judgment").

Plaintiff repeatedly makes statements in his declaration that are predicated by "I am informed and believe…." (*See, e.g.*, Doc. 23 at 3, 4, 5) In addition, Plaintiff makes statements "[b]ased on the facts [he has learned] and the testimony of witness Orellana." (*See, e.g.* Doc. 23 at 5) It is clear from the context of these statements that Plaintiff lacks personal knowledge of many events he is describing in his declaration. Accordingly, to the extent Plaintiff has made statements of which he lacks personal knowledge, Defendants' objection is **SUSTAINED** and such statements will not be considered by the Court in its analysis.

### E.      Conclusion

To the extent that statements offered by either party are argumentative, speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis. *Burch v. Regents of the Univ. of Cal.*, 433 F.Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("statements in

declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered on a motion for summary judgment") (citation omitted, emphasis in original). Rather, the Court's analysis relies on evidence only that it has deemed admissible to determine whether there is a dispute of material fact.

**IV.    Request for Judicial Notice**

The Court may take judicial notice of a fact that "is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

Plaintiff requests judicial notice be taken of the following articles and news reports:

1.    ACLU, *Patterns & Practices of Police Excessive Force in Kern County – Finding[s] & Recommendations*, November 2017;

2.    American Diabetes Association, *Inappropriate Law Enforcement Response to Individuals With Diabetes: An Introduction and Guide for Attorneys*, Sarah Fech & Gregory Murray, September 2014.

3.    Bakersfield Californian, January 11, 2017, Henry, Lois, *Silence on police incidents breeds mistrust*;

4.    EMSl.COM News, *Drunk v. Diabetes: How Can You Tell?* July 31, 2011;

5.    Philadelphia Police Department Education & Training Bureau, No. 13-01, Date 4-5-13; Diabetes Mellitus ... What You Should Know; Assist Officer, A Summary of Hints to Aid Police Officers; and

6.    *The Washington Post*, Balko, Radley; June 20, 2014, *Cops v. Diabetics*.

(Doc. 25 at 2) However, Plaintiff fails to address how the information contained in these documents is subject to judicial notice, or identify the specific facts for which he seeks to have the Court take judicial notice.

Significantly, "to the extent the court can take judicial notice of press releases and news articles, it can do so only to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1029 (C.D. Cal. 2015) (quoting *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2009)). Because it appears Plaintiff seeks to have the Court take judicial notice of all the statements contained in these documents as facts, the request is improper. *See Gerritsen*, 112 F. Supp.3d at 1029. Accordingly, Plaintiff's request for judicial notice is **DENIED**.

## V.     Undisputed Material Facts[2]

On the morning of April 6, 2015, at approximately at approximately 8:02 a.m., Bakersfield Police Officers Bittleston, Garcia, Enns, and Ott "responded to a report of a possible DUI driver" in a white Ford Bronco, "who had been driving erratically, driving on sidewalks, across lanes, and ultimately crashed into a dirt field where the car became stuck." (DUF 1; *see also* Doc. 19-9 at 1, Patterson Decl. ¶¶2-3) Urian Orellana, who had previously seen the driver "swerving onto -- onto and off the sidewalk," was present when the officers arrived on the scene. (Orellana Depo. 14:21-22, 24:13-16)

"Garcia was the first officer to arrive on the scene," and estimates he arrived at 8:05 a.m. (JSF 1; DUF 2; Garcia Decl. ¶3) Mr. Orellana told Garcia the driver "looked like he was drunk… because he was driving -- he was swerving all over the road." (Doc. 19-4 at 17, Orellana Depo. 24:22-25) Garcia observed that the driver, Plaintiff, "was still in the vehicle." (DUF 3; Garcia Decl. ¶4) The tires of the vehicle were spinning, and "the driver's side window was down." (*Id.*; Doc. 19-4 at 19, Orellana Depo. 28:11-12)

"Garcia attempted to ascertain if [Plaintiff] was okay," and Plaintiff "began speaking to Officer Garcia." (DUF 3-4; Garcia Decl. ¶¶4-5) Garcia instructed Plaintiff "to turn the car off," but Plaintiff refused and said he "want[ed] to go home." (DUF 4; Garcia Decl. ¶5) Garcia directed Plaintiff to turn off the car a second time. (*Id.*) Plaintiff again refused, "then shifted his vehicle into drive and pressed down on the gas pedal." (DUF 5; Garcia Decl.¶ 6) Garcia believed Plaintiff was attempting to flee and "was fearful for his life because he could easily have been run over by [Plaintiff]." (DUF 5-6; Garcia Decl. ¶¶ 6-7) Garcia instructed Plaintiff: "Stop your vehicle now" and at the same time, grabbed [Plaintiff's]… arm and pulled it out of the driver side window," applying "an arm-bar hold to gain compliance." (DUF 7; Garcia Decl. ¶ 8) Orellana observed Garcia try "to reach to turn the vehicle off, but he couldn't reach." (Doc. 19-4 at 20, Orellana Depo. 31:3-6) Plaintiff "removed his foot from the gas pedal; however, he refused to put the vehicle in park." (DUF 8; Garcia Decl. ¶ 8)

---

[2] The parties prepared a Joint Statement of Undisputed Material Facts ("JSF") that contained very limited facts. (Doc. 19-3) In addition, each of the parties prepared additional facts in support of the motion. (Doc. 19-4; Doc. 24) To the extent any facts identified by the parties are undisputed and the Court found the evidence cited supports the facts identified, these are identified as "DUF" for Defendants' Undisputed Facts and "PUF" for Plaintiff's Undisputed Facts.

Bittleston arrived while Garcia was holding Plaintiff's arm "and approached the driver's side window." (DUF 10; Garcia Decl.¶ 11; Bittleston Decl. ¶ 3)  The officers attempted to unlock the vehicle door but were unable to do so.  (Orellana Depo. 27:15-16; *see also* Garcia Decl.¶ 13; Bittleston Decl. ¶4)  Bittleston and Garcia "kept telling [Plaintiff] to exit the vehicle, but he wouldn't exit." (Doc. 19-4 at 18, Orellana Depo. 27:16-18)  "Bittleston proceeded to grab the back of [Plaintiff's] sweater and the two officers attempted to remove [Plaintiff] out of the driver's side window because they were unable to open the locked driver door." (DUF 12)  However, the two officers were unable to remove Plaintiff from his vehicle. (*Id.*)

Upon Ott's arrival to the scene, he "broke the passenger side window [with his baton] and gained entry into the vehicle from the passenger side." (DUF 13; Ott Decl. ¶ 3; *see also* Orellana Depo. 29:5-8)  "Ott unlocked [Plaintiff's] seatbelt which freed him" but "was not able to access" the driver's side door to unlock it.  (*Id.*)  Plaintiff "continued to actively resist the police officers" and "kept struggling to be freed." (Doc. 19-4 at 24, Orellana Depo. 45:8-10)

When Enns arrived, he "assisted Officers Garcia and Bittleston on the driver side window." (DUF 15; Enns Decl. ¶ 3)  Plaintiff "kept struggling" and "moving around." (Doc. 19-4 at 21, Orellana Depo. 34:19-21)  Enns redirected Plaintiff's head "to avoid injury as [Plaintiff] was violently thrashing his whole body around." (DUF 16; Enns Decl. ¶4)  Plaintiff "kept struggling" and "moving around." (Doc. 19-4 at 21, Orellana Depo. 34:19, 21)  While the other officers "were already in the process of trying to get [Plaintiff] out of the vehicle, … the engine was turned off" by Ott.  (*Id.*, 54:7-10)  The officers removed Plaintiff "from the vehicle through the window… and guided him to the ground next to his vehicle." (DUF 17)

Orellana saw two officers grabbed Plaintiff's wrists or arms when Plaintiff was on the ground.  (Orellana Depo. 38:14-15)  "Enns noticed that [Plaintiff] had his right hand under his body in his waistband area," and the officers told Plaintiff "several times to put his right hand behind his back," but he refused.  (DUF 19-20)  "Enns used his baton by wedging it between [Plaintiff's] ribcage and forearm" to "pry [Plaintiff's] arm from underneath his body." (DUF 21)  Both officers Enns and Ott controlled Plaintiff's right arm.  (*Id.*)  "Garcia then proceeded to handcuff [Plaintiff]." (DUF 22; Garcia Decl. ¶ 21)  Once Plaintiff was in handcuffs, "he settled down." (Orellana Depo. 38:20-21)

Enns interviewed Plaintiff "and asked if he had been drinking alcoholic beverages either that morning or the night before." (DUF 23) Plaintiff "indicated he had not but he appeared to be disoriented and confused," and his "speech was slurred." (*Id.*) "Enns did not smell … alcohol or see any visible signs of drug use such as needle marks." (*Id.*) He asked Plaintiff "if he had any medical conditions for which he took medication," and Plaintiff responded "he was a diabetic and takes insulin." (*Id.*) The officers did not know Plaintiff "was a diabetic or was experiencing any sort of medical condition until [Plaintiff] disclosed his condition to Officer Enns." (DUF 25) Upon learning Plaintiff was diabetic, Enns requested an ambulance at 8:17 a.m. (DUF 26; Enns Decl. ¶ 12)

Plaintiff had no recollection of anything that happened "other than seeing the flashing blue and red lights and… being on his knees in handcuffs." (DUF 29; Wilson Depo. 19:21-21:18, 46:15-18, 75:20-23)

## VI.    Discussion and Analysis

As an initial matter, the Court notes that in his complaint, Plaintiff fails to identify against which defendants each cause of action is raised. (*See* Doc. 1 at 10-12) Accordingly, for purposes of evaluating the merits of this motion, the Court will assume each cause of action is raised against each defendant.

### A.    Battery

Under California law, a battery occurs when: "[a] defendant intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's person; (2) [the] plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to [the] plaintiff." *Brown v. Ransweiler*, 89 Cal.Rptr.3d 801, 811 (2009). However, a claim for battery by a police officer is analogous to a claim for excessive use of force. *Id.* ("A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable"); *see also Edson v. City of Anaheim,* 63 Cal.App.4th 1269, 1272 (1998) (an officer who uses force in the course of an arrest is not liable for battery unless the plaintiff establishes that the force used was unreasonable). Consequently, a claim for battery by a police officer under California law is analyzed under the Fourth Amendment's reasonableness standard. *Edson*, 63 Cal. App. 4th at 1274; *Saman v. Robbins*, 173 F.3d 1150, 1156-57 & n. 6 (9th Cir. 1999).

The Supreme Court explained that "the reasonableness inquiry" under the Fourth Amendment is objective:

> [T]he question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham*, 490 U.S. at 396-97 (internal citations omitted). In applying this standard, the fact-finder considers "the totality of the circumstances and . . . whatever specific factors may be appropriate in a particular case."[3] *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). Thus, a court must balance the force used against the need for the use of force. *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997).

To evaluate objective reasonableness, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). Courts must also consider "the quantum of force used" "because the 'factors articulated in *Graham*, and other factors bearing on the reasonableness of a particular application of force are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure.'" *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir.1994). Ultimately, the "reasonableness" of the actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

### 1. Seriousness of the crime at issue

On the morning of the incident, several individuals called 911 reporting a driver "driving erratically, driving on sidewalks, [and] across lanes" and described the make and model of the vehicle. (DUF 1; *see also* Doc. 19-9, Patterson Decl. ¶¶ 2-3) There is no question that driving under the

---

[3] Plaintiff's counsel argued that the conduct of Mr. Wilson's deposition should be considered when evaluating whether there was a Fourth Amendment violation on April 6, 2015. This is not what the law requires. Even if there was evidence that the officers were responsible for the size of the conference room used for Mr. Wilson's deposition or the manner in which their attorney conducted the deposition—and there isn't-- this has no bearing on whether they violated the Constitution on the day of the incident. At most this would demonstrate that on the day of the deposition, they had animosity toward the plaintiff. Of course the officers' subjective animosity toward the plaintiff is irrelevant to a Fourth Amendment calculus.

influence is a serious offense, and the officers had reasonable suspicion that Plaintiff was engaged in criminal activity. *See People v. Wells*, 38 Cal. 4th 1078, 1087 (2006) (holding that a "traffic stop was justified by reasonable suspicion of criminal activity" where there was anonymous report that a driver was "weaving all over the roadway," coupled with a description of the vehicle and its location). Consequently, this factor supports the use of force.

### 2. Whether Plaintiff posed an immediate threat to safety

The Ninth Circuit determined "[t]he 'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Bryan*, 630 F.3d at 826 (9th Cir. 2010) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005)). However, "[a] simple statement by an officer that he fears for his safety or the safety others is not enough; there must be objective factors to justify such a concern." *Id.* (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001))

The undisputed evidence is that several individuals called 911, reporting that Plaintiff "had been driving erratically, driving on sidewalks, across lanes, and ultimately crashed into a dirt field." (DUF 1; Doc. 19-9 at 1, Patterson Decl. ¶¶2-3) This supports that Plaintiff posed a threat to the safety of others while operating his vehicle. *See Wells*, 38 Cal. 4th at 1087 (holding that "a possibly intoxicated highway driver, 'weaving all over the roadway,' poses a … grave and immediate risk to the public") In addition, Garcia asserts he "was fearful for his life because he could easily have been run over by [Plaintiff]." (DUF 5-6; Garcia Decl. ¶¶ 6-7) The evidence demonstrates Plaintiff posed an immediate threat to the safety of the officers through his failure to comply with the direction to turn off his vehicle, instead "shift[ing] his vehicle into drive" and pressing on the gas pedal while Garcia stood by the car. (DUF 5; Garcia Decl. ¶ 6; Orellana Depo. 19:6-12) Significantly, the Ninth Circuit determined that "a suspect who repeatedly refuses to comply with instructions or leave [his] car escalates the risk involved for officers unable to predict what type of noncompliance might come next." *Brooks v. City of Seattle*, 599 F.3d 1018, 1028-29 (9th Cir. 2010). The erratic driving, coupled with Plaintiff's continued attempts to drive his vehicle and refusal to comply with the officers' commands, clearly support the conclusion that the officer's fear for his safety was justified. Accordingly, this factor favors the application of force.

### 3. Attempts to resist and flee

After Garcia approached the car, he told Plaintiff to turn off the vehicle, but Plaintiff refused and said he "wanted[ed] to go home." (DUF 4; Garcia Decl. ¶5) Garcia again directed Plaintiff to turn off, after which Plaintiff "shifted his vehicle into drive and pressed down on the gas pedal." (DUF 5; Garcia Decl. ¶ 6) Orellana observed Plaintiff "refusing to exit the vehicle and … attempting to accelerate, causing the stuck vehicle to spin the rear times, throwing dirt into the air behind the vehicle." (Orellana Depo. 19:6-12)

Garcia instructed Plaintiff: "Stop your vehicle now" and at the same time, grabbed [Plaintiff's] … arm and pulled it out of the driver side window," applying "an arm-bar hold to gain compliance." (DUF 7; Garcia Decl. ¶ 8) Plaintiff "removed his foot from the gas pedal; however, he refused to put the vehicle in park." (DUF 8; Garcia Decl. ¶ 8)

After Bittleston arrived, both officers "kept telling [Plaintiff] to exit the vehicle, but he wouldn't exit." (Orellana Depo. 27:16-18) Plaintiff "continued to actively resist the police officers" and "kept struggling to be freed." (Orellana Depo. 45:8-10) Enns reported Plaintiff "was violently thrashing his whole body around" as the officers attempted to remove Plaintiff from his vehicle. (DUF 16; Enns Decl. ¶4) Likewise, Orellana testified that Plaintiff "kept struggling" and "moving around." (Orellana Depo. 34:19-21) Once Plaintiff was out of the vehicle and on the ground, "Enns noticed that [Plaintiff] had his right hand under his body in his waistband area," and the officers told Plaintiff "several times to put his right hand behind his back," but he refused. (DUF 19-20)

Because Plaintiff not only attempted to leave but also offered physical resistance to the officers' efforts to remove him from his vehicle and place him in handcuffs, he was actively resisting arrest. *See Brooks*, 599 F.3d at 1029 (where the plaintiff "used force to resist the Officers' efforts… and refused to get out of the car when asked," she engaged in "actively resistant" behavior.") Accordingly, this factor favors the application of force by the officers.

### 4. Quantum of force used

Plaintiff argues that "[t]he officers handled the situation unreasonably… and with excessive force." (Doc. 22 at 4) Throughout his opposition to the motion for summary judgment, Plaintiff contends that he was "beaten" by the defendants—without identifying *any* evidence that supports this

assertion. (*See, e.g.,* Doc. 22 at 2, 3, 5) Plaintiff's argument that he was beaten—without admissible evidence in the of affidavits or admissible discovery material—fails to create a dispute of fact. *See Matsuhita,* 475 U.S. at 586 (a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts"); Fed. R. Civ. P. 56(c). Further, Plaintiff fails to address—let alone identify— the specific force used by each of the defendant officers. Nevertheless, the Court has undertaken this task.

### a.      Garcia

First, Garcia grabbed Plaintiff's arm when he instructed Plaintiff to stop the vehicle for the third time and applied "an arm-bar hold to gain compliance." (DUF 7) Garcia and Bittleston attempted to remove Plaintiff from the vehicle, after attempts to unlock the door failed and Plaintiff "wouldn't exit" the car. (Orellana Depo. 27:15-18; *see also* Garcia Decl.¶ 13; Bittleston Decl. ¶4) Garcia assisted with the removal of Plaintiff from the vehicle through the window. (Doc. 19-7 at 3, ¶ 18) He placed the handcuffs on Plaintiff after other officers gained control of Plaintiff's right arm, which Plaintiff had been refusing to put behind his back. (*Id.*, ¶ at 21; DUF 22)

### b.      Bittleston

Bittleston arrived while Garcia was applying the arm-bar hold, and Bittleston "proceeded to grab the back of [Plaintiff's] sweater" in an attempt to remove Plaintiff from the vehicle through the window. (DUF 10, 12) Ultimately, the officers succeeded in removing Plaintiff from the vehicle, and there is no evidence that Bittleston used force upon Plaintiff after the removal.

### c.      Enns

Enns was the fourth officer to arrive on the scene, and he ""assisted Officers Garcia and Bittleston on the driver side window." (DUF 15) Enns redirected Plaintiff's head "to avoid injury as [Plaintiff] was violently thrashing his whole body around." (DUF 16) Once Enns and the other officers had removed Plaintiff from the vehicle through the window, "Enns noticed that [Plaintiff] had his right hand under his body in his waistband area." (DUF 19) When Plaintiff refused the officers' instructions to put his hand behind his back, "Enns used his baton by wedging it between [Plaintiff's] ribcage and forearm" to "pry [Plaintiff's] arm from underneath his body." (DUF 20-21) Both officers Enns and Ott controlled Plaintiff's right arm. (*Id.*)

#### d. Ott

When Ott arrived at the scene, he went to the passenger side door, where he broke the window and gained access to the vehicle to unbuckle Plaintiff's seat belt and turn off the car engine, while the other officers "were already in the process of trying to get [Plaintiff] out of the vehicle." (DUF 13; Orellana Depo. 54:7-10) Once Plaintiff was removed from the vehicle, Ott assisted with gaining control of Plaintiff's right arm for him to be placed in handcuffs. (DUF 21-22)

#### e. Total force used

Defendants contend that, coupled with the *Graham* factors, the total quantum of force used in this action demonstrates the force used was not unreasonable. (Doc. 19-1 at 16-22) In support of this assertion, Defendants rely, in part, upon the decisions issued in *Bohnert v. Mitchell*, 2010 U.S. Dist. Lexis 100324.

In *Bohnert*, the plaintiff "experienced the sudden onset of severe hypoglycemia, causing him to unconsciously operate his motor vehicle the wrong way on a high-speed freeway." *Id.*, 2010 U.S. Dist. Lexis 100324 at*4. The Department of Public Safety communications center "received several calls from drivers reporting the wrong-way vehicle," which "stopped after it likely struck an unknown object." *Id.* at *4-5. When the first officer, Mitchell, arrived, "[the] vehicle was stopped, the driver's window was down, and Plaintiff was sitting behind the steering wheel." *Id.* at *9. The plaintiff "turned off his vehicle's engine and placed the keys on the dashboard," and the officer grabbed the keys. *Id.* Another officer arrived and "looked into Plaintiff's vehicle and confirmed that other than the driver, there was nothing in the vehicle - such as weapons or a passenger - that could pose a threat to the officers." *Id.* The court summarized the interaction between Plaintiff and the officers as follows:

> At about the time he grabbed the keys, Officer Mitchell noticed that Plaintiff's eyes appeared "glassed over" or "glossy." Suspecting Plaintiff "could be" impaired by alcohol or drugs and uncertain what he was about to encounter, Officer Mitchell asked Plaintiff what he was doing. Plaintiff responded, "Trying to stay out of trouble." Officer Mitchell next asked Plaintiff to step out of the vehicle, to which Plaintiff replied, "No." Officer Mitchell then opened the driver's door and ordered Plaintiff to step out of his vehicle. Plaintiff again said, "No." Officer Mitchell then seized Plaintiff's left wrist in an attempt to physically remove Plaintiff from the vehicle. Plaintiff resisted Officer Mitchell's efforts to pull him from the vehicle, repeatedly shouting, "No, no, no!" Based on Plaintiff's refusal to comply with Officer Mitchell's orders to exit the vehicle, Officer Mitchell decided to arrest Plaintiff. Deputy Burke overheard Officer Mitchell's request for Plaintiff to step out of the vehicle, and shortly after that, he heard Officer Mitchell tell Plaintiff that he was under arrest.
> …

When Plaintiff refused to cooperate and exit the vehicle as directed by Officer Mitchell, Deputy Burke reached in the vehicle from the passenger side and used his right arm to grab Plaintiff around the neck while Officer Mitchell pulled on Plaintiff's left wrist. The officers were unsuccessful in removing Plaintiff from the vehicle because Plaintiff grabbed the steering wheel with his right hand and locked his left leg against the kick panel behind the foot pedals. Realizing that even two officers were not going to extricate Plaintiff from his "locked" position, Officer Mitchell removed his Taser from his belt, showed the Taser to Plaintiff and said something about it. In response to Officer Mitchell's commands and display of the Taser, Plaintiff clenched "his hands on the . . . steering wheel, lifted his feet up, spread them apart and stomped them on the floorboard." Officer Mitchell then used the Taser in "drive stun" mode to deliver a shock to Plaintiff's left leg above the knee. Plaintiff screamed in pain and immediately stopped bracing himself with his left leg which allowed the officers to successfully pull Plaintiff out of the driver's side of the vehicle.

One or both of the officers and Plaintiff, face first, fell out of the vehicle onto the asphalt of the high-speed (inside or number one) eastbound lane of the freeway. Plaintiff landed face down and held his arms tightly under his body, resisting the two officers' efforts to handcuff him. According to Officer Mitchell, Plaintiff was screaming and kicking while on the ground and [a]t about this time, Deputy Carr arrived to assist Deputy Burke and Officer Mitchell to place Plaintiff in handcuffs. Officer Mitchell tried to control Plaintiff's legs so he would not get kicked. He used his Taser twice in the drive-stun mode on the back of Plaintiff's right leg in the thigh area which "helped to straighten out his legs." This allowed Officer Mitchell to gain control of Plaintiff's legs by sitting on them.

Using physical force, Deputy Burke unsuccessfully pulled on Plaintiff's left arm to remove it from underneath Plaintiff and Deputy Carr tried to pull Plaintiff's right arm from underneath him without success. Officer Mitchell then used his Taser one last time to Plaintiff's kidney area to overcome Plaintiff's resistance to the Deputies' attempts to handcuff Plaintiff. After tasing Plaintiff the last time, Deputy Burke was able to pull Plaintiff's left arm from underneath him and roll Plaintiff to one side in order for Deputy Carr to place Plaintiff's right arm behind his back, handcuff him, and roll him over onto his back. After being handcuffed, Plaintiff was placed in leg restraints. Plaintiff struggled with the three officers outside of the pickup truck for about four to five minutes before the officers could restrain him with handcuffs and leg restraints.

*Id.*, 2010 U.S. Dist. LEXIS 100324 at *9-18. The court also noted Bohnert did not "inform the officers that he was having a medical emergency or was a diabetic" at any time before he was placed in handcuffs and in physical custody. *Id.*, 2010 U.S. Dist. LEXIS 100324 at *20.

Evaluating the *Graham* factors, the court determined each favor weighed in favor of finding the force used against Bohnert, though significant, was not excessive. *Bohnert*, 2010 U.S. Dist. LEXIS 100324 at *52-58. Specifically, the court explained that through Bohnert's refusal to exit his vehicle and resistance against the officer's efforts showed that "he posed a sufficient threat to the officers and other motorists due his unpredictable agitated state." *Id.* at *54-55. In addition, Bohnert "was 'actively resistant' because he employed force to defeat the officers' attempts to remove him from his vehicle and to control him while on the ground." *Id.* at *56 (quoting *Chew*, 27 F.3d at 1442). The court

concluded the officers' conduct—including the use of a taser—"did not rise to the level of excessive force." *Id.* at *60 (citing *Arpin v. Santa Clara Valley Trans. Agency*, 261 F.3d 912, 921-922 (9th Cir. 2001) ("finding no excessive force when physical force was used to handcuff suspect who had refused to cooperate with an officer's requests for identification and stiffened her arm and attempted to pull free from the officer"); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) ("finding no excessive force when officer used Taser in arresting of an uncooperative suspect for a traffic violation")).

### 3.     Conclusion

As in *Bohnert*, the *Graham* factors weigh in favor of finding the quantum of force used by the officers was not excessive. It is undisputed that none of the officers struck or kicked Plaintiff. The only use of a weapon was by Enns, who wedged his baton between Plaintiff's ribcage and forearm when Plaintiff failed to comply with the repeated orders to move his arm.[4] Collectively, the force used by the officers was less than that used by the officers in *Bohnert*, who not only struck the plaintiff's arm with a baton, but also used a taser three times to remove the plaintiff from his vehicle and to overcome the plaintiff's resistance to being placed in handcuffs. *See id.*, 2010 U.S. Dist. LEXIS 100324 *12-18, 49. Consequently, the Court finds the force used by the officers was not unreasonable. Indeed, Plaintiff conceded at the hearing that the level of force used by the officers was appropriate had it been used against anyone not having a diabetic or medical crisis. Accordingly, Defendants' motion for summary adjudication of Plaintiff's claim for battery is **GRANTED**.

### B.     Constitutional violations pursuant to 42 U.S.C. § 1983

Plaintiff contends Defendants are liable for a violation of 42 U.S.C. § 1983 (Doc. 1 at 11), which "is a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

---

[4] Counsel argued that "common sense" dictates that the Court find that the bruises to the plaintiff's torso must have been made by baton strikes, rather than using the baton to pry the plaintiff's arm from underneath him. The Court does not find that common sense dictates this result. Rather, the evidence and all reasonable inferences from it support how Enns's reported he used the baton.

42 U.S.C. § 1983.  To establish a Section 1983 violation, a plaintiff must show (1) deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must allege a specific injury was suffered, and show causal relationship between the defendant's conduct and the injury suffered.  *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976).  A person deprives another of a right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  In other words, "[s]ome culpable action or in action must be attributable to defendants."  *See Puckett v. Corcoran Prison - CDCR*, 2012 WL 1292573, at *2 (E.D. Cal. Apr. 13, 2012).

Plaintiff alleged: "[T]he defendants acted under color of state law in depriving Wilson of his liberty in violation of due process of law.  Among other things, defendants violated Wilson's rights under the due process clause of the Fourteenth Amendment to the United States Constitution."  (Doc. 1 at 11, ¶ 35)  In addition, Plaintiff asserted the defendants are liable for "battery committed by unlawful arrest" because "defendants had no warrant for the arrest of Wilson or other fact or information that constituted probable cause that plaintiff had ever committed or was about to commit a crime, so as to provide grounds for a lawful arrest."  (*Id.* at 10, ¶ 29)

### 1.     The Fourth and Fourteenth Amendments of the U.S. Constitution

Defendants argue Plaintiff's claim for a violation of the Fourteenth Amendment fails "because it is preempted by the Fourth Amendment, a claim that was not alleged by the Plaintiff in this case." (Doc. 19-1 at 27)  However, Plaintiff also alleges the defendants did not have a warrant for his arrest or probable cause for his arrest (Doc. 1 at 11), which would be a violation of the Fourth Amendment's prohibition of arrests without probable cause or other justification.  Specifically, the Fourth Amendment provides: "The right of the people to be secure in their persons. . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized." *U.S. Constitution, amend. IV.*

### a.     Unlawful arrest

A plaintiff may succeed on a claim for an unlawful arrest where the arrest is made without probable cause, which "exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009) (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)). As a threshold matter, the Court must determine whether Plaintiff was "seized" within the meaning of the Fourth Amendment, and if so, the extent of the seizure. If no seizure occurred, the officers' conduct plainly did not violate his Fourth Amendment right to protection from "unreasonable searches and seizures." *U.S. Const. amend. IV.*

A person is seized when an officer, "by means of physical force or show of authority, terminates or restrains his freedom of movement," *Brendlin v. California*, 551 U.S. 249, 254 (2007), such that "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The Supreme Court explained the "crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

It is undisputed that the conduct of the officers communicated to Plaintiff that he was not free to leave, as he was removed from the vehicle and handcuffed. However, Defendants argue Plaintiff was not taken under arrest, and that the officers executed a lawful investigatory stop. (*See generally* Doc. 19-1 at 24-26) On the other hand, Plaintiff appears to argue the seizure exceeded an investigatory stop, asserting the conduct of Defendants resulted "in the unreasonable seizure of Wilson." (Doc. 22 at 7)

### b. Investigatory stop or arrest

Law enforcement officers may initiate an investigatory stop of a citizen if they have reasonable suspicion that a person is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). The reasonable suspicion standard "'is a less demanding standard than probable cause,' and merely requires 'a minimal level of objective justification.'" *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). To constitute reasonable suspicion,

the officer's belief that "criminal activity is afoot" must be supported by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* at 21, 30; *see also Navarette v. California,* 134 S. Ct. 1683, 1687 (2014) (an officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity").

As the Ninth Circuit explained, "There is . . . no bright line rule for determining when an investigatory stop crosses the line and becomes an arrest." *Allen*, 66 F.3d at 1056 (internal quotations, citation omitted). "The totality of the circumstances determines whether and when an investigatory stop becomes an arrest." *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2013) (citation omitted). In determining whether the "totality of the circumstances" indicate police effectuated an arrest or a detention, courts are to "consider both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996) (internal quotations and citations omitted). Thus, the Court must evaluate "not only how intrusive the stop was, but whether the methods used were reasonable given the specific circumstances." *Id.*

### i. Intrusiveness of the stop

This factor requires the Court to "review the situation from the perspective of the person seized." *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295-96 (9th Cir.1988). "A seizure becomes unlawful when it is 'more intrusive than necessary.'" *Ganwich v. Knapp*, 319 F.3d 1115, 1122 (9th Cir. 2003) (quoting *Florida*, 460 U.S. at 504). Factors the Court may consider to evaluate the intrusiveness of a stop include the length of the stop, whether weapons were drawn, physical restriction of a suspect, the use of handcuffs, the number of police officers present, and whether an individual is transported in any manner during the stop. *See Washington*, 98 F.3d at 1189-90. Significantly, "if the police draw their guns it greatly increases the seriousness of the stop." *Washington*, 98 F.3d at 1188. Likewise, the use of handcuffs "substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982).

As discussed above, Plaintiff did not comply with the orders given and actively resisted the

officers' efforts to remove him from the vehicle. The officers did not draw their firearms, though Enns used a baton to move Plaintiff's arm. Although Plaintiff was placed in handcuffs, there is no evidence he remained handcuffed once he informed the officers that he was diabetic—only twelve minutes after the first officer arrived on the scene. Thus, the facts weigh in favor of finding the investigatory stop was not more intrusive than necessary.

### ii. Justification of the actions

In examining the reasons for the actions taken, the Court must undertake the inquiry "from the perspective of law enforcement," while bearing in mind that "the purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence." *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir.2009) (internal quotation marks, citation omitted). To determine "whether the use of intrusive techniques turns a stop into an arrest," the Court must determine whether the police conduct was reasonable. *Washington*, 98 F.3d at 1189. The Ninth Circuit explained,

> [W]e have only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as 1) the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) the police have information that the suspect is currently armed; 3) the stop closely follows a violent crime; and 4) the police have information that a crime that may involve violence is about to occur.

*Id.* (footnotes, citations omitted). In addition, the Court may "consider the specificity of the information that leads the officers to suspect that the individuals they intend to question are the actual suspects being sought." *Id.*

It is undisputed that Plaintiff was uncooperative and attempted to leave the scene, which endangered the officer standing by the vehicle. Significantly, officers may "take the steps necessary to protect themselves when they have adequate reason to believe …the suspect will pose particular risks to their safety." *Washington*, 98 F.3d at 1186. As a result, "pointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not automatically convert an investigatory stop into an arrest that requires probable cause." *Id.* (citing *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990); *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995)). Accordingly, the Court finds the investigatory stop was not converted into an arrest through the use of force or by placing Plaintiff in handcuffs.

Moreover, in opposing summary judgment, Plaintiff makes no argument that the officers placed

him under arrest or took actions that converted the investigatory stop to an arrest, and presents no evidence to support his claims for an unlawful arrest.[5]  Notably, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  Accordingly, Defendants' motion for summary adjudication of the claims for unlawful arrest and violation of Section 1983, on the grounds of an unlawful seizure, is **GRANTED**. ///

### b.      Excessive Use of Force

The Supreme Court of the United States has determined that the Due Process Clause of the Fourteenth Amendment protects individuals who have not yet been convicted of a crime "from the use of excessive force that amounts to punishment."  *Graham v. Connor*, 490 U.S. 386, 388 (1989). However, allegations of excessive force during the course of an arrest are analyzed under the Fourth Amendment, which prohibits arrests without probable cause or other justification. *Id.* ("claim[s] that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' ... are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard"); *see also Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) ("the use of force to effect an arrest is subject to the Fourth Amendment's prohibition on unreasonable seizures").

As discussed above related to Plaintiff's claim for battery, the officers did not act unreasonably. Accordingly, Defendants' motion for summary adjudication of Plaintiff's claim for a violation of Section 1983, on the grounds of excessive use of force by the officers, is **GRANTED**.

### 2.      Liability of the City

Plaintiff named the City of Bakersfield as a defendant in his complaint, and seemingly raised each cause of action against the City as well as the officers.  (*See* Doc.10-12)  Thus, it appears from the face of the Complaint that Plaintiff seeks to hold the City liable for a violation of his rights under the Fourth and Fourteenth Amendments.

Importantly, as general rule, a local government entity may not be held responsible for the acts of its employees under a *respondeat superior* theory of liability.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Rather, a local government entity may only be held liable if it inflicts the injury

---

[5] Plaintiff asserts he "is suing defendants for unreasonable use of force in violation of [his] rights."  (Doc. 22 at 1)

of which a plaintiff complains.  *Gibson*, 290 F.3d at 1185.  Thus, a government entity may be sued under Section 1983 when a governmental policy or custom is the cause of a deprivation of federal rights.  *Monell*, 436 U.S. at 694.

To establish liability, Plaintiff must establish: (1) he was deprived of a constitutional right; (2) the City had a policy; (3) this policy amounted to deliberate indifference of his constitutional right; and (4) the policy "was the moving force behind the constitutional violation."  *See Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)); *see also Monell*, 436 U.S. at 690-92.  Because Plaintiff has failed to establish that he suffered a violation of his constitutional rights, his claim against the City fails.  *See Gibson*, 290 F.3d at 1185; *Oviatt*, 954 F.2d at 1474.

Moreover, "[t]he issues on summary judgment are framed by the complaint" and "a plaintiff cannot oppose summary judgment based on a new theory of liability."  *Rodriguez v. Countrywide Homes*, 668 F. Supp. 2d 1239, 1246 (E.D. Cal. 2009).  As Defendants argue, Plaintiff failed to allege in his complaint that the City had policy or practice that amounted to deliberate indifference of his rights, and caused him harm.[6] (*See generally* Doc. 1 at 5-12)  Accordingly, he is unable to now state this theory of liability in opposition to summary judgment.  *See Rodriguez*, 668 F. Supp. 2d at 1246; *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-1293 (9th Cir. 2000) (holding that where the plaintiff did not include legal theory in complaint and did not identify the theory at any time prior to summary judgment, she could not raise the theory at the summary judgment stage of the proceedings).  Thus, Defendants' motion for summary adjudication of Plaintiff's claim for a violation of Section 1983 by the City is **GRANTED**.

## C.     False Arrest under California Law

False imprisonment[7] is defined by statute as "the unlawful violation of the personal liberty of another."  Cal. Pen. Code. § 236. The tort is defined similarly and consists of the "nonconsensual,

---

[6] Despite that Plaintiff did not plead a *Monell* claim, at the hearing, his attorney argued at length that the City's unconstitutional policy should be considered when evaluating the officers' conduct; the Court disagrees.  Whether the policy was unlawful, the focus of the inquiry is what the officers did or did not do and not whether the policy dictated, condoned or prohibited the officers' conduct.

[7] Under California law, false arrest is not a separate tort, but a subcategory of false imprisonment. *Watts v. Cty. of Sacramento*, 256 F.3d 886, 891 (9th Cir. 2001) (citation omitted); *see also Collins v. San Francisco*, 50 Cal. App. 3d 671, 673 (1975) ("false arrest is but one way of committing false imprisonment").

intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." *Molko v. Holy Spirit Assoc.*, 46 Cal.3d 1092, 1123 (1988).

Significantly, under California law,

> (b) There shall be no civil liability on the part of, and no cause of action shall arise against, any peace officer or federal criminal investigator or law enforcement officer described in subdivision (a) or (d) of Section 830.8, acting within the scope of his or her authority, for false arrest or false imprisonment arising out of any arrest under any of the following circumstances:
>       (1) The arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful.

Cal. Pen. Code § 847. Thus, a law enforcement officer is protected from liability for false arrest where the officer, acting within the scope of his or her authority, either (1) effects a lawful arrest or (2) has reasonable cause to believe the arrest is lawful. *Galvin v. Hay*, 374 F.3d 739 (9th Cir. 2004).

As discussed above, the officers did not place Plaintiff under arrest, but instead conducted an investigatory stop. Moreover, it appears Plaintiff has abandoned his claim for false arrest, as he focuses solely upon the claim that the officers used excessive force upon him and does not identify any evidence to support the claim for false arrest. (Doc. 22 at 1; *see generally* Doc. 22 at 1-10) Therefore, Defendants' motion for summary adjudication of Plaintiff's false arrest claim is **GRANTED**.

### D. Violation of the California Due Process Clause

Plaintiff alleged as his third cause of action that the "defendants deprived [him] of liberty without due process of law in violation of Article I. Section 7(a) of the California Constitution." (Doc. 1) Defendants assert this claim "must be adjudicated as a matter of law." (Doc. 19-1 at 27-28)

As Defendants observe, "[t]he California Due Process Clause does not create a private right of action for money damages." (Doc. 19-1 at 27, citing, *e.g., Shaw v. County of Santa Cruz*, 170 Cal. App. 4th 229, 265 n. 44 (2008); *Katzberg v. Regents of University of California*, 29 Cal. 4th 300, 326, 329 (2002)). Previously, this Court explained, "It is undisputed that the California Constitution does not provide a direct cause of action for damages for either equal protection or a due process liberty interest violation." *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1115 (E.D. Cal. 2012) (citing *Katzberg*, 29 Cal. 4th at 321; *Richards v. Dep't of Alcoholic Beverage Control*, 139 Cal. App. 4th 304, 317 (2006); *Javor v. Taggart*, 98 Cal. App. 4th 795, 807 (2002). However, a private claim for a violation of the due process clause of the California constitution may survive where a plaintiff seeks declaratory and

injunctive relief in addition to monetary damages. *Sanchez*, 914 F.Supp. 2d at 1116 (citing *Katzberg*, 29 Cal. 4th at 307; *Baxter Healthcare Corp. v. Denton*, 120 Cal. App. 4th 333, 360 (2004)).

Plaintiff seeks only monetary damages in his prayer for relief. (Doc. 1 at 12) Because he does not seek declaratory or injunctive relief, his claim for a violation of the due process clause of the California Constitution fails as a matter of law. *See Sanchez*, 914 F.Supp. 2d at 1115-16. Plaintiff does not dispute this. Therefore, Defendants' motion for summary adjudication of Plaintiff's claim for a violation of the state constitution is **GRANTED**.

## VII.    Conclusion and Order

As discussed above, Defendants carry their burden to demonstrate the absence of a genuine issue of material fact, and Plaintiff fails to identify evidence sufficient to establish required elements of his claims. Accordingly, summary judgment is appropriate. *See Celotex*, 477 U.S. at 323.

Based upon the foregoing, the Court **ORDERS**:

1.    Defendants' motion for summary judgment (Doc. 26) is **GRANTED**;

2.    The remaining motions are terminated as **MOOT**; and

3.    The Clerk of Court is **DIRECTED** to enter judgment in favor of the defendants and close this matter.


IT IS SO ORDERED.

Dated:    **December 6, 2017**            **/s/ Jennifer L. Thurston**
                                                     UNITED STATES MAGISTRATE JUDGE